FILED
U.S. DIST COURT
MIDDLE DIST. OF LA

2005 NOV -2  A 10: 55

SIGN_____
BY DEPUTY CLERK

| | |
|---|---|
| MARVIN C. BREAUD AND VICKI BREAUD | CIVIL ACTION |
| VS. | DOCKET NO. 03-CV 860 |
| WERNER ENTERPRISES, INC. OF NEBRASKA, AND JOHN HOLLAND | SECTION D |
| | MAGISTRATE 1 |
| FILED:_____ | |
| | DEPUTY CLERK |

## MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE EXPERT

## WITNESS TESTIMONY

On May 2, 2003, Plaintiff, Marvin Breaud, was stopped at a red light at the intersection of Choctaw and Plank, Baton Rouge, Louisiana when he was rear ended by the defendant, John Holland driving a 2001 Peterbilt Tractor owned by defendant Werner Enterprises, Inc of Nebraska. (See exhibit 1, Police Report).

Mr. Breaud initially complained of low back pain with burning. The pain then began radiating down the left leg. A Lumbar MRI on September 8, 2003 showed abnormalities. Mr. Breaud underwent a series of epidural steroid injections from October 10, 2003 to October 21, 2003 at the Louisiana Orthopaedic & Spine Institute. He then had nerve root injections at Summit Hospital. A discogram performed by Dr. Landry on February 10, 2004 showed a herniation at L5-S1. On September 10, 2004 Mr. Breaud underwent a posterior lumbar interbody fusion performed by Dr. Awasthi at Memorial Hospital.



Defendants wish to present the testimony of Charles E. Bain, B. Eng., M.D., C.C.F.P. as an expert in injury causation analysis. The gist of Dr. Bain's testimony will be that a low speed rear end collision could not produce the injuries Mr. Breaud complains of. He would testify that he used his expertise in engineering, emergency medicine and biomechanics to form an injury causation analysis.(See page 1 of Dr. Bain's Report attached as Exhibit "A".)

Plaintiffs wish to exclude Dr. Bain's testimony because it is neither relevant nor reliable.

LAW AND ARGUMENT

Under the Federal Rules of Evidence the trial judge must determine whether scientific testimony is relevant and reliable. Rule 702 as amended reads:

Rule 702. Testimony by Experts

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the fact of the case.

Rule 702 was amended as a result of <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). <u>Daubert</u> made trial judges "gatekeepers" to exclude unreliable expert testimony. <u>Daubert</u> set forth a checklist for trial judges to use to judge the reliability of scientific expert testimony. The factors set forth are:

(1)  Whether the experts theory or technique can be or has been tested;

(2)  Whether the theory or technique has been subjected to peer review and publication

(3)  The known or potential rate of error of the theory or technique

(4)  The existence and maintenance of standards controlling the technique's operation;

(5)  Whether the theory or technique has been generally accepted.  Daubert at pages 593 and 594.

## A. Is the expert qualified to testify regarding the matters he intends to address?

At his deposition of June 14, 2005 (Attached as Exhibit"B".)Dr. Bain testified that he holds a Bachelor of Engineering in Nuclear Engineering from the Royal Military College in Kingston, Ontario (deposition, page 10, lines 20 thru 22).  His studies were in the field of nuclear reactor design (deposition page 10, lines 24 and 25; page 11, line 1).  He relies on the first 2 years of his studies for his work in engineering and biomechancis (deposition, page 11, lines 8 thru 16, page 22 lines 16 thru 18).  Dr. Bain attended medical school at Queens University in Kingston, Ontario and did his internship at Scarborough General Hospital.  He is certified, in Canada, in both emergency medicine and family medicine (deposition, page 12 lines 19 and 20).  Dr. Bain is licensed to practice medicine in Texas but is not certified in any specialty field (deposition, page 12 lines 21 thru 25; page 13 lines 1 and 2).  He has attended 2 courses at the Northwestern University Traffic Institute (deposition page 13, lines 11 thru 18).  He does not hold himself out to be an accident reconstructionist (deposition, page 77, lines 23 and 24) and has never qualified as an accident reconstructionist. (deposition, page 78, lines 11 thru 15).  And from his testimony it can reasonably be concluded that he is not a neurologist, neurosurgeon or an orthopaedist.  He began working with Biodynamic Research Corporation in August of 2003 as a consultant.  He never saw or examined Mr. Breaud

Dr. Bain's lack of training and expertise is accident reconstruction, biomechanics, neurology, neurosurgery and orthopaedics prevent him from competently testifying regarding those matters which he intends to address.

**B. Whether the experts theory or technique can be or has been tested**

Dr. Bain's analysis suggested that there was a velocity change of less than five (5) mph. (deposition, page 55, line 2 thru 10). There was insufficient scientific evidence to make this determination. Dr. Bain reviewed photographs of the vehicle and trailer, repair estimate, depositions, medical records and the accident report, **assumed** a 10 foot acceleration by the striking vehicle and concluded a change in velocity of less that five (5) mph in the Breaud vehicle. Dr. Bain's methodology is not sufficiently reliable. Dr. Bain cited no article to support his methodology much less any peer reviewed articles.

**C. Whether the theory or technique has been subjected to peer review and publication**

Dr. Bain's testified that all the articles and papers he relied on in reaching his conclusion were peer reviewed. On further questioning he admitted that this was just an **assumption** on his part. (deposition page 29, lines 24 and 25 ; page 30, lines 1 thru 10). Dr. Bain has published one article, "Analytical Model for Investigating Sideswipe Collision," SAE 2004-01-1185, 2004 Society of Automotive Engineers (SAE) Congress, Detroit, Michigan, March, 2004. Dr. Bain cited no scientific studies or articles that address how you would determine the velocity of a vehicle based on photographs, repair estimates, depositions, medical records and the police report. Dr. Bain cited no articles dealing with Peterbilt Tractors running into the rear of another vehicle with a utility trailer attached. The lack of any scientific study where a Peterbilt tractor strikes a trailer hooked to another vehicle is crucial. There is no scientific test for Dr. Bain to rely on. Dr. Bain **assumed** the speed of

the Peterbilt. He did not conduct any independent tests of his own.

**D.  The known or potential rate of error of the theory or technique.**

Dr. Bain testified that the articles he relied on were not the type of studies that an error rate would be assigned to .(deposition, page 25, lines 4 thru 6; page 27, lines 15 thru 20; page 31, lines 6 thru 13; page 35; lines 9 thru 11; page 37, lines 19 thru 21 and page 38, lines 10 thru 12).  Dr. Bain also testified that the number of subjects used in the studies he relied on were not a statistical representation of the population. (deposition, page 24, lines 3 thru 5; page 27, lines 4 thru 6; page 35, lines 6 thru 8 and page 38, line 7 thru 9) In other words, the sampling was so small as to be meaningless. Dr. Bain did not cite any articles about Peterbilt Tractors striking trailers.

**E.  The existence and maintenance of standards controlling the theory and technique's operation.**

Dr. Bain did not cite a single article or study that validated his method of estimating the change of velocity by using photographs, repair estimates, depositions, medical records and the police report.

**F.  Whether the theory or technique has been generally accepted**

Again, Dr. Bain cited no articles or studies as generally accepted that validated his method of estimating the change of velocity.

**G. Does the testimony assist the trier of fact through the application of scientific, technical or specialized expertise to understand the evidence or to determine the fact at issue?**

The answer is no.  The examination of photographs, repair estimates, depositions, medical reports and the police report falls far short of any scientific method to determine the change of velocity.  And Dr. Bain is not a neurologist, neurosurgeon or orthopaedist and can not provide expert

testimony about low back injuries.

## CONCLUSION

Dr. Bain fails to meet the criteria in <u>Daubert</u> to qualify him as an expert in this case.

Therefore, his testimony should be excluded in this matter.

Respectfully submitted,

MICHAEL HINGLE & ASSOCIATES, LLC
Michael Hingle, T.A. #6943
Austin McElroy, # 07571
Attorney for Plaintiff
600 N. Hwy 190, Suite 202C
Covington, LA 70433
(985) 893-2295

### CERTIFICATE OF SERVICE

I do hereby certify that I have on this ____ day of _____, _____, served a copy of the foregoing pleading on counsel for all parties to this proceeding, by mailing the same by United States Mail, properly addressed, and first class postage prepaid.

RELEASE

**STATE OF LOUISIANA**
**UNIFORM MOTOR VEHICLE TRAFFIC CRASH REPORT**

JUN 0 2 2003

TOTAL NUMBER OF VEHICLES INVOLVED: 02

LAT.
LONG.

DATE OF CRASH: 05 02 2003  TIME (0000): 0820  DISTRICT/ZONE: 1 B 2  TROOP
PAGE # 0.1

IN PARISH OF: East Baton Rouge   PARISH CODE: 1 7 6 7

ON PRIMARY ROADWAY: Choctaw 2400

MILEPOST: 1.8   CITY OR TOWN: Baton Rouge

005347

RECEIVED MAY 0 5 2003 TRAFFIC RECORDS

DISTANCE: 14.0  MILES ☐ NE  FEET ☑ SW   STREET/HIGHWAY: Plank   ☐ AT INTERSECTION  ☑ NOT AT INTERSECTION

CRASH OCCURRED ON: E

**VEHICLE #01**

YEAR: 2001  MAKE: ATRB  MODEL: Trl  # DOORS: 2  # AXLES: 03  # TIRES: 10

VIN: 1XP5D89X105283 40  VEHICLE TOWED: A  REMOVED BY: Dobie

LICENSE PLATE: YEAR Perm  STATE WB  NUMBER 38508  TYPE: Apportioned

TRAILER YEAR 1995 MAKE Wabash TYPE TRL  PLATE Perm STATE WB NUMBER 68794

DRIVER'S NAME: Holland John  DATE OF BIRTH: 07 27 1960

STREET ADDRESS: 6740 Trailer Park   TELEPHONE: (850)626-1970
CITY: Milton  STATE: FL  ZIP: 32570

STATE FLA  DRIVER'S LICENSE NUMBER: H453464602670  INSTRUCTED TO EXCHANGE INFORMATION? ☑ YES ☐ NO

OWNER'S NAME: Werner Enterprise
STREET ADDRESS: P.O. Box 45308  CITY: Omaha  STATE NE ZIP 68145

PROOF OF INSURANCE? ☑ YES

NAME OF AGENCY: Baton Rouge C.A.?  TIME OF NOTIFICATION: 0820  TIME OF ARRIVAL: 0823  TIME ALL LANES OPEN: 1013

INVESTIGATION COMPLETE: ☑ YES ☐ NO   REPORT COMPLETED: 05 02 03

W. Blanford III

## 005347

**VEHICLE #02**

| A. PASSENGER CAR | E. MOTORCYCLE | J. SCHOOL BUS | M. TRUCK WITH TRAILER(S) | PAGE # |
| B. LT. TRUCK (PU , RTC.) | F. PEDALCYCLE | J. OTHER BUS | N. FARM EQUIPMENT | |
| C. VAN | G. OFF-ROAD VEHICLE | K. MOTOR HOME | O. OTHER | } 4 |
| D. A, B, OR C WITH TRAILER | H. EMERGENCY VEHICLE | L. SINGLE UNIT TRUCK | | 02 |

YEAR `1996` MAKE `Dodge` MODEL `9000` # DOORS `2` # AXLES `02` # TIRES `04`

V.I.N. `3 B 7 k l 2 3 C 8 T m 1 1 5 1 8 7` VEHICLE TOWED `A` A. YES B. NO C. LEFT AT SCENE REMOVED BY `owner`

LICENSE PLATE YEAR `2005` STATE `LA` NUMBER `B352109` TYPE `Private` REASON TOWED `A`
A. VEHICLE DAMAGE
B. DRIVER ARRESTED
C. INSURANCE VIOLATION
D. OTHER

TRAILER DESCRIPTION YEAR `1986` MAKE `Amc` TYPE `TRL` LICENSE PLATE YEAR `Aer` STATE `LA` NUMBER `E29257 4`

DRIVER'S NAME (LAST,FIRST,MI) `Breaud Martin C` DATE OF BIRTH `09 05 1962`

STREET ADDRESS `8687 Corlett Dr` TELEPHONE `(620) 382-5324`

| EJEC- TION | TRAP- PED OR EXTRI- CATED | AIR BAG | | FIRE | PASS | INJURY |
| --- | --- | --- | --- | --- | --- | --- |
| A | A | A B | D | m W | 4 b | E |

CITY `DL` STATE `La` ZIP `70811`

TRANSPORTED TO MEDICAL FACILITY
A. YES C. UNKNOWN
B. NO D. REFUSED AID `D`

STATE `LA` CLASS `E` ENDORSEMENTS DRIVER'S LICENSE NUMBER `4629690` INSTRUCTED TO EXCHANGE INFORMATION YES NO NAME OF FACILITY

OWNER'S NAME (LAST,FIRST,MI OR COMPANY NAME) `GM Gonzales`

SAME AS DRIVER? YES `X` NO

SR-10 FURNISHED? YES NO `X`

STREET ADDRESS `666 Chippewa`

PROOF OF INSURANCE? `X` YES NO

CITY `DL` STATE `La` ZIP `70805`

NOTICE OF VIOLATION ISSUED? YES NO `X`

OCCUPANT'S NAME (LAST,FIRST,MI)

STREET ADDRESS

TRANSPORTED TO MEDICAL FACILITY
A. YES C. UNKNOWN
B. NO D. REFUSED AID
NAME OF FACILITY

CITY STATE ZIP

| SEATING POSITION | EJECTION | TRAPPED OR EXTRICATED | AIRBAG | OCCUPANT PROTECTION SYSTEM USED | INJURY |
| --- | --- | --- | --- | --- | --- |
| A - FRONT SEAT-LEFT SIDE (MOTORCYCLE DRIVER) J - SLEEPER SECTION OF CAB (TRUCK) | A - NOT EJECTED | A - NOT TRAPPED | A - DEPLOYED | A - NONE USED-VEHICLE OCCUPANT | A - FATAL |
| B - FRONT SEAT-MIDDLE K - PASSENGER IN OTHER ENCLOSED | B - TOTALLY EJECTED | B - TRAPPED/EXTRI-CATED | B - NOT DEPLOYED | B - SHOULDER BELT ONLY USED | B - INCAPACITATING/SEVERE |
| C - FRONT SEAT-RIGHT SIDE PASSENGER OR CARGO AREA (NON-TRAILING UNIT) | C - PARTIALLY EJECTED | C - TRAPPED/NOT EXTRICATED | C-NOT DEPLOYED /SWITCH OFF | C - LAP BELT ONLY USED | C - NON-INCAPACITATING /MINOR INJ. |
| D - SECOND SEAT-LEFT SIDE L - PASSENGER IN OTHER UNENCLOSED (MOTORCYCLE PASSENGER) PASSENGER OR CARGO AREA (NON- | D - UNKNOWN | D - UNKNOWN | D - SHOULDER AND LAP BELT USED | D - POSSIBLE/ |
| E - SECOND SEAT-MIDDLE TRAILING UNIT) | | | E - UNKNOWN | E - CHILD SAFETY SEAT IMPROPERLY USED | COMPLAINT |
| F - SECOND SEAT-RIGHT SIDE M - PASSENGER ON TRAIN OR STREET CAR | | | | F - CHILD SAFETY SEAT USED | E - NO INJURY |
| G - THIRD ROW-LEFT SIDE N - TRAILING UNIT (MOTORCYCLE PASSENGER) | | | | G - HELMETS USED | |
| H - THIRD ROW-MIDDLE O - RIDING ON VEHICLE EXTERIOR (NON- | | | | H - RESTRAINT USE UNKNOWN | |
| I - THIRD ROW-RIGHT SIDE TRAILING UNIT) P - UNKNOWN | | | | | |

| | EJEC-TION | TRAP-PED OR EXTRI-CATED | AIR BAG | | FIRE | RACE | VIOL | INJURY |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |

| INSURANCE VEHICLE # 1 | | INSURANCE VEHICLE # 2 | |
| --- | --- | --- | --- |
| INSURANCE CO. NAME (NOT AGENCY NAME) `Evickson Companies` | EFFECTIVE DATE `8-1-02` | INSURANCE CO. NAME (NOT AGENCY NAME) `Great America Co` | EFFECTIVE DATE `5-3-02` |
| POLICY NUMBER `4698-6/28` | EXPIRATION DATE `8-1-03` | POLICY NUMBER `TBA` | EXPIRATION DATE `5-36-03` |
| AGENT'S NAME `Erickson Companies` | PHONE # `1816 960-9000` | AGENT'S NAME `William Fns` | PHONE # `( )` |
| AGENT'S ADDRESS `6144 W 67th St` | | AGENT'S ADDRESS `PO Box 34613` | |
| `Kansas City mo 64112` | | `Lafayette La 70502` | |

| | TIME CALLED | ARRIVED SCENE | DEPARTED SCENE | ARRIVED HOSPITAL | | TIME CALLED | ARRIVED SCENE |
| --- | --- | --- | --- | --- | --- | --- | --- |
| EMERGENCY SERVICES AMBULANCE | | | | | RESCUE UNIT | | |

AMBULANCE SERVICE

FIRE DEPARTMENT

USER RECORDS
RELEASE

STATE OF LOUISIANA
UNIFORM MOTOR VEHICLE TRAFFIC CRASH REPORT
CONTRIBUTING FACTORS AND CONDITIONS

COMPUTER NUMBER     PAGE #

22557d89 - 03

534

WRITE APPROPRIATE LETTER IN BLOCK

## ROAD SURFACE
(ONE PER COLUMN)   **A**

A. DRY
B. WET
C. SNOW/SLUSH
D. ICE
E. CONTAMINANT (SAND, MUD, DIRT, OIL, ECT.)
F. UNKNOWN
G. OTHER

A. CONCRETE
B. BLACK TOP
C. BRICK
D. GRAVEL
E. DIRT
F. UNKNOWN
G. OTHER

## TYPE OF ROADWAY   **A**

A. ONE-WAY ROAD
B. TWO-WAY ROAD WITH NO PHYSICAL SEPARATION
C. TWO-WAY ROAD WITH A PHYSICAL SEPARATION
D. TWO-WAY ROAD WITH A PHYSICAL BARRIER
E. UNKNOWN
F. OTHER

## ROADWAY CONDITIONS   **A**

A. NO DEFECTS
B. DEFECTIVE SHOULDERS
C. HOLES
D. DEEP RUTS
E. BUMPS
F. LOOSE SURFACE MATERIAL
G. CONSTRUCTION, REPAIR
H. OVERHEAD CLEARANCE LIMITED
I. CONSTRUCTION - NO WARNING
J. PREVIOUS CRASH
K. FLOODING
L. ANIMAL IN ROADWAY
M. OBJECT IN ROADWAY
N. OTHER DEFECTS

## WEATHER   **A**

A. CLEAR
B. CLOUDY
C. RAIN
D. FOG/SMOKE
E. SLEET/HAIL
F. SNOW
G. SEVERE CROSSWIND
H. BLOWING SAND, SOIL, DIRT, SNOW
I. UNKNOWN
J. OTHER

## LIGHTING   **A**

A. DAYLIGHT
B. DARK - NO STREET LIGHTS
C. DARK - CONTINUOUS STREET LIGHT
D. DARK - STREET LIGHT AT INTERSECTION ONLY
E. DUSK
F. DAWN
G. UNKNOWN

## VIOLATION   **D U**

A. EXCEEDING STATED SPEED LIMIT
B. EXCEEDING SAFE SPEED LIMIT
C. FAILURE TO YIELD
D. FOLLOWING TOO CLOSELY
E. DRIVING LEFT OF CENTER
F. CUTTING IN, IMPROPER PASSING
G. FAILURE TO SIGNAL
H. MADE WIDE RIGHT TURN
I. CUT CORNER ON LEFT TURN
J. TURNED FROM WRONG LANE
K. OTHER IMPROPER TURNING
L. DISREGARDED TRAFFIC CONTROL
M. IMPROPER STARTING
N. IMPROPER PARKING
O. FAILED TO GET OUT OF ROADWAY
P. FAILED TO DIM HEADLIGHTS
Q. VEHICLE CONDITION
R. DRIVER CONDITION
S. CARELESS OPERATION
T. UNKNOWN VIOLATIONS
U. NO VIOLATIONS
V. OTHER

## KIND OF LOCATION   **C**

A. MANUFACTURING OR INDUSTRIAL
B. BUSINESS CONTINUOUS
C. BUSINESS, MIXED RESIDENTIAL
D. RESIDENTIAL DISTRICT
E. RESIDENTIAL SCATTERED
F. SCHOOL OR PLAYGROUND
G. OPEN COUNTRY
H. OTHER

## REASON FOR MOVEMENT   **L P**

A. TO AVOID OTHER VEHICLE
B. TO AVOID PEDESTRIAN
C. TO AVOID ANIMAL
D. TO AVOID OTHER OBJECT
E. PARKING
F. VEHICLE OUT OF CONTROL, NOT PASSING
G. VEHICLE OUT OF CONTROL, PASSING
H. FOR TRAFFIC CONTROL
I. DUE TO CONGESTION
J. DUE TO PRIOR CRASH (COLLISION)
K. DUE TO DRIVER CONDITION
L. DUE TO VEHICLE CONDITION
M. HIGH WIND
N. NORMAL MOVEMENT
O. UNKNOWN
P. OTHER

## PRIMARY FACTOR   **B**

## SECONDARY FACTOR   **D**

A. VIOLATIONS
B. MOVEMENT PRIOR TO CRASH
C. VISION OBSCUREMENTS
D. CONDITION OF DRIVER
E. VEHICLE CONDITIONS
F. ROAD SURFACE
G. ROADWAY CONDITION
H. LIGHTING
I. WEATHER
J. TRAFFIC CONTROL
K. KIND OF LOCATION
L. CONDITION OF PEDESTRIAN
M. PEDESTRIAN ACTIONS

## ACCESS CONTROL   **A**

A. NO CONTROL (UNLIMITED ACCESS TO ROADWAY)
B. PARTIAL CONTROL (LIMITED ACCESS TO ROADWAY)
C. FULL CONTROL (ONLY RAMP ENTRANCE & EXIT)
D. UNKNOWN
E. OTHER

RECEIVED
MAY

TRAFFIC RECORDS

## VISION OBSCUREMENTS   **D D**

A. RAIN, SNOW, ETC. ON WINDSHIELD
B. WINDSHIELD OTHERWISE OBSCURED
C. VISION OBSCURED BY LOAD
D. TREES, BUSHES, ETC.
E. BUILDING
F. EMBANKMENT
G. SIGNBOARDS
H. HILLCREST
I. PARKED VEHICLES
J. MOVING VEHICLES
K. BLINDED BY HEADLIGHTS
L. BLINDED BY SUNGLARE
M. DISTRACTED BY NEON LIGHT SIGN / READ ON WAY
N. NO OBSCUREMENTS
O. NO OBSCUREMENTS
R. OTHER

## CONDITION OF DRIVER   **B A**

A. NORMAL
B. INATTENTIVE OR DISTRACTED
C. PHYSICAL IMPAIRMENT (EYES, EAR, LIMB)
D. ILLNESS
E. FATIGUED
F. APPARENTLY ASLEEP/BLACKOUT
G. HAD BEEN DRINKING IMPAIRED
H. HAD BEEN DRINKING - NOT IMPAIRED
I. DRUG USE - IMPAIRED
J. DRUG USE - NOT IMPAIRED
K. UNKNOWN
L. OTHER

## HARMFUL EVENTS

A. OVERTURNED
B. FIRE/EXPLOSION
C. IMMERSION
D. JACKKNIFE
E. OTHER NONCOLLISION
F. PEDESTRIAN
G. PEDALCYCLE
H. RAILWAY TRAIN
I. ANIMAL
J. MOTOR VEHICLE IN TRANSPORT
K. MOTOR VEHICLE IN TRANSPORT IN OTHER ROADWAY
L. PARKED MOTOR VEHICLE
M. OTHER OBJECT (NOT FIXED)
N. IMPACT ATTENUATOR
O. BRIDGE PIER OR ABUTMENT
P. BRIDGE RAIL
Q. GUARDRAIL FACE
S. GUARDRAIL END
T. MEDIAN BARRIER
U. HIGHWAY TRAFFIC SIGN POST
V. OVERHEAD SIGN SUPPORT
W. LUMINAIRE/LIGHT SUPPORT
X. UTILITY POLE
Y. OTHER POLE
Z. CULVERT
AA. CURB
BB. EMBANKMENT
CC. WALL BOX
DD. DITCH
EE. FENCE
FF. TREE
GG. UNKNOWN
HH. OTHER FIXED OBJECT

| | VEN 1 | VEN 2 |
|---|---|---|
| FIRST HARMFUL EVENT | | |
| MOST HARMFUL EVENT | | |

## VEHICLE LIGHTING   **D D**

A. HEADLIGHTS ON
B. HEADLIGHTS OFF
C. DAYTIME RUNNING LIGHTS
D. UNKNOWN

## RELATION TO ROADWAY   **A**

A. ON ROADWAY
B. SHOULDER
C. MEDIAN
D. BEYOND SHOULDER - LEFT
E. BEYOND SHOULDER - RIGHT
F. OFF ROADWAY
G. GORE
H. UNKNOWN
I. OTHER

## ALIGNMENT   **A**

A. STRAIGHT-LEVEL
B. STRAIGHT LEVEL ELEVATED
C. CURVE-LEVEL
D. CURVE-LEVEL ELEVATED
E. ON GRADE-STRAIGHT
F. ON GRADE-CURVE
G. HILLCREST-STRAIGHT
H. HILLCREST-CURVE
I. DIP, HUMP-STRAIGHT
J. DIP, HUMP-CURVE
K. UNKNOWN
L. OTHER

## MOVEMENT PRIOR TO CRASH   **A A**

A. STOPPED
B. PROCEEDING STRAIGHT AHEAD
C. TRAVELING WRONG WAY
D. BACKING
E. CROSSED MEDIAN INTO OPPOSING LANE
F. CROSSED CENTER LINE INTO OPPOSING LANE
G. RAN OFF ROAD OUT WHILE MAKING TURN AT INTERSECTION
H. CHANGING LANES ON MULTI-LANE ROAD
I. MAKING LEFT TURN
J. MAKING RIGHT TURN
K. STOPPED PREPARING TO, OR MAKING U-TURN
L. MAKING TURN, DIRECTION UNKNOWN
M. STOPPED, PREPARING TO TURN LEFT
N. STOPPED PREPARING TO TURN RIGHT
O. SLOWING TO MAKE LEFT TURN
P. SLOWING TO MAKE RIGHT TURN
Q. SLOWING TO STOP
R. PROPERLY PARKED
S. PARKING MANEUVER
T. ENTERING TRAFFIC FROM SHOULDER
U. ENTERING TRAFFIC FROM MEDIAN
V. ENTERING TRAFFIC FROM PARKING LANE
W. ENTERING TRAFFIC FROM PRIVATE LANE
X. ENTERING FREEWAY FROM ON RAMP
Y. LEAVING FREEWAY VIA OFF RAMP
Z. OTHER OR UNKNOWN

## VEHICLE CONDITION   **K K**

A. DEFECTIVE BRAKES
B. DEFECTIVE HEADLIGHTS
C. DEFECTIVE REAR LIGHTS
D. DEFECTIVE SIGNAL LIGHTS
E. ALL LIGHTS OUT
F. DEFECTIVE STEERING
G. TIRE FAILURE
H. WORN OR SMOOTH TIRES
I. ENGINE FAILURE
J. DEFECTIVE SUSPENSION
K. NO DEFECTS OBSERVED
L. UNKNOWN DEFECTS
M. OTHER

## TRAFFIC CONTROL CONDITIONS   **A A**

A. CONTROLS FUNCTIONING
B. CONTROLS NOT FUNCTIONING
C. CONTROLS OBSCURED
D. CONTROLS UNCLEAR OR DEFECTIVE
E. NO CONTROLS
F. CONDITION UNKNOWN

## TRAFFIC CONTROL   **C C**

A. STOP SIGN
B. YIELD SIGN
C. RED SIGNAL ON
D. YELLOW SIGNAL ON
E. GREEN SIGNAL ON
F. GREEN TURN ARROW ON
G. RIGHT TURN ON RED
H. LIGHT PHASE UNKNOWN
I. FLASHING YELLOW
J. FLASHING RED
K. OFFICER, WATCHMAN
L. RR CROSSING, SIGN
M. RR CROSSING, SIGNAL
N. RR CROSSING, NO CONTROL
O. WARNING SIGN (SCHOOL, ETC.)
P. SCHOOL FLASHING SPEED SIGN
Q. YELLOW NO PASSING LINE
R. WHITE DASHED LINE
S. YELLOW DASHED LINE
T. BIKE LANE
U. CROSSWALK
V. NO CONTROL
W. UNKNOWN
X. OTHER

## ALCOHOL/DRUG INVOLVEMENT

| | #1 | #2 |
|---|---|---|
| | A | A |

ALCOHOL/DRUGS PRESENT
A. NEITHER ALCOHOL OR DRUGS PRESENT
B. YES (ALCOHOL PRESENT)
C. YES (DRUGS PRESENT)
D. YES (ALCOHOL AND DRUGS PRESENT)
E. NOT REPORTED
F. UNKNOWN

ALCOHOL
A. TEST REFUSED
B. NO TEST GIVEN
C. TEST GIVEN, RESULTS PENDING
D. TEST GIVEN, BAC
E. UNKNOWN

DRUGS
A. TEST NOT GIVEN
B. TEST GIVEN, RESULTS PENDING
C. DRUGS REPORTED (SPECIFY)
D. UNKNOWN

SUSPECTED DRUGS

DPSSP 3105

INVESTIGATING OFFICER'S INITIALS

S347

**OFFICER'S NARRATIVE:** DESCRIBE ANY UNUSUAL CIRCUMSTANCES ASSOCIATED WITH CRASH, INCLUDING OFF... .'S OBSERVATIONS AND OPINIONS.
INCLUDE WITNESS NAMES, ADDRESSES, PHONE NUMBERS, ETC.
IF NECESSARY, INDICATE DAMAGE TO PRIVATE PROPERTY (WITH OWNER'S NAME & ADDRESS) AT THE END OF THE NARRATIVE
**REFER TO EACH BY VEHICLE NUMBER**

PAGE #
0 4

Driver #1 Stated he was East bound on the red light at Plank
behind veh #2 and forgot veh #2 was pulling a (utility) trailer
Driver #1 hit the trailer when he pulled up behind veh #2.

Driver #2 Stated he was Stopped on Choctaw East bound in the middle
lane. When he pulled up to the white line veh #1 hit him in the
rear knocking his trailer loose from the hitch.

| NON-COLLISION WITH MOTOR VEHICLE | REAR END | HEAD-ON | RIGHT ANGLE | LEFT TURN | LEFT TURN | LEFT TURN | RIGHT TURN | RIGHT TURN | SIDESWIPE SAME | SIDESWIPE OPPOSITE | OTHER | MANNER OF COLLISION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H | I | J | K | L | B |

Not to Scale
Officer P.O.L.
15' West S. pv. of Choctaw +
14' W. of W. pv. of Plank

04

Plank

Choctaw

| VEH | HEADED | DIRECTION BEFORE CRASH ON STREET, HIGHWAY OR DRIVE | FINAL LOCATION OF VEHICLES | DISTANCE TRAVELED AFTER IMPACT | SPEED EST. | POSTED | SKIDMARK DATA (FEET) FR. | FL. | RR. | RL. |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | E / N E S W | Choctaw | Scene | unk | 0 0 4 0 | 4 0 | 0 | 0 | 0 | e |
| 2 | E / N E S W | Choctaw | Scene | unk | 0 0 4 0 | 4 0 | 0 | 0 | 0 | e |

| DAMAGE TO VEHICLE 1 | | DAMAGE TO VEHICLE 2 | |
|---|---|---|---|
| AREA DAMAGED | EXTENT OF DEFORMITY | AREA DAMAGED | EXTENT OF DEFORMITY |
| | A- NONE<br>B- VERY MINOR<br>C- MINOR<br>D- MINOR/MODERATE<br>E- MODERATE<br>F- MODERATE/SEVERE<br>G- SEVERE<br>H- VERY SEVERE<br>I- UNKNOWN | | A- NONE<br>B- VERY MINOR<br>C- MINOR<br>D- MINOR/MODERATE<br>E- MODERATE<br>F- MODERATE/SEVERE<br>G- SEVERE<br>H- VERY SEVERE<br>I- UNKNOWN |

CITATION NO
R.S. OR ORD. NO

To WMH
From CF
8 Pages

# Report by
# Dr. C. E. Bain
# Biomechanics Expert

# BRC
BIODYNAMIC RESEARCH CORPORATION

22 February 2005

Ms. Sherri Young
Casteel & Associates, L. L. C.
138 McGehee Drive
Baton Rouge, LA 70815

Re:            *Breaud, Marvin vs. Warner Enterprises of Nebraska*
Your Ref #:     *5200-38*

Dear Ms. Young:

I am pleased to submit this report rendering my opinions regarding the above referenced matter.
Included in this document is a summary of findings pertinent to the formulation of my opinions
concerning Mr. Marvin Breaud's injuries, reported to have resulted from a motor vehicle
collision.

My professional background is documented in the attached copy of my curriculum vitae. My
time is billed by BRC at $225 per hour, and a copy of my testifying history is attached. I have
utilized my expertise in engineering, emergency medicine, and biomechanics to perform an
injury causation analysis in order to reach my conclusions.

During the course of my study of this matter, I have had access to the following items:

·      State of Louisiana Uniform Motor Vehicle Traffic Crash Report;

·      Color photocopies of photographs of 2003 Trailer, 14' long;

·      Black and white photocopies of photographs of:

        1996 Dodge
        2003 Trailer, 14' long;

·      Repair estimate for 2003 Trailer, 14' long;

·      Marvin Breaud's Answers to Interrogatories;

Ms. Sherri Young
21 February 2005
Page 2


·    Depositions of:

          John Holland
          Marvin Breaud
          Steven Ragusa, M.D.
          Deepak Awasthi, M.D.;

·    Medical records of Marvin Breaud from:

          Baton Rouge Radiology Group
          Dr. V. Bibb Saye
          Dr. Adolph Cronan
          Our Lady of The Lake Regional Medical Center
          Orthopaedic Surgery Associates of Baton Rouge
          The Bone and Joint Clinic
          Baton Rouge Physical Therapy
          Internal Medicine and Pediatric Clinic
          The Baton Rouge Clinic
          Lane Memorial Hospital
          The Neuromedical Center
          Baton Rouge General Medical Center
          Baker Physical Therapy Clinic
          Family Chiropractic Center
          Louisiana Orthopaedic and Spine Institute
          Baton Rouge Imaging/Open MRI
          Summit Hospital
          Greater New Orleans Surgery Center
          Memorial Medical Center
          LSU Healthcare Network
          Dr. Cornelius Gorman; and

·    Independent Medical Evaluation from Dr. Joe Morgan.

I have arrived at the following observations and preliminary opinions:

·    On 2 May 2003, Mr. Marvin Breaud, age 40, was the reportedly restrained driver of a
     1996 Dodge Ram 2500 4x2 Turbo Diesel Extended Cab pick-up that was pulling a utility
     trailer. The utility trailer was struck in the rear by a 2001 Peterbilt 379 6X4 tractor truck
     that was pulling an unloaded trailer. Both vehicles were stopped at a red light and when
     the light turned green, the Dodge moved forward a distance and then stopped. The
     Peterbilt moved forward and struck the rear of the utility trailer. The impact caused the
     neck of the utility trailer to bend and disconnect from the Dodge. Mr. Breaud assisted
     three other men in loading the damaged trailer onto a replacement trailer.

Ms. Sherri Young
21 February 2005
Page 3

- Mr. Breaud's medical history included visits to numerous health care providers for multiple medical problems. Between 1995 and 2003, Mr. Breaud had many health care visits for left and right knee complaints.

- On 3 May 1994, 12 June 1995, and 22 June 1995, Mr. Breaud saw his primary care physician for low back pain.

- On 17 July 2001, Mr. Breaud was seen at Lane Memorial Hospital where his wife reported that Mr. Breaud was taking two Percocet tablets every four hours and that he and his wife "were used to it".

- On 2 May 2003, Mr. Breaud was seen at Lane Memorial Hospital for low back pain approximately 13 hours after the subject event. The treating physician recorded "This complaint has been going on for days". An x-ray study of Mr. Breaud's lumbar spine was normal. Mr. Breaud's discharge diagnosis was lumbar strain.

- On 7 May 2003, Mr. Breaud saw Dr. K. Schwaab for low back pain. Dr. Schwaab reported that Mr. Breaud's pain was slowly improving and diagnosed Mr. Breaud with a lumbar strain S/P (status post) MVA (motor vehicle accident).

- On 24 June 2003, more than seven weeks after the subject event, Mr. Breaud saw Dr. R. Roth, a chiropractor, for back complaints. Dr. Roth diagnosed Mr. Breaud with a lumbar sprain/strain and treated Mr. Breaud on 18 occasions between 25 June 2003 and 22 August 2003.

- On 8 July 2003, Mr. Breaud saw Dr. F. A. Johnston, an orthopedic surgeon, for low back pain. Dr. Johnston's diagnosis was "low back strain with early spondylosis in his lumbar spine".

- Between 28 July 2003 and 12 January 2004, Mr. Breaud underwent approximately 36 physical therapy treatment sessions. At the time of his discharge he had shown "considerable improvement".

- On 11 August 2003 and 26 August 2003, Mr. Breaud saw Dr. Johnston for low back pain.

- On 2 September 2003, an MRI study of Mr. Breaud's lumbar spine showed L5-S1 disc desiccation. At this level there was diffuse bulging of the annulus with resultant bilateral neural foraminal stenosis.

- On 9 September 2003 and 30 September 2003, Mr. Breaud saw Dr. Johnston for low back pain that waxed and waned. Dr. Johnston's diagnosis was "lumbar strain with degenerative disc disease (DDD) at L5-S1".

Ms. Sherri Young
21 February 2005
Page 4

- On 30 October 2003, Dr. M. Shamsnia performed NCV (nerve conduction velocity)/EMG (electromyography) studies on Mr. Breaud's lower extremities. Dr. Shamsnia interpreted these studies as showing 1) Bilateral perineal and posterior tibial neuropathy 2) Left S1 radiculopathy.

- On that same day Mr. Breaud underwent a lumbar epidural steroid injection (ESI) by Dr. Johnston.

- On 5 November 2003, Dr. Johnston reported that Mr. Breaud's second ESI gave him relief for three days.

- On 13 December 2003, Dr. Johnston performed a selective S1 nerve root ESI. Dr. Johnston's diagnoses were 1) Left S1 radiculopathy 2) Left-sided L5-S1 herniated disc.

- On 6 January 2004, Mr. Breaud saw Dr. Johnston for increased low back pain and Dr. Johnston referred Mr. Breaud to another orthopedic surgeon.

- On 15 January 2003, Mr. Breaud saw Dr. J. Isaza, an orthopedic surgeon, for low back pain that was radiating into his left leg. Dr. Isaza documented a normal physical examination and diagnosed Mr. Breaud with DDD at L5-S1 and SI (sacroiliacal) dysfunction.

- On 10 February 2004, Mr. Breaud saw Dr. B. Landry, a radiologist, who performed a discogram on Mr. Breaud. Dr. Landry stated that there was positive pain reproduction and a disc herniation at L5-S1 while using the L4-5 level as a control.

- On 17 February 2004, Mr. Breaud saw Dr. Isaza for increasing low back pain. Dr. Isaza's diagnoses were L5-S1 discogenic pain and lumbar radiculopathy.

- On 13 March 2004, Mr. Breaud was seen at Summit Hospital for low back pain. Mr. Breaud was treated with a Demerol injection.

- On 16 March 2004, Mr. Breaud saw Dr. Isaza for severe low back pain. Dr. Isaza recommended surgery for Mr. Breaud.

- On 5 April 2004, Mr. Breaud saw Dr. J. Morgan, an orthopedic surgeon, for an independent medical examination.

- On 13 April 2004, Mr. Breaud saw Dr. Isaza who stated that Mr. Breaud was awaiting approval for his planned surgery. There are no further medical records from Dr. Isaza available for review at this time.

- On 17 July 2004, Mr. Breaud was seen at Lane Memorial Hospital for back pain. His medications at that time included Endocet, Methadone, Promethazine, and Aceon. Mr.

Ms. Sherri Young
21 February 2005
Page 5

· Breaud left prior to seeing a physician and signed an AMA (against medical advice) form.

· On 10 September 2004, Mr. Breaud was admitted to Memorial Medical Center for low back pain. Dr. D. Awasthi, a neurosurgeon, performed on Mr. Breaud an L5-S1 posterior lumbar interbody fusion with posterolateral decompression and arthrodesis at that level. Dr. Awasthi's pre- and post-operative diagnoses were "Lumbar DDD of L5-S1".

· On 17 October 2004, Mr. Breaud saw Dr. Awasthi for a post-operative follow-up visit.

· On 17 November 2004, Mr. Breaud saw Dr. C. Gorman, a rehabilitation consultant.

· There are no further medical records available for review at this time.

· Color images of the Dodge did not show any evidence of damage. There was no repair estimate for the Dodge available for review at this time. Color images of a red utility trailer showed that the neck had been displaced upward almost 90°. A repair estimate for the trailer stated the need to replace the tongue, coupler, and wiring harness.

· There were neither color images nor a repair estimate for the Peterbilt available for review at this time. It was reported that the Peterbilt was undamaged.

· If the Peterbilt had accelerated over a distance of 10 feet at 0.075 g, it would have achieved a speed of approximately 4.7 mph. It is likely that the Peterbilt would have shifted at least once during this almost three second interval.

· If the Peterbilt struck the Dodge at 4.7 mph, then utilizing the principle of conservation of momentum, the impact-related change in velocity (delta V) of the Dodge would have been approximately 3.8 mph. This assumed that the utility trailer did not absorb any energy which is incorrect given the deformation to the neck of the trailer.

· It was likely that the delta V of the Dodge was considerably less than 3.8 mph.

· If Mr. Breaud was subject to a delta V as high as 3.8 mph, he would have experienced impact-related motion during the collision that would have initially consisted of his torso moving into the forward-moving seatback structure. His head may have contacted the headrest.[1] There would have been some extension of his neck, followed by mild forward flexion during a subsequent rebound phase.[2] Mr. Breaud's foot may have come off the brake pedal.[3]

· Mr. Breaud was involved in a low speed rear-end impact that resulted in him being subjected to minimal forces.[4] The majority of volunteer test subjects exposed to this magnitude of impact developed no symptoms. A minority of test subjects experienced neck discomfort that resolved in one to two weeks.[5]

Ms. Sherri Young
21 February 2005
Page 6

- There would have been little differential movement between Mr. Breaud's thorax and lumbar spine and therefore no mechanism for injury to his lower back.[6] While a mild reflexive muscle strain to his lower back was possible secondary to a startle response, symptoms would have resolved within several days.

- DDD findings of disc herniations and protrusions are the result of a slow degenerative process that usually starts in the third decade of life,[7] and a significant number of asymptomatic people will have these findings.[8] Lumbar disc protrusions and herniations[9] are not the result of a one-time loading event unless bone disruption occurs. Mr. Breaud experienced neither significant lumbar spine loading nor bone disruption during the subject event.

- In summary, Mr. Breaud was involved in a low speed rear-end impact that subjected him to minimal forces that had no serious or long-term injury potential. Any muscular low back pain would have onset within hours and would have resolved within several days. Any other diagnoses, and investigations and treatments, are not the result of the subject event.

As additional information is made available to me, or as new facts are uncovered during the investigation and discovery process, my professional opinions may change to reflect the newfound information. The opinions expressed herein, to a reasonable medical and engineering certainty, reflect my conclusions based upon the information reviewed and the analysis performed as of this date.

Should you require additional information, please do not hesitate to contact me.

Sincerely,

Charles E. Bain, B.Eng., M.D., C.C.F.P. (E.M.)

CEB/msw

Enclosure: CEB CV & Testifying History

Ms. Sherri Young
21 February 2005
Page 7

[1] Braun, T. A., J. H. Jhoun, et al. (2001). Rear-End Impact Testing with Human Test Subjects. 2001-01-0168, Society of Automotive Engineers, Warrendale, Pa.

[2] McConnell, W. B., R. P. Howard, et al. (1993). Analysis of Human Test Subject Kinematic Responses to Low Velocity Rear End Impacts, 930889, Society of Automotive Engineers, Warrendale, PA.

[3] Anderson, R. D., J. B. Welcher, et al. (1998). Effect of Braking on Human Occupant and Vehicle Kinematics in Low Speed Rear-End Collisions, 980298, Society of Automotive Engineers, Warrendale, PA.

[4] Castro, W. H. M., M. Schilgen, et al. (1997). "Do "Whiplash Injuries" Occur in Low-Speed Rear Impacts." European Spine Journal 6: 366-375.

[5] Brault, J. R., J. B. Wheeler, et al. (1998). "Clinical Response of Human Subjects to Rear-End Automobile Collisions." Archives of Physical Medicine and Rehabilitation 79: 72-80.

[6] West, D. H., J. P. Gough, et al. (1993). "Low Speed Rear-End Collision Testing Using Human Subjects." Accident Reconstruction Journal 5(3): 22-26.

[7] Garfin, S. R. and H. N. Herkowitz (1996). Lumbar Disc Degeneration: Normal Aging or a Disease Process? The Lumbar Spine. S. W. Wiesel, J. O. Weinstein, H. N. Herkowitz, J. Dvorak and G. R. Bell. Philadelphia, W.B. Saunders Company. 1: 458-473.

[8] Jensen, M. C., M. N. Brant-Zawadzki, et al. (1994). "Magnetic Resonance Imaging of the Lumbar Spine." New England Journal of Medicine 331: 69-73.

[9] King, A. L (2002). Injury to the Thoracolumbar Spine and Pelvis. Accidental Injury: Biomechanics and Prevention. A. M. Nahum and J. W. Melvin. New York, Springer-Verlag, 2nd Ed.: 454-490.

1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF LOUISIANA

2

3   MARVIN C. BREAUD AND VICKI    )
    BREAUD,                       )

4                                 )      CIVIL ACTION
            Plaintiff(s)          )

5                                 ) DOCKET NO. 03-CV 860
    VS.                           )

6                                 ) SECTION D
    WERNER ENTERPRISES, INC. OF   )

7   NEBRASKA, AND JOHN HOLLAND,   )
                                  ) MAGISTRATE 1

8         Defendant(s)            )

9

    ************************************************************

10

                    ORAL DEPOSITION OF

11

          CHARLES E. BAIN, B.ENG., M.D., C.C.F.P.

12

                    JUNE 14, 2005

13

    ************************************************************

14

15          ORAL DEPOSITION of CHARLES E. BAIN, B.ENG., M.D.,

16  C.C.F.P., produced as a witness at the instance of the

17  Plaintiffs, and duly sworn, was taken in the above-styled

18  and numbered cause on the 14th day of June, 2005, from

19  1:04 p.m. to 3:22 p.m., before Delcine M. Benavides, CSR, in

20  and for the State of Texas, reported by machine shorthand,

21  at 9901 IH-10 West, San Antonio, Texas, pursuant to the

22  Federal Rules of Civil Procedure and the provisions stated

23  on the record or attached hereto.

24                                    ORIGINAL

25

CHARLES E. BAIN, B.ENG., M.D., C.C.F.P.

```
 1                    A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF(S):
         Mr. Ronald Favre
 4       MICHAEL HINGLE & ASSOCIATES, L.L.C.
         Hollycrest Plaza
 5       600 N. Highway 190, Suite 202C
         Covington, LA  70433
 6
     FOR THE DEFENDANT(S):
 7       Mr. Gregory D. Callihan
         CASTEEL & ASSOCIATES
 8       138 Maghee Drive
         Baton Rouge, LA  70815
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                        I N D E X

 2

 3   Appearances............................................ 2

 4   Stipulations........................................... 1

 5   CHARLES E. BAIN, B.ENG., M.D., C.C.F.P.

 6        Examination by Mr. Favre.......................... 4

 7   Signature and Changes.................................83

 8   Reporter's Certificate............................84-86

 9

10

11                      E X H I B I T S

12

13   NO. DESCRIPTION                                    PAGE

14    1  "Rear-End Impact Testing with Human Test Subjects".. 6

15    2  "Analysis of Human Test Subject Kinematic Responses
         to Low-Velocity Rear-End Impacts"................... 6

16    3  "Effect of Braking on Human Occupant and Vehicle
         Kinematics in Low Speed Rear-End Collisions......... 6

17    4  "Do "Whiplash Injuries" Occur in Low Speed Rear
         Impacts?".......................................... 7

18    5  Clinical Response of Human Subjects to Rear-End
         Automobile Collisions"............................. 7

19    6  "Low Speed Rear-End Collision Testing Using Human
         Subjects".......................................... 7

20    7  "Lumbar Disc Degeneration:  Normal Aging or a
         Disease Process?".................................. 7

21    8  "Magnetic Resonance Imaging of the Lumbar Spine in
         People without Back Pain".......................... 8

22    9  "Injury to the Thoracolumbar Spine and Pelvis....... 8
     10  Curriculum Vitae................................... 15
     11  Testifying History................................ 15

23

24

25
```

```
 1              CHARLES E. BAIN, B.ENG., M.D., C.C.F.P.,

 2       having been first duly sworn, testified as follows:

 3                          EXAMINATION

 4       BY MR. FAVRE:

 5            Q.   Would you state your name and address for the

 6       record, please?

 7            A.   Charles Edward Bain, 5711 University Heights

 8       Boulevard, San Antonio, Texas 78249.

 9            Q.   And is that your home address or business address?

10            A.   That's my business address.

11            Q.   And your phone number?

12            A.   (210) 691-0281.

13            Q.   Dr. Bain, my name is Ron Favre.  We introduced

14       ourselves earlier.  You're here today in response to a

15       subpoena, Subpoena Duces Tecum; is that correct?

16            A.   Yes.

17            Q.   And that's on the case of Marvin Breaud and Vicki

18       Breaud versus Warner Enterprises, Inc. of Nebraska and John

19       Holland?

20            A.   Yes.

21            Q.   Okay.  Let's talk about the Subpoena Duces Tecum

22       for a while -- for a minute.  Did you bring any documents

23       with you?

24            A.   Yes, I did.

25            Q.   Do you want to produce them in the order that we
```

01:04  5
01:04  10
01:04  15
01:04  20
01:05  25

0  5  1    requested them?  Let's start off with Number 1.

      2        A.   Sure.

      3             MR. CALLIHAN:  Before we go any further, we've

      4    already discussed this with your office.  Each item on the

01:05  5    list, the subpoena, we provided you in advance of the

      6    deposition for you to be able to review them.  It was our

      7    understanding that since you received them, you wouldn't

      8    need them again at the deposition.

      9             MR. FAVRE:  I really don't.  But if he's

01:05  10   got -- Well, I'll identify the copies we got from you, and

      11   we'll talk about that.  But I was just talking about for

      12   expediency of discussing --

      13            MR. CALLIHAN:  And that's fine.

      14            MR. FAVRE:  -- them rather than asking back

01:05  15   and forth.

      16            MR. CALLIHAN:  That's fine.

      17       Q.   (BY MR. FAVRE)  Number 1 is Braun, T.A.; J.H.

      18   Jhoun, et al., "Rear End Impact Testing with Human Test

      19   Subjects."  Do you have that document with you?

01:05  20       A.   No.  I don't have it with me.

      21       Q.   Okay.  So --

      22       A.   Could I refer to my report?

      23       Q.   Sure.  That's Number 4, I believe.  I got them

      24   marked already.  Is that the document referred to in the

01:07  25   subpoena?

0   7   1          A.    Yes, it is.

        2          Q.    Let's mark that as Exhibit 1.

        3                (Exhibit 1 marked)

        4          Q.    (BY MR. FAVRE)   The next one is an article or

01:07   5    publication by McConnell, W.E.; R.P. Howard, et al.,

        6    "Analysis of Human Test Subject with Kinematic Responses to

        7    Low-Velocity Rear-End Impacts."   That's a mouthful.

        8                Is that the article requested in Item Number

        9    2?

01:07   10         A.    Yes, it is.

        11         Q.    Okay.  Let's mark that as Exhibit 2.

        12               (Exhibit 2 marked)

        13         Q.    (BY MR. FAVRE)   Next is an article, Anderson, R.D.

        14   and J.B. Welcher, et al., "Effect of Braking on Human

01:08   15   Occupant and Vehicle Kinematics in Low Speed Rear-End

        16   Collisions."   Is that the article referred to in Item

        17   Number 3?

        18         A.    Yes, it is.

        19         Q.    Okay.  We'll mark that as Exhibit 3.

01:08   20               (Exhibit 3 marked)

        21         Q.    (BY MR. FAVRE)   Next is Castro, W.H.M.; M.

        22   Schilgen, et al., "Do 'Whiplash Injuries' Occur in Low-Speed

        23   Rear Impacts?"

        24         A.    Yes.  Here it is here.

01:09   25         Q.    Okay.  We'll mark that as Number 4.

0    )    1              (Exhibit 4 marked)

         2        Q.    (BY MR. FAVRE)   Next is Brault, J.R.; J.B. Wheeler,

         3    et al., "Archives of Physical Medicine and Rehabilitation."

         4              What are we on?  Number 5?

01:09    5              THE REPORTER:  Yes.

         6        Q.    (BY MR. FAVRE)  "Clinical Response of Human

         7    Subjects to Rear-End Automobile Collisions."

         8        A.    That's it on top.

         9        Q.    Is that the article referred to?

01:10   10        A.    Yes, it is.

        11        Q.    Okay.  We'll mark that as Exhibit 5.

        12              (Exhibit 5 marked)

        13        Q.    (BY MR. FAVRE)  Six, West, D.H.; J.P. Gough, et al.

        14    Low Speed Rear-End Collision Testing Using Human Subjects."

01:10   15    Is that the article referred to?

        16        A.    Yes, it is.

        17        Q.    We'll mark that as 6.

        18              (Exhibit 6 marked)

        19        Q.    (BY MR. FAVRE)  Number 7 is Garfin, S.R. and H.N.

01:11   20    Herkowitz, "Lumbar Disc Degeneration:  Normal Aging or a

        21    Disease Process?"  Is that the article, sir?

        22        A.    Yes, it is.

        23        Q.    Mark that as 7.

        24              (Exhibit 7 marked)

01:11   25        Q.    (BY MR. FAVRE)  Number 8 is Jensen, M.C., M.N.

0ʹ  L  1   Brant-Zawadzki, "Magnetic Resonance Imaging of the Lumbar

2   Spine."  Is that the article?

3        A.   Yes, it is.

4        Q.   Number 8.

01:12  5              (Exhibit 8 marked)

6        Q.   (BY MR. FAVRE)  And Number 9 is King A.I., "Injury

7   to the Thoracolumbar Spine and Pelvis."

8        A.   Yes.

9        Q.   That is marked as Number 9.

01:12  10             (Exhibit 9 marked)

11             MR. FAVRE:  Those are the only documents that

12   were produced to us in response to this Subpoena Duces

13   Tecum; is that correct?

14             MR. CALLIHAN:  That was all the documents,

01:12  15   yes.

16             MR. FAVRE:  That's all?

17             MR. CALLIHAN:  Everything you requested was

18   provided to you, yes.

19        Q.   (BY MR. FAVRE)  Now, did you refer to any other

01:13  20   documents in reaching your conclusions or your calculations?

21        A.   Yes, I did.

22        Q.   We requested any and all articles, literature,

23   journals and research or any documents read, reviewed and/or

24   consulted supporting and/or not supporting the opinion of

01:13  25   the physical damage in the accident May 2nd, 2003 was not of

0· 3 1    sufficient severity to cause any injury and/or cause any

2    serious injury including but not limited to the nine we just

3    identified.  What other documents did you utilize?

4        A.   I can't name them specifically at this point, but

01:13 5    it's the whole body of engineering medical and biomedical

6    literature I've been exposed to over the past 30 years.

7    These articles I provided you are representative of areas in

8    the field.

9        Q.   So other than your general review of these

01:14 10    articles, these other articles, these were specifically

11    presented for this case?  You didn't look at any other ones

12    in reaching your conclusions?

13        A.   Well, I relied on other articles that have formed

14    part of my knowledge base.  And to go back to those and

01:14 15    bring out a textbook or a particular article, that would

16    have been thousands.

17             MR. CALLIHAN:  If you're requesting every

18    article or every book he's ever read for every formula that

19    he may have ever used, I'll object to the request as overly

01:14 20    broad.

21        Q.   (BY MR. FAVRE)  That's not my request.  My request

22    is, in forming your opinion on this, did you particularly

23    use any articles or studies other than the nine you

24    presented?  Not your general knowledge but you went to,

01:14 25    looked at a particular article, document, whatever, in

01:15

01:15

01:16

01:16

01:17

1    forming your opinion here, that you utilized specifically

2    for this case?

3    A.   Other than the knowledge I have from all of those

4    other articles and textbooks, are you asking me did I

5    actually open up a textbook and look at a page or an

6    article?

7    Q.   Correct.  Any textbook or any document with this

8    case in mind?

9    A.   I can't say that I did.

10    Q.   Okay.  So that seems to satisfy the Subpoena Duces

11    Tecum.  Do you have a copy of your CV with you?

12    A.   Yes, I do.

13    Q.   Why don't you look at the copy I have and see if

14    it's the same or has it been updated recently?

15    A.   I don't believe it has.

16    Q.   Okay.  They should be the same then.  And I'll just

17    use mine.  Doctor, why don't you just give me a general

18    rundown of your educational background.  And then I'll ask

19    specific questions if I have any.

20    A:   In 1970 I attended Royal Military College in

21    Kingston, Ontario.  There I received my bachelor of

22    engineering degree in nuclear engineering that was offered

23    through the Chemical Engineering Department.

24    Q.   What is nuclear engineering?

25    A.   To very briefly summarize it would be reactor --

1   nuclear reactor design.

2        Q.   You wouldn't have used any of that information

3   specifically in any of the biochemical engineering or

4   biomechanical engineering, I'm sorry, in your practice,

5   would you?

6        A.   I'm not sure I understand your question.  If I

7   could get you to just to restate it or rephrase it, please.

8        Q.   Does nuclear engineering play into your field of

9   practice in either medicine or biomechanical engineering

10  today?

11       A.   Not nuclear engineering specifically.  But the

12  first two years of undergraduate engineering are common to

13  all disciplines and the math and physics in those first two

14  years are what I'm using presently with my engineering work

15  at BRC involving accident reconstruction, back to analysis

16  on humans and biomechanics originating from that.

17       Q.   Continue with your educational background, please.

18       A.   Following my degree at Royal Military College, I

19  served in the Canadian Air Force for five years as a pilot.

20  I left the Air Force in 1979 and attended medical school at

21  Queen's University in Kingston, Ontario.  Following that I

22  did my internship in Toronto at Scarborough General

23  Hospital.  Following that I began practicing medicine both

24  in emergency medicine and family medicine.

25       Q.   And when was the beginning of your practice?

0   3   1        A.    1983.

        2        Q.    1983.  Did you specialize in any area of medicine?

        3        A.    Yes, I did.

        4        Q.    What area was that?

01:19   5        A.    In family practice and emergency medicine.

        6        Q.    And that's in Canada?

        7        A.    That's correct.

        8        Q.    And that's --¬family medicine is a specialty in

        9   Canada?

01:19  10        A.    Yes, it is.

       11        Q.    And the other one was?

       12        A.    I'm sorry?

       13        Q.    The other one was -- family medicine and what?

       14        A.    Emergency medicine.

01:19  15        Q.    And that's a specialty also?

       16        A.    Yes, it is.

       17        Q.    Have you practiced -- or do you have any other

       18   specialty?

       19        A.    No.  In Canada I'm certified both in family

01:19  20   medicine and emergency medicine.

       21        Q.    Are you certified -- I understand that you have a

       22   license in Texas to practice medicine?

       23        A.    Yes, I do.

       24        Q.    Are you certified in any specialty field in the

01:19  25   United States?

0  ? 1        A.    I don't have any -- I have not written any board

2      examinations here in the States.

3        Q.    What are the top two; Certificate, College of

4      Family Physicians of Canada?  Is that what you do to get

01:19  5      your board certification?

6        A.    Yes.

7        Q.    And also in the Family Physicians of Canada?

8        A.    Yes.

9        Q.    That's a board certification study?

01:20 10        A.    Yes.

11        Q.    In 2003 you attended the Northwestern University

12      Traffic Institute?

13        A.    Yes, I did.

14        Q.    Did you get a degree or certificate from the

01:20 15      Northwestern University Traffic Institute?

16        A.    There was a certificate given after each of the two

17      courses I attended stating I had successfully completed the

18      course.

19        Q.    Any other educational accomplishments other than

01:20 20      the medical and the short courses at Northwestern

21      University?

22        A.    Formal education is listed on my CV.

23        Q.    Okay.  Let's talk about that.  What is your formal

24      education?

01:21 25        A.    We just went through it.

Q. I asked for any other. I'm sorry.

A. I'm sorry, no, I said the formal education is listed on my CV.

Q. How long have you been employed as a doctor or a biomechanical engineer in the United States?

A. I started work in August 2003, so it's almost two years.

Q. And where did you start working?

A. Here in San Antonio at Biodynamic Research Corporation.

Q. Other than your employment with Biodynamic Research Corporation, do you have any other employment in the United States?

A. No, sir.

Q. Do you have a medical practice in the United States?

A. Not a clinical medical practice, no, sir.

Q. Not a clinical?

A. No.

Q. What type of medical practice would you have?

A. Well, I'd like to think I'm still involved in medicine. I'm practicing nonclinical medicine. I'm involved in reviewing medical charts and formulating opinions. I'm not seeing patients in the United States.

Q. Does your involvement with medicine today in the

0    ?    1     United States utilize your medical license in Texas?  Would

     2     you have to be licensed in Texas to do what you're doing

     3     today?

     4         A.    No, I wouldn't have to be.

01:23    5         Q.    Okay.  Let's mark as this -- his CV as 10.

     6            (Exhibit 10 marked)

     7         Q.    (BY MR. FAVRE)  Have you been qualified as an

     8     expert in any courts in the United States?

     9         A.    Yes, sir.

01:23   10         Q.    I noticed -- I think it was part of your CV of a

    11     document.  I'm not sure how I got it.  It list one, two,

    12     three, four, five, six, seven, eight, nine cases, court

    13     cases.  You've testified as an expert in each of those?

    14         A.    I have an updated list here.  I'm not sure what

01:23   15     list you have, Mr. Favre.  But maybe I could give you this

    16     one.  That is my testifying history over the past two years.

    17         Q.    Okay.  Well, let's go down the list that I have and

    18     if --

    19         A.    Sure.

01:24   20         Q.    Can I have this?

    21         A.    Yes.

    22         Q.    Mark this as 11.

    23            (Exhibit 11 marked)

    24         Q.    (BY MR. FAVRE)  Can you look at these, the one I

01:24   25     have and the one you provided, and tell me which ones are

```
0:    |    1    not on the list that I have.  I don't want to mark it up

           2    because this is an exhibit, but I do need to know.

           3                Just put a little check by the ones that are

           4    not on my list?

01:24      5         A.    Over here, okay.

           6         Q.    Yes.

           7         A.    (Complies)

           8         Q.    Okay.  That should be all.

           9         A.    There's some more here.  Seems you're missing the

01:25     10    first half dozen or so off of that list.

          11         Q.    Let's talk about the -- the nine that I have, and

          12    then we'll go back and get the ones that I don't have, okay?

          13         A.    Yes.

          14         Q.    James Dicamillo versus Otis Elevator.  You

01:26     15    testified as an expert in that case?

          16         A.    Yes, I did.

          17         Q.    And that was in Philadelphia County, Pennsylvania?

          18         A.    Yes.

          19         Q.    In what capacity did you testify as an expert?

01:26     20         A.    Biomechanics.

          21         Q.    And -- I see three Otis Elevator cases on my list.

          22    The Dicamillo, Kern -- I got Kern twice on this list.  You

          23    testified 04-15, so that's actually the same case?

          24         A.    No, it isn't.

01:26     25         Q.    You testified in two Kern cases versus Otis
```

CHARLES E. BAIN, B.ENG., M.D., C.C.F.P.

```
0.  7   1   Elevator?
        2       A.  I'm sorry.  I'm sorry, I thought you were referring
        3   to Dicamillo and Kern being the same case.
        4       Q.  No, no.  Kern -- See, I've got Kern --
01:27   5       A.  Yes.
        6       Q.  On the list I was provided, I've got Kern as
        7   number two and Kern as number nine?
        8       A.  They are the same cases.
        9       Q.  Same case, okay.  What was that case about; do you
01:27  10   recall?
       11       A.  The Dicamillo case?
       12       Q.  Yeah.
       13       A.  Mr. Dicamillo had alleged he caught his finger in a
       14   freight elevator door resulting in an injury to his right
01:27  15   shoulder.
       16       Q.  Are any of these eight that you provided earlier --
       17   that was provided to me earlier, are any of those rear-end
       18   cases?
       19       A.  Yes.
01:27  20       Q.  Which ones?  I'll tell you what, let's use the
       21   whole case list that you've got in your hand.  Identify the
       22   ones that are rear-end collision cases.
       23           MR. CALLIHAN:  Well, which one are we going to
       24   use as an exhibit?
01:28  25           MR. FAVRE:  (Indicating)
```

0   3   1                 THE WITNESS:  That one.

        2                 MR. FAVRE:  This one.

        3                 MR. CALLIHAN:  Do you want him to mark the one

        4       that you're going to use as an exhibit or not?

01:28   5                 MR. FAVRE:  Yeah, you can.  You can put on "X"

        6       on the inside of the cases that indicate rear-end cases.

        7                 MR. CALLIHAN:  Of course, this is subject to

        8       what he remembers.  There may be others on the list.

        9                 MR. FAVRE:  Correct.

01:29   10          Q.   (BY MR. FAVRE)  Okay.  So Linda McGill versus State

        11      Farm was a low back case?

        12                MR. CALLIHAN:  Was a what?

        13          Q.   (BY MR. FAVRE)  I'm sorry, rear-end collision?

        14          A.   I believe it was.

01:29   15          Q.   Was that a low back disk injury case?

        16          A.   I can't remember what her injury claim was.

        17          Q.   Was it a herniated disk case?

        18          A.   I can't remember.  I'm drawing a blank on that one.

        19      I'm sorry.

01:29   20          Q.   Was it a surgery case, low back?

        21          A.   That I don't know.

        22          Q.   Was it an 18-wheeler case?

        23          A.   I don't think it was an 18-wheeler, but I'm not

        24      sure.

01:30   25          Q.   Well, did you testify for the plaintiff or for the

0:    )    1     defendant?

2          A.    For the defendant.

3          Q.    Next one is Frances Babbitt versus ACE

4     Transportation?

01:30   5          A.    Yes.

6          Q.    Was that an 18-wheeler case?

7          A.    The striking vehicle was, I believe, an F-350

8     pulling a loaded trailer -- a loaded utility trailer.

9          Q.    And that was a rear-end case?

01:30   10         A.    Yes, it was.

11         Q.    Did that involve low back disk injury?

12         A.    Yes, it did.

13         Q.    Did it involve a herniated disk?

14         A.    I believe it did.

01:30   15         Q.    Did it involve surgery?

16         A.    There were two plaintiffs in that case, and I -- I

17    think one of them had low back surgery.

18         Q.    And you testified for the plaintiff or defendant?

19         A.    For the defendant.

01:31   20         Q.    What about Ronetta Percival versus Matson --

21    Elizabeth Matson?

22         A.    That was a low speed rear-end collision.

23         Q.    Low speed rear-end collision.  Did it involve low

24    back disk injury?

01:31   25         A.    No, it didn't.

0    ι    1          Q.    What did it involve, if you recall?

       2          A.    A shoulder injury.

       3                MR. CALLIHAN:  I'm just going to make a

       4    continuing objection to the questions that you're asking

01:31  5    him, regarding Dr. Bain's memory.

       6                MR. FAVRE:  If you don't remember, he can

       7    state he doesn't remember.

       8                MR. CALLIHAN:  Since these documents were not

       9    requested as far as the particulars of the case.  I'm just

01:31  10   going to make a continuing objection.

       11         Q.    (BY MR. FAVRE)  Okay.

       12               Johnny Thomas versus Walt's Drive Away

       13   Service; do you recall that case?

       14         A.    No, I don't.

01:31  15         Q.    You don't recall anything about it?

       16         A.    No, sir, I don't.

       17         Q.    Trisha George versus State Farm; do you recall that

       18   case?

       19         A.    Yes, I did.

01:32  20         Q.    Okay.  Was that a rear-end case?

       21         A.    I believe it was.

       22         Q.    Was it a low back injury?

       23         A.    I don't believe it was.

       24         Q.    Do you recall what the injury was?

01:32  25         A.    I think there were multiple injuries.  Neck was one

CHARLES E. BAIN, B.ENG., M.D., C.C.F.P.

0   ?   1    of them.  I can't remember the specifics of the case.

2        Q.    Was it an 18-wheeler case?

3        A.    I don't believe so, but I can't be certain.

4        Q.    Linda Tucker versus Allstate; do you recall that?

01:33   5    A.    Vaguely.  I don't recall the vehicles involved or

6    the nature of the injury that was alleged.

7        Q.    Were you testifying for the plaintiff or the

8    defendant?

9        A.    For the defendant.

01:33  10    Q.    Were any of these testifying for the plaintiff?

11       A.    No, sir.

12       Q.    Deborah Calridge versus Billy Gerald Grady; do you

13   recall that?

14       A.    Yes, I do.

01:33  15    Q.    Was that an 18-wheeler case?

16       A.    It was a loaded dump truck that struck a small

17   vehicle in the rear.

18       Q.    Rear-end.  Did it involve a low back disk injury?

19       A.    No, it didn't.

01:33  20    Q.    Do you recall what injury it did involve?

21       A.    It involved the development of a chronic pain.  The

22   condition I can't recall if it was related to her neck or

23   back.

24       Q.    And Clifford McVey versus Maria Vicenta de Flores;

01:34  25   do you recall that?

0:    1    A.    I believe both vehicles were pickups.  Mr. McVey's

2    vehicle was struck in the rear, and then I believe he hit

3    somebody in front of him.

4    Q.    Did that case involve a low back disk injury?

01:34    5    A.    I believe it did, but I can't be certain.

6    Q.    Do you recall if it was a herniated disk?

7    A.    I believe so.  But again, I'm even less certain on

8    that.

9    Q.    Do you recall if it was a surgery case?

01:34    10    A.    I can't recall that.

11    Q.    These are all the court appearances you've made as

12    an expert in biomechanical engineering?

13    A.    An expert in biomechanics, that's correct.

14    Q.    Is there a difference in biomechanics and

01:35    15    biomechanical engineering?

16    A.    Biomechanical engineering to me would imply that I

17    took a degree program in biomechanical engineering which I

18    haven't.  But I do have expert in biomechanics.

19    Q.    Okay.  So you testified as a biomechanic?

01:35    20    A.    That's correct.

21    Q.    In all of these cases?

22    A.    Yes, sir.

23    Q.    And you've never testified as an expert physician,

24    medical doctor?

01:35    25    A.    I have never testified solely as a medical

0:    5    1    physician.

2    Q.    Were you ever denied testimony as an expert?

3    A.    No, sir.

4    Q.    Did you do any testifying in Canada as an expert?

01:36    5    A.    No, I didn't.

6    Q.    So you began your career in Texas?

7    A.    Yes.

8    Q.    Let's look at the articles that we identified

9    earlier, okay?  Just generally, how do you use those

01:36    10    particular articles in forming an opinion?

11    A.    Some of the articles were used to show how an

12    occupant moves when they've been involved in a low-velocity

13    rear-end collision.  That's actually the majority of the

14    articles.  Some of the articles actually noted any symptoms

01:37    15    from the human subjects that were used.  I've used those

16    articles to be representative of the world body of

17    literature that involves human subject test in low-velocity

18    collisions.

19    Q.    Exhibit Number 5 is "Clinical Response of Human

01:38    20    Subjects to Rear-End Collisions."  Do you know the error

21    rate of the study?  This was a rear-end collision study,

22    right?

23    A.    That's right.

24    Q.    Experiments, tests?

01:38    25    A.    This was a study where they subjected 42

0'   3   1     individuals to rear-end collisions.  Most of the people

         2     submitted to both.  There was a couple who declined the

         3     second impact.  They were impacted at five and eight

         4     kilometers an hour which is roughly three and five miles per

01:38    5     hour.  And from there they documented all of their symptoms

         6     that these people experienced and the length of time that

         7     they had their symptoms.

         8                  They then collated those results.  It's simply

         9     a descriptive study.  There weren't efforts to make any

01:39   10     definitive findings out of the study.  They simply stated

        11     that roughly a third of their individuals involved in these

        12     impacts experienced symptoms.

        13                  They gave mean symptom duration for the men

        14     and women and they presented the range of symptom duration,

01:39   15     but there wasn't any detailed statistical analysis performed

        16     that result in stating that 5 percent of people have

        17     symptoms after a low-velocity collision plus or minus

        18     3 percent.

        19          Q.    This study involved 42 people, 21 male, 21 female?

01:39   20          A.    Yes.

        21          Q.    Ages 20 to 40?

        22          A.    If that's in the article, then that's correct.

        23          Q.    Do you claim that this is statistically

        24     representative of the population of the United States, for

01:39   25     instance?

0    )    1      A.   No, I don't.

         2      Q.   I asked you if you knew the error rate of the

         3   study.  Do you?

         4      A.   Well, the study doesn't have a result that would

01:40    5   say that it's got an "X" result with an error rate of such

         6   and such.  It didn't do that.  It didn't attempt to do that.

         7      Q.   Do you know if any of the subjects had prior neck

         8   or back problems who volunteered to be targets?

         9           MR. CALLIHAN:  Are you asking him if he knows

01:40   10   firsthand or if it's in the article?

        11           MR. FAVRE:  Is it in the article?  If he knows

        12   firsthand, that's good.

        13           MR. CALLIHAN:  I'm not sure I follow the

        14   question.  You're asking him if he knows.

01:40   15           MR. FAVRE:  Well, he read the article, and he

        16   cited it.  And I want to know if in the article it states

        17   that any of these people had pre-existing neck or back

        18   conditions.

        19           MR. CALLIHAN:  As listed in the article.

01:41   20           THE WITNESS:  Yes.  These people did have a

        21   pre-existing -- some of them had pre-existing neck

        22   degenerative conditions based on MRI studies.

        23      Q.   (BY MR. FAVRE)  This particular study, was it --

        24   what was the purpose of this study?  What was the study

01:41   25   about?

0:  :   1        A.    The study was to present the incident rate of men

2    and women experiencing symptoms in low-velocity rear-end

3    collisions.

4        Q.    Were they looking particularly at any area of the

01:41   5    body?

6        A.    To my knowledge, they were looking at all areas of

7    the body.

8        Q.    Did they do any post-test or radiographic studies

9    on these people?

01:41  10        A.    I don't believe so, but I'd have to refer to the

11    study.  They did post-test clinical examinations, but I'm

12    not sure they did post-test radiographic examinations.

13        Q.    Let's look at the next one.  "Effect of Braking on

14    Human Occupant and Vehicle Kinematics in Low-Speed Rear-End

01:42  15    Collisions."  What did you utilize from that article in

16    forming your opinion?

17        A.    This was again to be representative of human

18    subject testing in low-velocity collisions.  This particular

19    paper looked at how braking affected the individual's

01:43  20    movement during the collision.  Also as part of that study

21    they documented their -- any symptoms that they experienced

22    as a result of these impacts.  The primary reason for the

23    study, though, was to analyze the individual's motion during

24    the event.

01:43  25        Q.    This study actually only used two participants; is

0   3   1   that correct?

2       A.    That's correct.  There were a very little number of

3   participants in this study.

4       Q.    Do you allege that that's representative --

01:43   5   statistically representative of the population?

6       A.    No, it's not.

7       Q.    They were tested both unaware and aware of the

8   collision?

9       A.    That's correct.

01:43   10      Q.    Does that make a difference?

11      A.    In the very low-speed collisions, it does make a

12  difference in the motion of their head and neck.  Once you

13  get above five miles per hour Delta V the difference becomes

14  a lot less.

01:44   15      Q.    Is there an error rate in this study?

16      A.    Again, it was a descriptive study.  They were

17  simply describing the motion of the individuals with regards

18  to the automobile movement in a brake, unbrake situation.

19  There wasn't a statistical analysis to come up with a number

01:44   20  with a given error rate.

21      Q.    Did this study involve post-radiographic study of

22  the subjects?

23      A.    There were pre- and post-test neurologic and

24  orthopedic examinations be a physician.  There also were

01:45   25  post-test MRI examinations of the neck of the individual who

0   5   1      occupied the target vehicle.

        2          Q.   But not the lumbar spine?

        3          A.   Just the neck, sir.

        4          Q.   So this particular test was aimed at getting data

01:45   5      about the cervical spine as opposed to the lumbar spine?

        6          A.   That's right.   It's generally accepted that the

        7      lumbar spine is well-protected in these events and is not at

        8      risk for injury, therefore, the focus of the vast majority

        9      of these papers is on the neck.

01:45  10          Q.   Generally accepted?

       11          A.   Yes, sir.

       12          Q.   By the medical community or what?

       13          A.   By the biomedical community.

       14          Q.   Biomedical.

01:45  15          A.   Yes.

       16          Q.   What about the medical community; do you have any

       17      knowledge of their acceptance of that there?

       18          A.   Myself, my circle of colleagues, emergency

       19      physicians.   I think the general belief is that low-velocity

01:46  20      rear-end collisions are relatively benign.

       21          Q.   What about of orthopedics?

       22          A.   I can't speak for orthopedic surgeons.

       23          Q.   Neurosurgeons?

       24          A.   I can't speak for them, either.

01:46  25          Q.   Neurologists?

0.   ;   1       A.   No, sir.

2       Q.   You would defer to them?

3       A.   No, sir, I wouldn't.

4       Q.   If you can't speak for them, why wouldn't you defer

01:46   5   to them?

6       A.   Well, those physicians are very well-trained to

7   make diagnoses and to treat patients.  They're not trained

8   to give opinions in causation.

9       Q.   But they do it every day, don't they?

01:46  10       A.   Yes, sir, they do.

11       Q.   The first article we talked about and this article

12   here, are those articles subject to peer review?

13       A.   All of these articles were peer reviewed.

14       Q.   How do I find that out?  How do I know if it's peer

01:46  15   reviewed or not?

16       A.   That's a good question.  I know SAE papers are all

17   peer reviewed.

18       Q.   Is there a group of peers that do this or is it

19   just subjected to the community at large and whoever

01:47  20   responds is peer reviewed?

21       A.   No, the --

22       Q.   How do you know?

23       A.   I'm sorry?

24       Q.   How did you know how it's done?

01:47  25       A.   I don't know the actual specifics.  I would assume

0: 7   1    that a journal would have a group of individuals at their

2    disposal to review articles within their area of expertise.

3    Those articles are typically sent out to three reviewers.

4    Comments are then returned to the principal investigator.

01:47   5    The paper is then modified according to those comments and

6    then resubmitted to the journal.

7        Q.   So you don't know, but you assume that these have

8    been peer reviewed?

9        A.   I assume they've been peer reviewed.  I don't know

01:47  10    specifically.

11        Q.   Next one is "Low Speed Rear-End Collision Testing

12    Using Human Subjects."  This doesn't give a number of

13    individuals used in this test, does it?

14        A.   I'd have to look through the paper.  I believe it

01:48  15    does state somewhere in here how many subjects were

16    utilized.

17            This paper, I believe, came out of a set of

18    data that had been published more than once.  In the other

19    journal where it was published there may be more

01:48  20    information.  But other than sitting down and reviewing this

21    article in detail, I'm not able to give you a number off the

22    top of my head.

23        Q.   So the original publication isn't what you reviewed

24    on making your conclusion here?

01:49  25        A.   Well, this article may have been -- the data may

0`  )  1    have been used in two different publications.  I can't speak

       2    to that.  I'm just surmising that at this point.  But for

       3    the number of subjects that were used in this testing, other

       4    than sitting down and reading through the paper, I can't

01:49  5    come up with an immediate number.

       6         Q.   Do you know if you have an error rating in this

       7    study?

       8         A.   Again, this was a paper that -- a descriptive

       9    paper, and there was not any details to statistical analysis

01:49 10    done.  It was outlining the head and neck accelerations --

      11    or sorry, the head accelerations in individuals in

      12    low-velocity rear-end collisions.  It didn't make an effort

      13    to sum this up, give an average, and give a range.

      14              And I think the reason they did that was that

01:50 15    there is so much variability amongst individuals in size and

      16    build, sex and age, that unless you took individuals all of

      17    the same age and same body build and tested a large number

      18    of those and said here's the mean head acceleration plus or

      19    minus so much percent, it's difficult to correlate that to

01:50 20    other individuals.  But it does give an idea of the

      21    magnitude that some of these individuals experienced as far

      22    as their peak head acceleration.

      23         Q.   As far as what?

      24         A.   As far as their peak head acceleration.

01:50 25         Q.   So this was again a study of the cervical spine in

01:         1    low-speed impacts not dealing with the lumbar spine?

            2        A.   They weren't dealing so much with the neck.  They

            3    were simply describing the occupant's movement as a result

            4    of this event.  And that would include their back and neck

01:51       5    and then relating any symptoms that they may or may not --

            6    or that they may have experienced.

            7        Q.   Did they test the neck in this article?

            8        A.   Well, they used their entire body in the study and

            9    then reported the -- their movements.  They actually gave a

01:51      10    numerical data because they were wearing accelerometers on

           11    their head.

           12        Q.   What data did they report for the lumbar spinal?

           13        A.   The only instrumented portion of the test subjects

           14    was their head.

01:51      15        Q.   So --

           16        A.   They didn't --

           17        Q.   -- seems like they were testing for the cervical

           18    spine more than the lumbar spine, correct?

           19        A.   Yes.  Again, my comment before, that the neck is

01:51      20    certainly much more of interest to biomechanics than the

           21    lumbar spine because of the potential for injury.

           22        Q.   Would the biomechanics change for the person

           23    wearing a helmet as opposed to a person not wearing a

           24    helmet?

01:52      25                   MR. CALLIHAN:  Objection to the relevance to

0    ?    1    this case.  Is there a relevance to this case?  I mean --

2    MR. FAVRE:  There's a relevance to the

3    validity of the studies and he used these in his

4    calculations --

01:52    5    MR. CALLIHAN:  Wearing helmets?

6    MR. FAVRE:  The study itself.

7    MR. CALLIHAN:  This case?

8    MR. FAVRE:  The study itself he's using, I

9    want to know the validity of this study and the facts of

01:52    10    this study since he cited it.

11    MR. CALLIHAN:  The study or the issue of

12    wearing helmets?

13    MR. FAVRE:  It's part of the study.

14    MR. CALLIHAN:  So you're asking him about the

01:52    15    validity of the study?

16    Q.    (BY MR. FAVRE)  I'm asking if it makes a difference

17    if the people were wearing helmets; would it change the

18    biomechanical data?  As I understand rear-end collision

19    it's a mechanism of the head thrust forward, backward.

01:52    20    You're testifying that cervical spine is more susceptible

21    than the lumbar spine.  And I'm asking, is that true with or

22    without a helmet?

23    A.    Well, it depends on how much mass you're going to

24    put on their head.  If you put on a very, very heavy object

01:53    25    and then certainly the forces you're going to see generated

0 3    1    of the neck will be different than if they have no object.

       2        Q.    (BY MR. FAVRE)  Do they talk about the mass of the

       3    helmet in this study?

       4        A.    No.  I would think that to measure accelerations

01:53  5    they would be putting on a device that was as light as

       6    possible to minimize the effect of the head.

       7        Q.    That's another assumption you make?

       8        A.    They didn't specify the weight of the helmet.  They

       9    just stated each subject wore a helmet which was firmly

01:53  10   attached to the head.

       11       Q.    But my question was, did the biomechanical

       12   mechanism alter if you add weight to the head and you said

       13   yes?

       14       A.    The weight could change the kinematics of the head.

01:54  15       Q.    What do we have here?  Three, two, one.  Where's

       16   number four?

       17       A.    Right here.  Exhibit 4 or number four?

       18       Q.    It's my number four.

       19             MR. CALLIHAN:  You're on four.  I think was

01:54  20   Number 1.

       21       Q.    (BY MR. FAVRE)  Yeah, it was.

       22             We haven't discussed "Rear-End Testing with

       23   Human Subjects" yet, have we?  That's Exhibit 1?

       24       A.    I believe we haven't.

01:54  25       Q.    Okay.  Tell me about that study.

01  3  1        A.    This study had several things they were trying to

       2  do.  One, again, was describe the motion of the occupants in

       3  low-speed rear-end collisions.

       4        Q.    Can you tell me how many subjects in this study?

01:55  5        A.    They used seven.

       6        Q.    Seven, okay.  Do you allege that that's

       7  statistically representative of the population?

       8        A.    No.

       9        Q.    Do you know the error rate of this study?

01:55  10        A.    Again, it was a descriptive study, and there wasn't

      11  a statistical analysis performed.

      12        Q.    Did this study involve cervical testing?

      13        A.    If you mean by cervical testing, did they measure

      14  the accelerations of their head and neck, no, they didn't.

01:55  15  They didn't take measurements on the individuals.  The

      16  vehicles were instrumental.

      17        Q.    Did this study involve the lumbar spine?

      18        A.    The lumbar spine was part of the study.

      19        Q.    Is it?

01:56  20        A.    Well, I assume each of the occupants had a lumbar

      21  spine that participated in the study.

      22        Q.    What conclusions did it reach about the lumbar

      23  spine?

      24        A.    Well, there were no complaints attributed to the

01:56  25  lumbar spine.  All the individuals who did have complaints

0    5    1    were related to the neck.

2    Q.    Were those complaints investigated radiographically

3    or follow-up examinations or --

4    A.    Again, I'd have to read the subject in detail, but

01:57    5    it seems that most of the subjects did not experience any

6    symptoms immediately following the test.  I'd have to go

7    into their protocol to find out how far post-test they

8    followed their subjects.

9    Q.    Okay.  This says -- my review of it, volunteers had

01:57    10    previous cervical spine symptoms.  Is that your

11    appreciation?

12    A.    If that's what's written.

13    Q.    No.  This is my summary.  I'm just asking you.

14    A.    Oh, I'm sorry.  I'm sorry.

01:57    15    MR. CALLIHAN:  You don't have a page number

16    listed there?

17    Q.    (BY MR. FAVRE)  Well, what I'm getting at is these

18    tests all seem to be testing for cervical injuries.  These

19    specific tests wanted volunteers with previous cervical

01:58    20    injuries.  Nothing about the lumbar.

21    A.    Some of them did look at lumbar -- some of the

22    studies in the world's literature have looked at lumbar

23    spine as part of the process of collecting symptoms that the

24    patient reported in total.  I noticed here in the abstract

01:58    25    that three of these participants experienced minor neck

0. 3    1    stiffness that result without treatment in one day. So

2    obviously they have follow-up that extended at least one day

3    after the event.

4            (Recess from 1:58 p.m. to 2:03 p.m.)

02:02    5      Q. (BY MR. FAVRE) I think we're on Line Number 6,

6    Exhibit 2, the "Analysis of Human Test Subject Kinematic

7    Responses to Low-Velocity Rear-End Impacts; is that it?

8      A. Yes, it is.

9      Q. This was -- used a dummy. This test used a dummy,

02:03   10    not actual subjects?

11      A. No, it used both.

12      Q. Both?

13      A. Yes.

14      Q. Four people?

02:03   15      A. Yes.

16      Q. And one dummy?

17      A. Yes.

18      Q. What are the results of this study?

19      A. Well, again this study was a descriptive study to

02:03   20    analyze the motion of the individual's pelvis, back, neck,

21    and head resulting from a low-speed rear-end collision.

22      Q. The subjects in this study were employed by

23    Biodynamic Research Corporation?

24      A. That's right, they were.

02:03   25      Q. Were they followed up?

0   3   1        A.    Yes, they were.

        2        Q.    And what results?

        3        A.    Their symptoms that they experienced were outlined

        4   in the study and I think any symptoms that resulted I think

02:04   5   were dated within a matter of days.  I'd have to refer to

        6   the study to give you the actual times.

        7        Q.    Again, that's not statistically representative of

        8   the population, is it?

        9        A.    No, it's not.

02:04  10        Q.    Was there an error rating in this study?

       11        A.    Again, it was a descriptive study without a

       12   statistical analysis being done.

       13        Q.    Was this subject to peer review?

       14        A.    Yes, it was.

02:04  15        Q.    Do you know or are you assuming again?

       16        A.    I'm pretty sure.  I'm pretty sure it is.  This was

       17   an SAE publication, yes.

       18        Q.    Again, how do I tell if it's peer reviewed?  What

       19   in the study tells me that or what in the publication tells

02:05  20   me that?

       21        A.    Referring to the actual study, it won't state that.

       22   But I know all SAE papers are subject to peer review.

       23        Q.    You utilized the article "Injury to the

       24   Thoracolumbar Spine and Pelvis"?

02:05  25        A.    Yes.  That is an article by Dr. King who published

02:05  1  this in 2002, I believe, which summarizes very nicely the

2  world's research up to that point with regards to injuries

3  in that area of the body.

4     Q.  And what out of that study did you use in

02:06  5  formulating your opinions?

6     A.  Well, what he was doing was collating the

7  literature and describing the pathophysiology of disk

8  herniations.  These weren't statistical studies.

9     Q.  So he just gathered a bunch of statistics and

02:06  10  studies and wrote an article on them?

11     A.  No, he didn't.  He reviewed the literature to write

12  this chapter in this prominent biomechanic's textbook.

13     Q.  Which literature?

14     A.  Pardon me?

02:06  15     Q.  Which literature he reviewed?

16     A.  I would assume the world's literature.  I mean, he

17  cites numerous papers from a variety of journals from

18  numerous years.

19     Q.  I'm sorry, you might have misunderstood my

02:06  20  question.  That's what I was asking.  This wasn't a study;

21  he did no study?  He gathered studies and literature and

22  made a report on the world view?

23     A.  Yes.

24     Q.  Am I correct?

02:06  25     A.  That's right.  He -- he used these studies to

0' 7  1    demonstrate the state of knowledge, biomechanical knowledge

      2    at this time with regards to low back, mid back, and pelvic

      3    injuries.

      4        Q.   Did he reach a conclusion or is it just a report?

02:07 5        A.   No, he reached a conclusion.

      6        Q.   And that conclusion was?

      7        A.   Let me see if I can find a paragraph that probably

      8    summarizes.  His last paragraph, which is fairly lengthy in

      9    his discussion section, if I could summarize it, states "The

02:08 10   mechanism of disk rupture has been studied extensively and

      11   all scientific evidence points to a slow, degenerative

      12   process.  The inability of a disk to rupture under a single

      13   load or impact is frequently contradicted by physicians,

      14   particularly the treating physicians of the claimants."  And

02:08 15   then he goes on and discusses their opinion and why it is

      16   faulty from a causal perspective.

      17       Q.   Does he discuss any other universal physicians who

      18   feel otherwise?

      19       A.   Does he discuss physicians who agree with

02:08 20   biomechanics?

      21       Q.   No.  You just read something that says physicians,

      22   particularly treating physicians, agree that it takes more

      23   than one impact or one load to rupture a disk.  That means

      24   there's other physicians or are there that disagree with

02:09 25   that?

A.    I don't think he stated that.  He stated "the

inability of a disk to rupture under a single load or impact

is frequently contradicted by physicians."  That's his

statement.  He's not saying he's got other physicians

stating this.  He's just stating that this biomechanical

knowledge of how the spine deals was degeneration and the

pathophysiology of disk rupture, what the opinion of

physicians is concerning that.

Q.    And that is that single load or single impact won't

cause a disk to rupture, if I'm understanding you?

A.    That's the biomechanical literature.  And science

has been demonstrated to date that the disk does not rupture

as a result of a one-time event unless there's been

significant bone damage.

Q.    What about significant disk damage?

A.    The thing that's misunderstood here by a lot of

people who don't understand the biomechanical literature is

that the disk and annulus structure is stronger than bone in

a dynamic setting.  So if you fall on your butt or if you

get ejected out of a fighter and the axial loading is going

to cause an injury, the first injury to occur will be a bone

fracture, not a disk herniation.

              (Brief discussion off the record)

Q.    (BY MR. FAVRE)  So the bone would fracture before

the disk would rupture?

0:    1      A.   Under a dynamic loading event; that is correct.

2      Q.   Now, that's a healthy disk or a sick disk, diseased

3  disk?

4      A.   At this point, it appears to be both types of disk.

02:11  5      Q.   And what -- what do you base that statement on?

6      A.   Well, again, it's studies that are shown or that

7  have been summarized by Dr. King.  One of the probably

8  classic studies was taking a cadaver specimen of a vertebral

9  body disk complex, that is, two vertebral bodies with a disk

02:11  10  in between and taking away all the other structures.  In

11  sizing the annulus of the disk, that's the fibrous ring

12  surrounding the disk material, and then loading those two

13  bones, dangling them together, the disk material does not

14  come squirting out that hole.

02:12  15        That is a misconception that physicians have.

16  The disk material is very soft and jelly like or toothpaste

17  like.  It is not.  It's a very thick, almost rubbery like

18  substance that does not flow like we think water or jelly

19  will flow.  It acts differently.

02:12  20      Q.   What causes a herniated disk?  What causes the

21  flow?  You know they do flow; am I right?

22      A.   That's correct.

23      Q.   So what causes that flow?

24      A.   Well, first of all, that flow is not flow like you

02:12  25  and I understand it.  It is a very slow movement that takes

0   ?   1   a long time basically.

2                What allows that to happen is, as the disk

3   degenerates, the first process that probably happens is an

4   impairment of nutrients going to the disk that results in

02:12  5   the disk losing water content or drying out as is commonly

6   referred to.

7                The next thing that happens is the disk then

8   loses height.  And the annulus surrounding the disk begins

9   to bulge as a result of that.  The disk is layered like an

02:13  10  union.  Each layer of the fibers run at different

11  directions.  As you work your way out, once that disk starts

12  to bulge, the stress strain pattern within those fibers is

13  altered and that can allow the degeneration process to

14  start.  It starts from inside out.  So as a layer

02:13  15  degenerates and allows disk material to move into that space

16  it does so slowly.  And then as another layer degenerates,

17  it worms its way over and moves into that space.  And

18  follows somewhat of a torturous path outside of the disk.

19      Q.   And biomechanical engineers or biomechanics don't

02:13  20  believe that no matter how damaged or diseased a disk is

21  that an impact can cause further damage?

22      A.   The evidence does not support that statement.

23      Q.   Okay.  Thank you.  And the evidence is contained in

24  at least the article we're talking about here by Dr. King,

02:14  25  was it?

(210) 331-2280
9901 IH 10 West, Suite 630

ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 558-3670
(800) 969-3027

0:  1    1        A.    That's right.  This is a very good summary.  And if

        2    you refer to his bibliography, he lists dozens of papers by

        3    individuals who have carried out this research that have led

        4    to this believe.

02:14   5        Q.    All right.  I'm going to ask you again.  I'm going

        6    to try to ask it right this time.  In the field, the

        7    discipline of biomechanics, is there a school of thought

        8    that disagrees with the school that says low-impact rear-end

        9    collisions will not cause disk herniations?

02:14  10        A.    I'm sure there's individuals out there that feel

       11    that can occur.  But the literature as a whole and the

       12    community as a whole does not stand by that position.

       13        Q.    But my question was, is there a school of thought?

       14        A.    Not that I'm aware of.

02:15  15        Q.    I know that there probably are individuals as you

       16    said, correct, but you don't know that there's a movement

       17    or --

       18        A.    No.

       19        Q.    What is SAE?

02:15  20        A.    It is the Society of Automotive Engineers.

       21        Q.    Is that article an SAE article?

       22        A.    The one by Dr. King?

       23        Q.    Yes.

       24        A.    No, it's not.

02:15  25        Q.    Do you know if it was subject to peer review?

CHARLES E. BAIN, B.ENG., M.D., C.C.F.P.

0: 5  1        A.   His article I doubt it was peer reviewed.  It's a

2    chapter in a textbook that was published in 2002.

3              MR. CALLIHAN:  So it's a textbook?

4              THE WITNESS:  It's a biomechanical textbook.

02:15  5        Q.   (BY MR. FAVRE)  Number -- my number eight, which is

6    Exhibit 7 is another article.  It's not a test, if I'm not

7    mistaken, correct?

8        A.   No.  This is a book chapter, the same as Dr. King

9    has written, by two individuals in a medical textbook called

02:16  10   "The Lumbar Spine."

11        Q.   And their conclusions?

12        A.   Well, they're discussing degenerative disk disease

13   in the perspective that it's a long-standing

14   slowly-progressive phenomenon.  But they're taking the

02:16  15   position one of those is that this is just a normal aging

16   process.  And the other position is that, no, this is

17   actually a disease process.  But I think the point being

18   that either way how you look at it, this is a long-standing

19   slowly-progressive condition that is not adversely affected

02:16  20   by any one event.

21        Q.   Again, I get confused because if you have a

22   diseased disk that's asymptomatic and it keeps degenerating,

23   one day it's going to become symptomatic -- assuming one day

24   it becomes symptomatic.  There's nothing that would cause

02:17  25   that in your opinion to become symptomatic other than that

0: 7  1    day, living, aging.  No trauma, no rear-end collision, no

      2    fall on your butt like you stated earlier, nothing would

      3    cause that to be symptomatic other than waking up one

      4    morning and that now your disk hurts?

02:17 5        A.   As a generalization, that's correct.

      6        Q.   Are there exceptions?

      7        A.   One of the problems with this whole area is, number

      8    one, back pain is extremely common.  When you look at

      9    various articles such as you see in textbooks like this,

02:18 10   clinicians will state that 95 percent back pain episodes do

      11   not get diagnosed.  Back pain not yet diagnosed, back pain

      12   of unknown etiology, and it invariably settles down and

      13   disappears.  So of the episodes of back pain that people

      14   have, really only a very, very small percentage get

02:18 15   diagnosed accurately.  So that's the first thing, back pain

      16   is very common.

      17              Number two is degenerative disk disease is

      18   very, very common.  And from the MRI studies we have seen

      19   that degenerative disk disease is very, very common in

02:18 20   individuals who do not have back pain.  So that begs the

      21   question then, if you have back pain and you see

      22   degenerative disk disease, is the degenerative disk disease

      23   causing the back pain.  There is a major tendency within the

      24   medical community saying, yes, it is when, in fact, the

02:19 25   literature states that is probably not the case.

Q.   Excuse me, Doctor.  I just handed you Exhibit whatever.

A.   Eight.

Q.   Eight.  Because I think that's in conjunction with the previous exhibit you're talking about now, the MRI imaging, and you have used a study of whatever that publication is as one of your documents that you reviewed in forming your opinion; is that correct?

A.   That's correct.

Q.   So we can talk about both of them at the same time.

A.   Sure.

Q.   But let me ask you to go back because I missed something.  I'm sorry.  But you're saying the misconception --

A.   With the very high frequency of low back pain within our population and the high frequency of degenerative disk disease in our population, there is a tendency to relate the two and state that all episodes of back pain are due to degenerative disk disease.  That is far, far from the truth.  Because you have evidence of degenerative disk disease on an MRI does not mean that the back pain you have is coming from that degenerative disk disease.  There's lots of other structures in the back where pain can originate from.

Q.   There are ways to determine where the pain is

1    coming from, aren't there?

2        A.    Not very good ways. As I mentioned earlier, when

3    you look at studies that try to accurately diagnose back

4    pain, they're only successful about 5 percent of the time.

02:20    5    The vast majority of people's episodes of back pain are

6    undiagnosed.

7        Q.    Okay. Just to clarify in my mind because we're not

8    used to thinking like that. You have a complaint. Maybe

9    it's rheumatoid complaint, something, and science medicine

02:21    10    knows that that area is controlled by this facet, this disk;

11    am I right? You get numbness in your hand, you know it's

12    coming -- if it's on the inside of the ring finger, it's

13    coming from something up here; they can tell?

14        A.    Well, if you have a symptom such as numbness on the

02:21    15    inside of your hand, there's several places that can

16    originate from. Yes, one of them can be the neck. But it

17    can be any area along that nerve supplying your finger that

18    can be the cause of that symptom.

19        Q.    And my question was, are there tests that doctors

02:21    20    can and do to determine whether it's coming from that nerve

21    or somewhere's down the arm?

22        A.    Yes. Electrical diagnostic testing consisting of

23    electromyography and nerve conduction velocity studies is

24    the typical manner that physicians -- the typical method

02:22    25    that physicians would utilize to determine where in that

0:  ?  1    nerve the injury is coming from or the symptom is coming

      2    from, where the area of pathology exist.

      3        Q.   So even though you can have back pain with no disk

      4    problem, you can have disk problems with no back pain.  When

02:22 5    you have disk problems and back pain, it can be traced

      6    through testing; is that not true?

      7        A.   Not necessarily.  There is -- I don't know if

      8    you're working towards --

      9        Q.   Excuse me, I didn't say necessary.  I said can it

02:22 10   be traced through testing to the disk if it correlates?

      11       A.   I'd say there's no good testing that correlates to

      12   that.

      13       Q.   No needle testing at all?

      14       A.   Well, if you're referring to diskography --

02:22 15       Q.   Well, diskography or dye injection.

      16       A.   Yeah.  That's diskography.  Diskography is a very

      17   controversial area.  There's a group of physicians who feel

      18   it can be used to localize pain to a disk.  But there's

      19   another large group of physicians who feel it is not a

02:23 20   reliable test and should not be used.

      21       Q.   Do you know what the author of Exhibit Number 9

      22   adheres to, which group of physicians?

      23       A.   No, I don't.

      24       Q.   Let's gather all this stuff up.  You want to take a

02:23 25   break?

0. 3   1          A.   I'm okay if you are, sir.

       2          Q.   Yeah, let's take five minutes, so I can --

       3          A.   Sure.

       4          Q.   -- regroup my documents.

02:23  5               (Recess from 2:23 p.m. to 2:25 p.m.)

       6          Q.   (BY MR. FAVRE)  Let's look at your report.  Do you

       7     have a copy of it?

       8          A.   Yes, sir, I do.

       9          Q.   First off, who commissioned you to do this report?

02:25 10          A.   Mr. Callihan's firm.  The initial contact I had was

      11     with Ms. Sherry Young.

      12          Q.   Have you ever done work for his firm before?

      13          A.   I don't believe I have.

      14          Q.   Let's look at -- just start -- why don't you tell

02:26 15     me what your report says in your own words paragraph by

      16     paragraph.

      17               MR. CALLIHAN:  You want him to read it to you?

      18               MR. FAVRE:  Well --

      19               THE WITNESS:  Why don't I take a different

02:26 20     approach if you don't mind.  There's a lot of information in

      21     this report.

      22          Q.   (BY MR. FAVRE)  You're over my head.  I'll follow

      23     you anywhere.

      24          A.   When I analyze a case like this, the first thing I

02:26 25     do is look at the vehicle dynamics, in other words, how the

0:   ;   1    vehicle has moved, what the forces and accelerations were as

        2    a result of that impact.

        3                    From there I look at how the individual in the

        4    vehicle in question would have moved.  Try to get an

02:27   5    appreciation for the accelerations that they would have

        6    experienced.  And then look at various injury mechanisms and

        7    injury tolerance levels for the alleged or proposed injury.

        8    Compare that to the medical record and do a validation

        9    process.

02:27  10                    So it's a step-by-step process that I go

       11    through this.  And that allows me in the end to make an

       12    opinion.  Were the necessary -- First of all, was the

       13    mechanism of injury present.  If it was, was the -- were the

       14    forces present in that mechanism injury to cause the injury,

02:27  15    in other words, would it exceed that individual's injury

       16    tolerance and is that validated by the medical record.

       17        Q.   Now, let's talk about the things that you just told

       18    me.

       19        A.   Yes.

02:28  20        Q.   Write them down.

       21        A.   If we go -- the first thing was the impact itself.

       22    And if you go to Page 5 of my report towards the bottom

       23    third, I start to deal with that.

       24        Q.   Starting with the "likely at the Delta V"?

02:28  25        A.   Just above that.  Actually, the first thing I do is

0  3  1    I, of course, look at the pictures that's available, any

2    repair estimates that's available.  This is an unusual type

3    of impact in that the tongue of this trailer was bent

4    upwards and there was reported to have been no damage to the

02:29  5    truck and there didn't seem to be any damage from the images

6    I had of the Dodge.  I did receive a repair estimate for the

7    trailer stating they had to replace the tongue and coupler

8    and the wiring harness which implies, I think, that there is

9    no damage to the rear of that utility trailer.

02:29  10        So try to come up with a Delta V for the Dodge

11    of Mr. Breaud's vehicle.  I took a couple of different

12    approaches to it.  One is that the truck in striking the

13    trailer drove it forward causing the tongue to bend.  As it

14    bent at some point, probably when it would -- the bend would

02:29  15    contact the ground at around 30 to 45 degrees of bend, that

16    tongue would pop off of the ball hitch.

17        Q.   What do you mean by contact the ground?

18        A.   This is the tongue.  As it bends, it's -- this bend

19    eventually is -- the trailer is here.  The trailer is not

02:30  20    moving.  It's on the ground.  The Dodge is not moving.  It's

21    here on the ground.  So this tongue as it bends is going to

22    bend downwards.  And at some point that is going to contact

23    the ground.

24        Q.   Do you know if it did contact the ground?

02:30  25        A.   No, I don't.  I didn't look at the vehicle.  I

0'   )   1    would assume, though, that when you look at the height of

         2    the trailer hitch on the Dodge, I would probably -- two

         3    feet.  So that tongue, that length, I would think in the 30'

         4    to 45 degree range contact with the ground might occur

02:30    5    allowing it then to pop off the ball hitch.  If that had

         6    occurred, the facts that there was no damage to the rear of

         7    the bumper or the tailgate on Mr. Breaud's Dodge would imply

         8    that the tongue did not, strike that.  Which would mean then

         9    that Mr. Breaud's vehicle did not move if that was the

02:31   10    scenario.

        11              Now, I don't have -- I think that is certainly

        12    very, very possible.  Is it probable, I can't state that,

        13    but I think it's very possible.

        14         Q.  How did that scenario play into your calculations

02:31   15    and/or your conclusions?

        16         A.  Well, that was at the low end.  So I had that one

        17    scenario.  The very low end that it is possible that his

        18    truck didn't move.  So let's go up to the other end then.

        19    If his truck did move, I had to make a couple of assumptions

02:31   20    here.  One is that his truck and that utility trailer would

        21    act as one mass and when the freight liner hit it, all that

        22    energy would be translated through the trailer through the

        23    tongue to Mr. Breaud's pickup to move it forward.  In that I

        24    discounted any energy absorbed by the tongue of the trailer.

02:32   25    So I assumed it was one mass.

0:  ?   1          Now, to get a striking velocity for the

        2   Peterbilt it was reportedly stopped and he stated he moved

        3   forward while looking where to turn.  So I went into

        4   accident reconstruction textbooks and validated how fast a

02:32   5   tractor trailer could accelerate.  This one was empty.  And

        6   I made the assumption that if he accelerated at that rate

        7   over 10 feet, that's going to take approximately 3 seconds.

        8   It's not unlikely that to attain that you might have had to

        9   shift once in that time frame which I don't think he did.

02:32  10   But if he accelerated normally over a distance of 10 feet,

       11   he could get up to almost 5 miles an hour, 4.7.

       12       Q.   How did you reach -- How did you conclude the

       13   10 feet distance?

       14       A.   I just took that as a number.  I mean, if it

02:33  15   became -- he accelerated over 20 feet, then his speed is

       16   certainly going to be higher.  It wouldn't be double, but it

       17   would be higher.  But the reason I took 10 feet is because I

       18   said if this Peterbilt hit that utility trailer going 5

       19   miles an hour, I should except to see some damage on the end

02:33  20   of the utility trailer just from my own experience.  And the

       21   repair estimates didn't indicate that was the case.  So I

       22   think that was reasonable to assume that his velocity was

       23   less than 5 miles an hour and that would consist -- be

       24   consistent with him accelerating over -- well, it would be

02:33  25   the same as him accelerating normally over 10 feet, so I

0˙ 3    1    used that as an upper -- as an upper scenario.

2            From there then I used the principle of

3    conservation momentum to calculate what Mr. Breaud's vehicle

4    Delta V would have been.  Again assuming no energy to deform

02:34    5    the tongue of the utility trailer and from that calculation,

6    his Delta V would have been 3.8 miles per hour.  3.8

7    assuming the truck hit him at 5 miles an hour and all of

8    that energy was transferred through to Mr. Breaud's Dodge.

9       Q.  3.8 miles an hour, correct?

02:34    10       A.  Yes, sir.

11       Q.  You say Mr. Breaud's foot may have come off of the

12    brake pedal.  What difference would that make?

13       A.  It wouldn't have made any difference how Mr. Breaud

14    moved but in these low-velocity studies one of the common

02:34    15    findings is that once a lot of the people's feet that were

16    on the brake while stopped as a result of the impact, once

17    the Delta V got past 3 miles an hour, a lot of these

18    people's feet tended to come off of the brake.  And when you

19    think of Mr. Breaud's foot being on the brake here, as the

02:35    20    vehicle started to move away from him, the tendency is for

21    the brake to move forward and away from his foot.  So the

22    foot -- in other words, if you had a camera in the vehicle,

23    the foot would appear to come off the brake.  And that's

24    what they're referring to.  If that's the case, then his

02:35    25    vehicle would have rolled ahead.  He's traveling at 3.8

0:  ;   1    miles per hour.  It's going to take him a second, second and

        2    a half, normal reaction time, to get back on the brake.  And

        3    then for him to stop, he's probably going to travel anywhere

        4    from maybe six to ten feet forward before he gets his

02:35   5    vehicle stopped.  That's a consequence of his foot coming

        6    off the break as a result of the collision.

        7         Q.   So if I understand you, you assumed the distance of

        8    10 feet.  And if it were greater, then the Delta V would be

        9    greater?

02:36  10         A.   If the truck was allowed to accelerate normally

       11    over a longer distance, then, yes, its impact speed would be

       12    higher.  And consequently Mr. Breaud's Delta V would be

       13    higher.  But again, the evidence does not support that

       14    because the rear of that trailer appears to be undamaged.

02:36  15         Q.   Appears.  Did you examine the trailer?

       16         A.   No, sir, I didn't.  I used the images that were

       17    provided and the repair estimate that was provided.

       18         Q.   And you obviously did no examination of Mr. Breaud

       19    himself?

02:36  20         A.   That's correct, sir.

       21         Q.   Do you know how the trailer hitch was installed on

       22    the truck?

       23         A.   I assume it was directly mounted to the frame.  I

       24    don't know the exact mechanism or the components.  But those

02:37  25    types of trailer hitches are usually attached to the frame

0: 7  1    of the vehicle.

   2         Q.    Bolted or welded?

   3         A.    I don't know if it was bolted or welded, sir.

   4         Q.    Would it make a difference?

02:37  5         A.    No.   Not if it was bolted on securely.

   6         Q.    What if it wasn't bolted on securely?  Would it

   7    make a difference?

   8         A.    Then it may have been lying underneath the vehicle

   9    after the impact.

02:37 10         Q.    It doesn't make a difference one way or the other

  11    if it's bolted or welded, as long as it's bolted securely is

  12    what you're saying?

  13         A.    Yes.   If it's bolted properly on, then any forces

  14    that applied to it would be transmitted through the vehicle

02:37 15    whether it was bolted or welded.

  16         Q.    You say it is likely that the Peterbilt would have

  17    shifted at least once.  Would that make a difference?

  18         A.    Well, that's just in my own experience.  I'm not a

  19    truck driver.  But just watching trucks accelerate that as

02:37 20    they're pulling away from a stop sign you count 1001, 1002,

  21    1003.  The vast majority of trucks in order to continue

  22    accelerating would shift during that time frame.

  23         Q.    Ten feet?

  24         A.    It takes them three seconds to cover ten feet.

02:38 25         Q.    Would it make a difference in your calculations if

0.  3   1   he shifted or didn't shift?

        2       A.   No, sir.

        3       Q.   Because his deposition testimony is he didn't

        4   shift?

02:38   5       A.   That's right.  Which tends to, I think, put a lower

        6   speed onto the impact speed, the fact that he didn't shift.

        7       Q.   You say if the Peterbilt struck the Dodge at 4.7

        8   miles an hour, so how did you pick the 4.7?  Is that

        9   arbitrary or did you calculate that?

02:38   10      A.   That was calculated based on the distance of

        11  ten feet.

        12      Q.   Which is arbitrary?

        13      A.   That is arbitrary yes, sir.  I picked a number that

        14  I thought was at the upper end of the -- I was going to say

02:39   15  scale, but just at the upper end of the -- that would result

        16  in a speed at the upper end of this event.

        17      Q.   And we've already discussed if the distance was

        18  greater and the speed was greater, the Delta V would be

        19  higher?

02:39   20      A.   That's correct.

        21      Q.   You say his head may have contacted the head rest

        22  part.  Why did you conclude that?

        23      A.   That again has been shown in low-velocity tests

        24  that the velocity in which people's head tend to hit the

02:39   25  head rest is roughly in the range that their feet tend to

come off the brake so around -- as the speed gets above
three miles an hour, people's heads tend to go back far
enough to hit the head rest.  If someone is in a Delta V at
ten miles an hour and they're adamant their head didn't hit
the head rest, then I highly doubt that was a Delta V of
ten.  So it does tend to tell you greater than or less than.

Q.   But it doesn't have anything to do with your
calculations?

A.   No, sir.

Q.   You say Mr. Breaud was involved in a low-speed
rear-end impact that resulted in him being subjected to
minimal forces.  That's based on your calculations starting
with the ten feet distance, the Delta V?

A.   Well, let's say Mr. Breaud was subjected to a Delta
V as high as five miles an hour.  From the low-velocity
testing it can be -- you can appreciate the type of
accelerations he would have been subjected to.  And the
Delta V of five miles an hour, his acceleration forward
would have been within the three to four G range.  So that's
what his seat back would have been doing in moving forward,
compressing, and then accelerating him forward.  So as the
pelvis, lumbar spinal, mid spine would have been subjected
to a three to four G acceleration for a -- maybe a tenth of
a second.

Q.   Let me change the subject a little bit here before

0:  !   1    I forget because I have a tendency to do that.  I wanted to

        2    ask this three times already.  Do biomechanics contend that

        3    no injury to the spine can occur at a low-impact collision

        4    with a Delta V of, say, five?

02:42   5       A.    No.  If individuals did state that, then the

        6    evidence doesn't support them.  People do experience

        7    symptoms and experience injuries in low-velocity rear-end

        8    collisions.

        9       Q.    What's the determining factors that would determine

02:42  10    if a person does or doesn't besides the obvious, treatment

       11    by his orthopedist and neurosurgeon?

       12       A.    Well, I'm not sure what you meant by the last

       13    statement, treatment by the orthopedist.  But when you look

       14    at the low-velocity studies and when you look at placebo

02:42  15    rear-end collisions, it does seem to be that five miles per

       16    hour is given around there.  It seems to be the range where

       17    people above that start to experience symptoms.  And people

       18    less than that typically do not experience symptoms.  But

       19    that has to be taken into context in our society that you

02:43  20    can convince somebody they've been in a rear-end collision

       21    who actually haven't been; 20 percent of people will

       22    experience symptoms.  That's been demonstrated.  But when

       23    you look at the literature, various papers, and some of the

       24    analyses that I've done support that injury threshold being

02:43  25    around five miles an hour.

0:  ¦  1    Q.   But you said that people in minimal rear-end

2    low-impact collisions can be hurt?

3    A.   I didn't say hurt.  They can certainly experience

4    symptoms.

02:43  5    Q.   Okay.

6    A.   People in no collision can experience symptoms.

7    Q.   Or do you attribute that to what?

8    A.   That's an area open to discussion.  In our culture

9    and society where people do believe they can be injured in

02:44  10   low-velocity rear-end collisions, there is information out

11   there that tells us that if you convince somebody they've

12   been in one, there's -- in that one study there's about a

13   20 percent chance that they would have neck pain that they

14   said was caused by that event.

02:44  15   Q.   Well, it goes back to my original question.  Do

16   biomechanics all believe that you can't be injured in a

17   low-impact collision unless you are psychosomatically

18   complaining or other reasons but there's no mechanical

19   injury to the body?

02:44  20        MR. CALLIHAN:  Talking about injury or

21   herniated disk?  I'm going back to your original question

22   which I think was herniated disk.

23        MR. FAVRE:  No.  I think injury.  Because I

24   think he said right here.

02:45  25        MR. CALLIHAN:  Well, I'm just asking.

0:  ;    1          MR. FAVRE: I'll object. You may be right.

       2      Q.   (BY MR. FAVRE) I'm asking off this paragraph, "The

       3   majority of volunteer test subjects exposed to this

       4   magnitude of impact developed no symptoms. Minority

02:45   5   experienced symptoms." And my question was, do biomechanics

       6   believe that there are no symptoms for low-speed collision?

       7      A.   No. Biomechanics to my knowledge believe that

       8   people can become symptomatic -- can complain of symptoms

       9   after a low-speed rear-end collision. That's been shown by

02:45  10   the literature over and over again.

      11      Q.   Do they believe that these symptoms are brought

      12   about by physical injury or something other than physical

      13   injury.

      14      A.   Well, when we look at the low-speed range of less

02:45  15   than ten miles per hour, yes, people can experience muscular

      16   injury of their neck. They can experience symptoms of that

      17   for varying time periods.

      18          When you look at the low-velocity human

      19   subject testing that has been done worldwide, a very small

02:46  20   percentage of people actually had low back discomfort after

      21   this. And I think the percentage was less than 1 percent.

      22   Sorry, was 1 percent of participants. All of those

      23   individual's pain settled down very quickly. Three of them

      24   within a day and one within four days. Various of these

02:46  25   papers state that you cannot injure your low back in a

1    low-velocity rear-end collision.  And I agree with that.  I

2    believe you cannot injure your back.  There are no

3    differential forces applied to your back that allows an

4    injury to take place.  But people in these events, because

5    of the noise and the surprise involved, can develop a

6    reflexive muscle type strain that can lead them to have

7    symptoms for a very short time period.

8         Q.   And this reflexive muscle strain can be a violent

9    reflexive action?

10        A.   Well, I think you can answer that as well as I can.

11   We've all been startled.  We've all moved suddenly and felt

12   a muscle pull but --

13        Q.   Maybe again I'm asking a bad question.  Can a

14   violent muscle reflexive action cause severe damage?

15        A.   No.

16        Q.   Why not?

17        A.   The most the individual is going to get is a mild

18   muscle strain.  You're just suddenly contracting muscle as

19   a startled response.  You're not contracting them against

20   anything.  You're not trying to lift a heavy barrel.  And

21   you will develop -- if you do develop symptoms, which is

22   unlikely, then they typically settle down within days.

23        Q.   Because you mentioned this earlier, I'm going to

24   ask you if I misunderstood you again.  You said something

25   about when you were taking off some factors.  And I don't

1  remember what the question was.  But you mentioned the

2  position of the body.  Would that -- could that make a

3  difference in the mechanics of an injury if the body is in a

4  certain position in a vehicle?

5      A.    If the person is out of position -- When I say out

6  of the position, I'm meaning out of a normal driving

7  position, then that would have to be taken into

8  consideration.

9      Q.    How would that make a difference?

10     A.    Well, again, in a low-speed rear-end collision, if

11  we're talking about the low back, it probably wouldn't make

12  a lot of difference.  I mean, if we think of a person being

13  out of position typically they'd be leaning forward or they

14  could be leaning to the side reaching for something out of

15  the passenger seat.  But their low back is going to be

16  accelerated uniformly forward by that dancing seat back.

17     Q.    In your initial paragraph I believe, at least on --

18  well, "I have arrived at the following observations and

19  preliminary opinions"; do you see that paragraph?

20     A.    Yes, sir.

21     Q.    Where did you get your data from to reach these

22  opinions?

23     A.    I received it from Ms. Young.

24     Q.    From who?

25     A.    Ms. Young.

0:     )     1        Q.    Okay.   She told you that Mr. Breaud was a

             2     restrained driver?

             3        A.    Oh, I'm sorry.   I have a list down below that that

             4     shows you the records that were provided me.

02:50    5        Q.    Okay.   That's what I'm asking you.   Which records

             6     did you review?

             7        A.    Oh, the ones listed here.

             8        Q.    Did you get that information, restrained driver?

             9        A.    Yes.

02:50   10        Q.    Which one?

            11        A.    Oh, that would be off of the -- I would assume the

            12     police report.

            13        Q.    Okay.   That he was pulling an unloaded trailer?

            14        A.    Off of -- possibly the police report, possibly his

02:50   15     statement or deposition.

            16        Q.    Okay.   Both vehicles were stopped at a red light.

            17     When the light turned green, the Dodge moved forward.   Then

            18     distancing, then stopped.   Where did you get that

            19     information?

02:50   20        A.    I believe both individuals, Mr. Holland and Mr.

            21     Breaud stated something to that effect.

            22        Q.    Where?

            23        A.    Pardon me?

            24        Q.    Stated it where?

02:50   25        A.    In the depositions.

0.   L   1        Q.   Did you review Mr. Breaud's deposition?

        2         A.   Yes, sir.

        3         Q.   Or, I think, Mr. Breaud stated that he was stopped

        4    and he was struck from the rear and I believe he denies that

02:51   5    the 18-wheeler came to a stop behind him and then the

        6    mechanism, as you're assuming it was, took place.

        7              MR. CALLIHAN:  You say you think.  Is that an

        8    assumption on your part;?  Or do you know that for a fact

        9    that's what his deposition testimony was?

02:51  10              MR. FAVRE:  I think that's his deposition

       11    testimony.  I'm paraphrasing.

       12              MR. CALLIHAN:  So it's an assumption.

       13         Q.   (BY MR. FAVRE)  Well, I'm paraphrasing.  Did you

       14    read his deposition?

02:51  15         A.   Yes, sir, I did.

       16         Q.   If he said that, why wasn't that considered?

       17         A.   Well, in the first deposition, he didn't mention

       18    that.  And it was a year and some-odd later in the second

       19    deposition he stated that the Peterbilt did not stop.  The

02:52  20    Peterbilt driver stated that he was stopped.  Either case,

       21    if we use an impact speed of 5 miles an hour, the fact that

       22    the rear of that utility trailer is not damaged I think

       23    supports that, that this speed of the Peterbilt was less

       24    than that.  Now, whether he was stopped or not I still think

02:52  25    that that roughly 4.7 or 5 mile an hour closing speed of the

```
0.  ?  1    Peterbilt does put an upper limit onto the impact analysis.

       2        Q.    And you're basing that on the fact that the rear of

       3    trailer wasn't damaged?

       4        A.    Not from the images that I saw.  The repair

02:52  5    estimate did not outline any repair work to the rear of the

       6    trailer.

       7        Q.    Okay.  And you reviewed a bunch of medical records

       8    of Mr. Breaud.  Did any of those records contain complaints

       9    of low back pain prior to the accident?

02:53 10        A.    Yes, sir, they did.

      11        Q.    Okay.  Which ones were they?

      12        A.    Mr. Breaud's primary care physician.  If I could

      13    refer to --

      14        Q.    Sure.

02:53 15        A.    Thank you.  In Dr. Cronan's records there were

      16    three references to low back pain.  One on the 25th of May

      17    '94.  The other on 12 June and 22 June of '95.  There was

      18    also a reference by an emergency room note on 30 May of

      19    1994, Our Lady of the Lake Regional Medical Center.

02:54 20        Q.    Do you know the date of the accident?

      21        A.    2 May 2003, I believe.

      22        Q.    And the back pain references, what, June --

      23        A.    They were '94 and '95.

      24        Q.    Now, again, I must have asked earlier, do you have

02:54 25    any -- review any records that indicated he had complaints
```

0:  1   1   of low back pain prior to the accident?

2          A.   How far prior?

3          Q.   Any records you reviewed.

4          A.   I just stated that he had episodes of low back pain

02:55  5   in 1994 and 1995.

6          Q.   That was after the accident?

7          A.   That was prior to the accident.

8          Q.   Both of them were prior.  I'm sorry.  What's the

9      date of the accident?

02:55 10              MR. CALLIHAN:   2003.

11         Q.   (BY MR. FAVRE)  Okay.  I thought you were saying

12     '03.  My bad.

13         A.   Sorry.

14         Q.   So that would be '94 and '95?

02:55 15         A.   Yes, sir.

16         Q.   Anything more recent between '03 and '95?

17         A.   I just had the emergency room record from the

18     facility that he went to on that date of the event, 2 May

19     2003.  It was Lane Memorial Hospital where the physician

02:55 20   recorded that he had back pain for several days.  I'm not

21     sure what that meant but that could easily be interpreted

22     that he had back pain that preceded -- that he was having

23     ongoing back pain that preceded the event by several days.

24              (Brief discussion off the record)

03:00 25         Q.   (BY MR. FAVRE)  What is crush?  Crush, the term

0    )    1    crush?

2         A.    Crush.    With regards to automobile accidents that

3    would be the permanent deformation that results from an

4    impact.

03:00    5         Q.    Do you use crush to -- to compute force?

6         A.    You can use crush if you have a vehicle that's been

7    damaged.    You can use the standard accident reconstruction

8    formulas and have an idea of the force that was needed to

9    generate it.

03:00    10         Q.    What about acceleration?    Can you determine

11    acceleration from crush?    Is crush an intrusion

12    interchangeable?

13         A.    Well, crush would apply to the -- anywhere in the

14    entire vehicle, but intrusion typically refers to elements

03:00    15    of the passenger compartment moving inwards towards the

16    occupant.

17         Q.    So let's talk about crush then.    Can it be used to

18    determine acceleration?

19         A.    You can -- There are formulas that you can use to

03:01    20    analyze crush of two vehicles and come to an understanding

21    of the Delta V involved in that impact.

22         Q.    So you can use crush to determine Delta V?

23         A.    Yes, sir.

24         Q.    Or change of velocity?

03:01    25         A.    Yes.

0.    :    1        Q.    Did you use any crush considerations in your

          2    calculations?

          3        A.    No, I didn't.

         ·4        Q.    No crush considerations regarding the trailer?

03:01     5        A.    No, sir.

          6        Q.    Why not?

          7        A.    Well, first of all, there wasn't any evident crush

          8    to any of the vehicles. The only real visible damage was

          9    the tongue of the trailer.  And I don't know how much force

03:01    10    would be required to bend that, whether it be 1,000 pounds,

         11    5,000 pounds.  I don't know that.  And those aren't answers

         12    I'm going to find in an accident reconstruction textbook.

         13        Q.    Would that make a difference if it took 1,000

         14    pounds to bend it or 5,000 pounds?

03:02    15        A.    Well, I made the assumption that the trailer was

         16    not damaged in my calculations for Mr. --

         17        Q.    I'm talking about the hitch.

         18        A.    The hitch.  I'm sorry.  The hitch was not damaged

         19    in my assumptions with Mr. Breaud's vehicle.  I assumed that

03:02    20    all of the energy went into moving his vehicle forward.  I

         21    didn't count any energy that was used to deform the tongue

         22    of the trailer.

         23        Q.    Have you inspected the frame of the truck?

         24        A.    No, sir.  I haven't inspected any of the vehicles.

03:02    25        Q.    We already discussed the trailer hitch, how it was

1    mounted.  We don't know if it was brackets or how it was

2    raised?

3        A.   Yes, sir, that's right.

4        Q.   Would you need to know the crush or damage to the

5    trailer hitch, the truck -- and the truck frame to make your

6    calculations?

7        A.   No, sir.  I didn't -- again, I didn't use any

8    crush-related calculations for this event.

9        Q.   Would they aid you if you knew them?

10       A.   You're stating that the vehicles were damaged and

11   I'm not aware of that?

12       Q.   No.  I guess what I'm asking is another bad

13   question.  Assuming the vehicles were damaged, could you

14   reach your calculations without using crush or it's just an

15   alternate method?

16       A.   Sorry.  Could you repeat the question, sir?  I'm

17   getting confused.

18       Q.   I asked if you need to know crush or damage to the

19   trailer, the hitch, and the truck frame to make your

20   calculations, and you said no?

21       A.   If I was doing an energy-based calculation, the

22   energy of the truck being transmitted to Mr. Breaud's

23   vehicle, then yes, any energy taken up in deformation I

24   would need to know that.  But I haven't done that type of

25   calculation here.

0    1    1        Q.    Would that -- What would that type of calculation

         2    tell you?  My question was, is there an alternate method of

         3    reaching the same conclusion or --

         4        A.    If there was crush damage, you -- yes, you could

03:04    5    use that method to come up with a Delta V.

         6        Q.    It would be the same --

         7        A.    Well, the vehicles here that would be very

         8    difficult because typically the coefficient of stiffness --

         9    coefficient of stiffness values are for passenger cars and I

03:05   10    think light trucks.  But we certainly wouldn't find a

        11    coefficient of stiffness for the Peterbilt nor would we find

        12    a coefficient of stiffness for the utility trailers.  So it

        13    would be very -- if there were crush present, it would be

        14    very difficult to use crush-based or energy-based formulas

03:05   15    to come up with that Delta V.

        16        Q.    Do you know if Mr. Breaud was moving or stopped at

        17    impact?

        18        A.    I made the assumption that he was stopped.

        19        Q.    And why was that?

03:05   20        A.    He said he was stopped.  One of the things Delta V

        21    is useful for it's a change in velocity.  Therefore, if

        22    Mr. Breaud's vehicle was going 5 miles an hour and he

        23    underwent a Delta V of 3.8 miles per hour, then his speed at

        24    the end of that would be 8.8 miles per hour.  If his Delta V

03:05   25    was the same and his starting speed was O, then his end

1  spend was 3.8 miles an hour.  So when you use Delta V terms,

2  it's not necessary to know what the starting vehicle speed

3  is because you know his vehicle underwent a change of that

4  much.

5      Q.    You don't know or do you know whether Mr. Breaud

6  was aware or unaware of the impending collision?

7      A.    In his first deposition I would make the assumption

8  he was unaware.  He didn't say anything that would indicate

9  he was aware.  In his second deposition, he stated that the

10 Peterbilt truck did not stop which would make me think that

11 he was aware of the event.

12     Q.    Would it make a difference biomechanically?

13     A.    If he was aware of the event which he stated in his

14 second deposition then because of the very low speed that

15 this impact occurred at, his motion would have been less.

16 Sir, when I say "motion," I meant the motion of his head and

17 neck.

18     Q.    Do you know when you were first retained to give an

19 opinion in this case?

20     A.    No, I don't, sir.  I don't have copies with me of

21 the communications that my office had with Ms. Young's

22 office.

23          MR. CALLIHAN:  Of course, work product I would

24 place an objection to any notes or correspondence by me and

25 Mr. -- or Dr. Bain.

```
0.  3   1              MR. FAVRE:  Do you object to him telling me

        2    when he was first retained or giving me a document that says

        3    when he was first retained?

        4              MR. CALLIHAN:  He can tell you, I guess, the

03:08   5    date that he was first retained.  But as far as any

        6    documentation --

        7              MR. FAVRE:  Okay.  If I ask him to tell you

        8    when it was so we can get on with the deposition, would that

        9    be sufficient?

03:08  10              MR. CALLIHAN:  Yeah.

       11       Q.   (BY MR. FAVRE)  Would you tell your attorney what

       12    your records show?

       13       A.   I --

       14       Q.   And then he can tell us?

03:08  15       A.   Oh, sure.

       16              MR. FAVRE:  Is that okay?

       17              MR. CALLIHAN:  Yes.

       18       Q.   (BY MR. FAVRE)  Doctor, have you ever been a

       19    recipient of any government grants?

03:08  20       A.   No, sir.

       21       Q.   Do you know if the trailer hitch was made of iron

       22    or steel?

       23       A.   I would assume it was steel, but I don't know.

       24       Q.   You don't know the strength properties of the

03:09  25    hitch -- of the tongue?
```

A.    No, sir.

Q.    Do you know of any data or existing database that crashes vehicles into trailers connected to vehicles?

A.    No.  I don't think there's anything out there.  I'm not aware of anything.

Q.    You don't know any -- or poundage or force that it would take to bend that trailer tongue in the shape it was in, do you?

A.    No, sir.

Q.    Do you have any idea what speed the tractor would have been in to bend that other than what you calculated to be five miles an hour?

A.    No, sir.  I don't know -- given the truck's weight I think was 28,000 pounds, I think the only way to find that out would be to run a test.

Q.    Would that be important to do?

A.    I think we could do it.  I think that the Delta V if we -- for Mr. Breaud's vehicle, if we did run such a test, would be considerably lower than what I've stated as 3.8.

Q.    And your calculations wouldn't be affected or determined by the method of attaching the trailer hitch to the van or the pickup truck?

A.    No, sir.  I made the assumption that it was originally attached and did not come off.

0:      1        Q.    Have you ever written a paper on lumbar disk injury

        2    or disease?

        3        A.    No, sir.

        4        Q.    Have you ever given a seminar as a doctor or as a

03:12   5    biomechanic regarding lumbar disk disease?

        6        A.    I have given talks to organizations on the

        7    biomechanics of lumbar disk disease but not as a physician.

        8        Q.    Do you know if -- if your company, Biodynamics,

        9    does work exclusively for insurance companies or do you-all

03:12  10    do work for other entities?

       11        A.    Well, I know that they work for a variety of

       12    companies, insurance and otherwise, and we also do work for

       13    plaintiffs.

       14        Q.    They do work for plaintiffs?

03:12  15        A.    Yes, sir.

       16        Q.    But you've never done any?

       17        A.    I've offered opinions for plaintiffs I think on

       18    three occasions.

       19        Q.    Did those three occasions entail rear-end

03:13  20    collisions?

       21        A.    Yes, sir.  All three did.

       22        Q.    Low speed?

       23        A.    Yes, sir.

       24        Q.    Was that in connection with a lawsuit?

03:13  25        A.    Yes, sir.

0   3   1         Q.    And you weren't asked to testify in that lawsuit?

        2         A.    That's correct, sir.

        3         Q.    Do you know why?

        4         A.    No, sir.

03:13   5         Q.    Do you know Dr. McNish?

        6         A.    Yes, I do.

        7         Q.    Is he still employed?

        8         A.    Yes, he is.

        9         Q.    Are you aware that his testimony was turned down by

03:13  10   courts in Louisiana?

       11         A.    I wasn't aware of that, no.

       12         Q.    What about Florida?

       13         A.    I don't know the specifics.  I believe most of the

       14   consultants in our company has had their testimony limited

03:13  15   at one point or another, but I'm not aware of specifics.

       16         Q.    And he still works for your company?

       17         A.    Yes, sir, he does.

       18         Q.    Do you consider or does your discipline consider

       19   when you give a biomechanical opinion, is that an accident

03:14  20   reconstruction or does it contain elements of

       21   reconstruction?  Would you hold yourself out as an accident

       22   reconstructionist, I guess, I'm asking?

       23         A.    No, sir.  I don't hold myself out as a

       24   reconstructionist.  I have training in accident

03:14  25   reconstruction, and I do impact analyses on low-speed

0: 5    1    collisions.  But to me someone holding themselves out as an

        2    accident reconstructionist would reconstruct high-speed

        3    events, roll-overs, and, no, sir, I don't do that.

        4        Q.    And you don't feel you'll be qualified to do that?

03:15   5        A.    High-speed roll-over or high-speed collision?

        6        Q.    A typical accident reconstruction?

        7        A.    Well, certainly low-speed events I believe I'm -- I

        8    feel I'm qualified to do an impact analysis on those.  But

        9    the high-speed events, no, sir, I wouldn't be offering just

03:15   10   strictly an accident reconstruction opinion on those.

        11       Q.    Have you ever been qualified as an accident

        12   reconstruction expert in any court?

        13       A.    As an accident reconstructionist solely?

        14       Q.    Yeah.

03:16   15       A.    No, sir.

        16       Q.    And there's several qualifications in different

        17   courts or for all biomechanical expertise?

        18       A.    And medical.

        19       Q.    You've been qualified as a medical expert?

03:16   20       A.    Yes, sir.

        21       Q.    In cases involving automobile accidents?

        22       A.    Yes, sir.

        23       Q.    I thought I asked that question earlier.  Let's get

        24   into that.  Was that here in the United States or in Canada?

03:16   25       A.    Here in the States, sir.

0.   5    1        Q.   Are those cases on your list --

          2        A.   Yes.

          3        Q.   -- that you provided?

          4        A.   Yes, sir.

03:16     5        Q.   Can we go back to that?

          6        A.   Yes, sir.

          7        Q.   That's an exhibit way back there.  Okay, which ones

          8   are -- you qualified as a medical expert?

          9        A.   I've spoken to medical issues in all of those

03:17    10   cases.

         11        Q.   You gave medical opinions?

         12        A.   Yes, sir.

         13        Q.   In all of those cases?

         14        A.   Yes, sir.

03:17    15        Q.   And that medical opinion is in conjunction with

         16   your biomechanical background?

         17        A.   It's in conjunction with my almost 20 years as an

         18   emergency medicine and family physician.

         19        Q.   You've given opinions as to the diagnosis of

03:17    20   patients?

         21        A.   Yes, sir.

         22        Q.   Prognosis?

         23        A.   Not directly.  Not directly.

         24        Q.   Have you ever given an opinion as a medical doctor

03:17    25   standing alone from any involvement in the case with

```
0   7    1  biomechanics?

         2      A.   Yes, sir.

         3      Q.   Which ones?

         4      A.   One case.  Percival, up near the top, fourth one

03:17    5  from the top.  Third from the top?  Fourth.

         6      Q.   Percival.  Ronetta Percival versus Elizabeth

         7  Matson?

         8      A.   That's -- Yes, sir.

         9      Q.   Okay.  Thank you.  I'm almost done.

03:18   10      A.   I'm sorry, sir?

        11      Q.   I'm almost done.

        12           Were any sensitivity tests done at different

        13  speeds in reaching your conclusions?

        14      A.   Well, to answer your question directly, no, that

03:18   15  term was not used in these studies.  But to these

        16  low-velocity rear-end collisions were run -- there have been

        17  studies done over the whole gamut of the low-velocity range

        18  from one mile an hour up to ten miles an hour.  So if you're

        19  using sensitivity the term is -- with regards to different

03:19   20  speeds, that has been done in the -- when you consider the

        21  entire world's literature.

        22      Q.   What about sensitivity tests for different angles?

        23      A.   All of the -- I shouldn't say that.  Most of the

        24  low-velocity literature using human subject testing has been

03:19   25  collinear -- have been collinear collisions.  There have
```

0    )    1    been some collisions done at offsets up to 30 degrees.

         2         Q.    Any sensitivity test down where different distances

         3    were used for the target vehicle accelerating from a stop?

         4         A.    The target vehicles --

03:20    5         Q.    I'm sorry, the striking vehicle?

         6         A.    The striking vehicles have been accelerated over a

         7    variety of different distances and a variety of different

         8    rates to achieve a certain impact speed.  And the impact

         9    speed would have been calculated beforehand so that they

03:20   10    would have an appreciation for the Delta V range that the

        11    target vehicle was going to undergo.  And as I said, some of

        12    those target vehicles have been -- have undergone a Delta V

        13    in excess of ten miles an hour.  So that would imply an

        14    impact speed well in excess of that.

03:20   15              But the distance over which the target

        16    vehicles were accelerated is not that important.  It's the

        17    final speed at impact.  I mean, they could have accelerated

        18    very slowly over a long distance.  They could have

        19    accelerated very rapidly over a short distance.  The end

03:21   20    result is you want to achieve a certain velocity prior to

        21    impact.

        22         Q.    Do you know a Dr. Lloyd.

        23         A.    Dr. William Lloyd?

        24         Q.    Let me check it out.  He used to work here or still

03:21   25    works here?

0    ↳    1     A.    I don't know Dr. Lloyd.    I am aware that he used to

2    work at BRC.

3         Q.    You're aware that he was not permitted to testify

4    regarding causation of injuries in Kernel versus

03:21  5    Mid-Continental Casualty cases, Jefferson Parish, Louisiana?

6         A.    No, sir.

7         Q.    You don't know anything about that?

8         A.    No, sir, I don't.

9         Q.    When did you last work in Canada as a doctor?

03:21  10         MR. CALLIHAN:    I'm going to object.    He can

11    answer, but it's already been asked and answered twice now,

12    I think.

13         THE WITNESS:    My last shifts -- I don't know

14    if I worked in the month of June 2003, but I certainly

03:22  15    worked in May.    So the end of May 2003.

16         Q.    (BY MR. FAVRE)    And who did you work for?

17         A.    I was self-employed.    I worked at three hospitals.

18    One primarily as a full-time casualty officer.    Another one

19    on a part-time basis as a casualty officer.    And a third one

03:22  20    on a part-time basis as a casualty officer and as an

21    in-house physician.

22         Q.    I think that's all I have.

23         MR. CALLIHAN:    We're done.

24         (Deposition concluded at 3:22 p.m.)

25

```
 1                    CHANGES AND SIGNATURE
 2   RE:  MARVIN C. BREAUD AND VICKI BREAUD VS. WERNER
     ENTERPRISES, INC. OF NEBRASKA, AND JOHN HOLLAND
 3
     PAGE    LINE    CHANGE              REASON
 4   _____
                      SEE ATTACHED
 5   _____
     _____
 6   _____
     _____
 7   _____
     _____
 8   _____
     _____
 9   _____
     _____
10   _____
     _____
11
12        I, CHARLES E. BAIN, B.ENG., M.D., C.C.F.P., have
     read the foregoing deposition and hereby affix my signature
13   that same is true and correct, except as noted above.
14
                      _____
15                    CHARLES E. BAIN, B.ENG., M.D.,
                      C.C.F.P., Witness
16
17   THE STATE OF  Texas      )
     COUNTY OF   Bexar        )
18
          Before me, Cheryl L. Parkinson , on this day
19   personally appeared CHARLES E. BAIN, B.ENG., M.D., C.C.F.P.,
     known to me (or proved to me under oath or through
20   _____ ) (description of identity card or other
     document) to be the person whose name is subscribed to the
21   foregoing instrument and acknowledged to me that they
     executed the same for the purposes and consideration therein
22   expressed.
23        Given under my hand and seal of office this 27th
     day of  June       ,  2005 .
24
                      Cheryl L Parkinson
25   _____   Notary Public in and for
     CHERYL L. PARKINSON    the State of  Texas
     Notary Public
     State of Texas
     My Comm. Exp. 06-17-2006
```

|  |  |
|---|---|
| **MATTER:** | Breaud, Marvin vs. Warner Enterprises of Nebraska |
| **DEPOSITION OF:** | Dr. Charles E. Bain, B.Eng., M.D., C.C.F.P. |
| **DATE TAKEN:** | 6/14/2005 |

June 24, 2005 - Read and corrected by Dr. Charles E. Bain, B.Eng., M.D., C.C.F.P.

Page 11    Line 15

    Now Reads: at BRC...
    Should Read: ...reconstruction, kinematic analysis

    Reason: clairification

Page 11    Line 16

    Now Reads: on humans...
    Should Read: of human occupants and the biomechanics...

    Reason: clarification

Page 21    Line 21

    Now Reads: It involved...
    Should Read: It involved the development of a chronic pain condition.

    Reason: clarification

Page 22    Line 18

    Now Reads: haven't...
    Should Read: But I do have expertise...

    Reason: clarification

Page 23    Line 17

    Now Reads: literature...
    Should Read: literature that involved human subject testing...

    Reason: clarification

Errata
Page 2

Page 26    Line 1

        Now Reads:  The study...
        Should Read:  ...the incidence of...

        Reason:  clarification

Page 27    Line 18

        Now Reads:  to the automobile...
        Should Read:  ...in a braked, unbraked...

        Reason:  clarification

Page 27    Line 19

        Now Reads:  There wasn't...
        Should Read:  ...analysis done to come...

        Reason:  clarification

Page 31    Line 9

        Now Reads:  paper...
        Should Read:  ..there were not any details to perform a
                   statistical analysis

        Reason:  clarification

Page 31    Line 10

        Now Reads:  done...
        Should Read:  on.  It was...

        Reason:  clarification

Page 31    Line 15

        Now Reads:  there is...
        Should Read:  ...variability among individuals...

        Reason:  clarification

Page 32    Line 9

        Now Reads:  then...
        Should Read:  ...They actually gave

        Reason:  clarification

Page 32    Line 20

        Now Reads:  certainly...
        Should Read:  certainly of much more interest...

Errata
Page 3

Reason: clarification

Page 34          Line 1

Now Reads: of the...
Should Read: in the...

Reason: clarification

Page 34          Line 6

Now Reads: ...of the...
Should Read: ...effect on the...

Reason: clarification

Page 37          Line 1

Now Reads: ...result...
Should Read: stiffness that resolved...

Reason: clairification

Page 37          Line 2

Now Reads: obviously...
Should Read: ...they had...

Reason: clarification

Page 38          Line 4

Now Reads: ...and I think
Should Read: ...and I think any symptoms that resulted
resolved

Reason: clarification

Page 38          Line 5

Now Reads: were dated...
Should Read: within a matter...

Reason: clarification

Page 39          Line 12

Now Reads: ...biomechanic's...
Should Read: ...biomechanical...

Errata
Page 4

<table>
<tr><td></td><td></td><td>Reason:</td><td>clarification</td></tr>
</table>

Page 41 Line 5

  Now Reads: stating this...
  Should Read: ...He's stating the biomechanical

  Reason: clarification

Page 41 Line 6

  Now Reads: knowledge...
  Should Read: knowledge of how the spine degenerates
       and...

  Reason: clarification

Page 41 Line 12

  Now Reads: has...
  Should Read: has demonstrated...

  Reason: clarification

Page 42 Line 10

  Now Reads: ...In
  Should Read: ...structures.  Incising

  Reason: clarification

Page 42 Line 11

  Now Reads: sizing...
  Should Read: the annulus...

  Reason: clarification

Page 42 Line 13

  Now Reads: ...dangling...
  Should Read: bones, compressing them...

  Reason: clarification

Page 42 Line 14

  Now Reads: come...
  Should Read: ...out of that...

  Reason: clarification

Page 44 Line 4

Errata
Page 5

        Now Reads:  to...
        Should Read:  to this belief.

        Reason:  clarification

Page 45        Line 14

        Now Reads:  ...But...
        Should Read:  slowly-progressive phenomenon.

        Reason:  clarification

Page 45        Line 15

        Now Reads:  position...
        Should Read:  One of the positions they're taking is that
                this is just a normal aging

        Reason:  clarification

Page 45        Line 18

        Now Reads:  ...how...
        Should Read:  you look...

        Reason:  clarification

Page 46        Line 23

        Now Reads:  causing...
        Should Read:  ...There is a tendency...

        Reason:  clarification

Page 46        Line 25

        Now Reads:  literature...
        Should Read:  ...that it is...

        Reason:  clarification

Page 48        Line 16

        Now Reads:  originate...
        Should Read:  cause the numbness.  Yes,...

        Reason:  clarification

Page 49        Line 2

        Now Reads:  ...exist.
        Should Read:  ...exists.

Page 51          Line 8

Reason: clarification

Now Reads: Compare...
Should Read: I compare...

Page 51          Line 14

Reason: clarification

Now Reads: forces...
Should Read: ...mechanism enough to cause...

Page 52          Line 10

Reason: clarification

Now Reads: ...So...
Should Read: So to try to...

Page 52          Line 11

Reason: clarification

Now Reads: of...
Should Read: of Mr. Breaud's vehicle, I took...

Page 53          Line 23

Reason: clarification

Now Reads: tongue...
Should Read: ...In that scenario I

Page 55          Line 3

Reason: clarification

Now Reads: conservation...
Should Read: conservation of momentum...

Page 55          Line 15

Reason: clarification

Now Reads: findings...
Should Read: findings is that a lot of...

Page 57          Line 14

Reason: clarification

Errata
Page 7

              Now Reads:  that...
              Should Read:  that are applied...

              Reason:  clarification

Page 58        Line 24

              Now Reads:  that the...
              Should Read:  that the velocity at which...

              Reason:  clarification

Page 60        Line 15

              Now Reads:  rear-end...
              Should Read:  ...It seems to be ...

              Reason:  clarification

Page 60        Line 16

              Now Reads:  hour...
              Should Read:  hour is the range where

              Reason:  clarification

Page 60        Line 19

              Now Reads:  ..,society that...
              Should Read:  ...society that if you

              Reason:  clarification

Page 60        Line 24

              Now Reads:  analyses...
              Should Read:  ...support the injury...

              Reason:  clarification

Page 63        Line 19

              Now Reads:  a startled...
              Should Read:  a startle response.  You're...

              Reason:  clarificationi

Page 64        Line 6

              Now Reads:  of the...
              Should Read:  of position...

              Reason:  clarification

Errata
Page 8


Page 64        Line 16

                      Now Reads:  accelerated...
                      Should Read:  ...uniformly forward by the advancing...

                      Reason:  clarification

Page 66        Line 25

                      Now Reads:  that that..
                      Should Read:  that the roughly...

                      Reason:  clarification

Page 72        Line 21

                      Now Reads:  is useful...
                      Should Read:  is useful for is that it's ...

                      Reason:  clarification

Page 80        Line 16

                      Now Reads:  ...rear-end collisions...
                      Should Read:  ...rear-end collisions that were...

                      Reason:  clarification

1    deposition is as follows:

2            Mr. Ronald Favre - 02:28

         Mr. Gregory D. Callihan - 00:00

3

4            I further certify that I am neither counsel for,

5    related to, nor employed by any of the parties in the action

6    in which this proceeding was taken, and further that I am

7    not financially or otherwise interested in the outcome of

8    the action.

9            Certified to by me this _21st_ day of

10   _June_____, 2005.

11

12   _Delcine M. Benavides by hym_

     DELCINE M. BENAVIDES, Texas CSR 4721

13   Expiration Date:  12/31/05

     Firm Registration No. 77

14   9901 IH-10 West, Suite 630

     San Antonio, Texas  78230

15   (210) 331-2280

16

17

18

19

20

21

22

23

24

25

## A

**able** 5:6 30:21
**about** 4:21 5:11,11
13:23 16:11 17:9
19:20 20:15 25:25
28:5,16,21 29:11
33:14 34:2,25 35:22
36:20 41:15 43:24
47:5,10 48:4 51:17
61:12,20 62:12 63:25
64:11 69:10,17 70:17
77:12 80:22 82:7
**above** 27:13 51:25 59:1
60:17 83:13
**above-styled** 1:17
**absorbed** 53:24
**abstract** 36:24
**accelerate** 54:5 56:10
57:19
**accelerated** 54:6,10,15
64:16 81:6,16,17,19
**accelerating** 54:24,25
57:22 59:21 81:3
**acceleration** 31:18,22
31:24 59:18,23 69:10
69:11,18
**accelerations** 31:10,11
34:4 35:14 51:1,5
59:17
**accelerometers** 32:10
**acceptance** 28:17
**accepted** 28:6,10
**accident** 8:25 11:15
54:4 67:9,20 68:1,6,7
68:9 69:7 70:12
77:19,21,24 78:2,6
78:10,11,13
**accidents** 69:2 78:21
**accomplishments**
13:19
**according** 30:5
**accurately** 46:15 48:3
**ACE** 19:3
**achieve** 81:8,20
**acknowledged** 83:21
**act** 53:21
**action** 1:4 63:9,14 84:3
86:5,8
**acts** 42:19
**actual** 29:25 37:10 38:6
38:21
**actually** 10:5 16:23
23:13,14 26:25 32:9
45:17 51:25 60:21
62:20
**adamant** 59:4

**add** 34:12
**address** 4:5,9,9,10
**adheres** 49:22
**advance** 5:5
**adversely** 45:19
**affected** 26:19 45:19
75:21
**affix** 83:12
**after** 13:16 24:17 37:3
57:9 62:9,20 68:6
85:1
**again** 5:8 22:7 26:17
27:16 31:8,25 32:19
35:2,10 36:4 37:19
38:7,11,15,18 42:6
44:5 45:21 55:4
56:13 58:23 62:10
63:13,24 64:10 67:24
71:7
**against** 63:19
**age** 31:16,17
**Ages** 24:21
**aging** 3:19 7:20 45:15
46:1
**agree** 40:19,22 63:1
**agreement** 85:6,12
**ahead** 55:25
**aid** 71:9
**aimed** 28:4
**Air** 11:19,20
**al** 5:18 6:5,14,22 7:3,13
**allege** 27:4 35:6
**alleged** 17:13 21:6 51:7
**allow** 43:13
**allowed** 56:10
**allowing** 53:5
**allows** 43:2,15 51:11
63:3
**Allstate** 21:4
**almost** 14:6 42:17
54:11 79:17 80:9,11
**alone** 79:25
**along** 48:17 85:7
**already** 5:4,24 58:17
60:2 70:25 82:11
**alter** 34:12
**altered** 43:13
**alternate** 71:15 72:2
**amongst** 31:15
**amount** 85:25
**analyses** 60:24 77:25
**analysis** 3:14 6:6 11:15
24:15 27:19 31:9
35:11 37:6 38:12
67:1 78:8
**analyze** 26:23 37:20
50:24 69:20

**Anderson** 6:13
**and/or** 8:23,24 9:1
53:15
**angles** 80:22
**annulus** 41:18 42:11
43:8
**another** 34:7 43:16
45:6 49:19 71:12
77:15 82:18
**answer** 63:10 80:14
82:11
**answered** 82:11
**answers** 70:11
**Antonio** 1:21 4:8 14:9
86:14
**anything** 20:15 59:7
63:20 68:16 73:8
75:4,5 82:7
**anywhere** 50:23 56:3
69:13
**appear** 55:23
**appearances** 3:3 22:11
**appeared** 83:19
**appears** 42:4 56:14,15
**applied** 57:14 63:3
**apply** 69:13
**appreciate** 59:16
**appreciation** 36:11
51:5 81:10
**approach** 50:20
**approaches** 52:12
**approximately** 54:7
**arbitrary** 58:9,12,13
**Archives** 7:3
**area** 12:2,4 26:4 30:2
39:3 46:7 48:10,17
49:2,17 61:8
**areas** 9:7 26:6
**arm** 48:21
**around** 52:15 59:1
60:16,25
**arrived** 64:18
**article** 6:4,8,13,16 7:9
7:15,21 8:2 9:15,18
9:25 10:6 24:22
25:10,11,15,16,19
26:15 29:11,11 30:21
30:25 32:7 38:23,25
39:10 43:24 44:21,21
45:1,6
**articles** 8:22 9:7,10,10
9:13,23 10:4 23:8,10
23:11,14,14,16 29:12
29:13 30:2,3 46:9
**asked** 14:1 25:2 67:24
71:18 77:1 78:23
82:11

**asking** 5:14 10:4 20:4
25:9,14 33:14,16,21
36:13 39:20 61:25
62:2 63:13 65:5
71:12 77:22
**ASSOCIATES** 2:4,7
**assume** 29:25 30:7,9
35:20 39:16 53:1
54:22 56:23 65:11
74:23
**assumed** 53:25 56:7
70:19
**assuming** 38:15 45:23
55:4,7 66:6 71:13
**assumption** 34:7 54:6
66:8,12 70:15 72:18
73:7 75:24
**assumptions** 53:19
70:19
**asymptomatic** 45:22
**attached** 1:23 34:10
56:25 75:25 85:5,11
85:20
**attaching** 75:22
**attain** 54:8
**attempt** 25:6
**attended** 10:20 11:20
13:11,17
**attorney** 74:11
**attribute** 61:7
**attributed** 35:24
**August** 14:6
**author** 49:21
**automobile** 3:18 7:7
27:18 69:2 78:21
**Automotive** 44:20
**available** 52:1,2 85:4
**average** 31:13
**aware** 27:7 44:14 71:11
73:6,9,11,13 75:5
77:9,11,15 82:1,3
**away** 20:12 42:10
55:20,21 57:20
**axial** 41:20
**A.I** 8:6

## B

**B** 3:11
**Babbitt** 19:3
**bachelor** 10:21
**back** 3:21 5:14 9:14
11:15 16:12 18:11,15
18:20 19:11,17,24
20:22 21:18,23 22:4
25:8,17 32:4 37:20
40:2,2 46:8,10,11,11
46:13,15,20,21,23

47:12,15,18,21,23
48:3,5 49:3,4,5 56:2
59:2,20 61:15,21
62:20,25 63:2,3
64:11,15,16 67:9,16
67:22 68:1,4,20,22
68:23 79:5,7
**background** 10:18
11:17 79:16
**backward** 33:19
**bad** 63:13 68:12 71:12
**Bain** 1:11,15 3:5 4:1,7
4:13 73:25 83:12,15
83:19 84:10,17
**Bain's** 20:5
**ball** 52:16 53:5
**barrel** 63:20
**base** 9:14 42:5
**based** 25:22 58:10
59:12
**basically** 43:1
**basing** 67:2
**basis** 82:19,20
**Baton** 2:8
**became** 54:15
**become** 45:23,25 62:8
**becomes** 27:13 45:24
**before** 1:19 5:3 32:19
41:24 50:12 56:4
59:25 83:18
**beforehand** 81:9
**began** 11:23 23:6
**beginning** 11:25
**begins** 43:8
**begs** 46:20
**behind** 66:5
**being** 17:3 38:12 45:17
55:19 59:11 60:24
64:12 71:22 85:1
**belief** 28:19
**believe** 5:23 10:15
18:14 19:7,14 20:21
20:23 21:3 22:1,2,5,7
26:10 30:14,17 34:24
39:1 43:20 44:4
50:13 61:9,16 62:6,7
62:11 63:2 64:17
65:20 66:4 67:21
77:13 78:7
**below** 65:3
**Benavides** 1:19 84:13
86:12
**bend** 52:13,14,15,18,22
70:10,14 75:7,11
**bends** 52:18,21
**benign** 28:20
**bent** 52:3,14

(210) 331-2280
9901 IH 10 West, Suite 630

ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 558-3670
(800) 969-3027

besides 60:10
between 42:10 68:16
bibliography 44:2
Billy 21:12
biochemical 11:3
Biodynamic 14:9,11
  37:23
Biodynamics 76:8
biomechanic 22:19
  76:5
biomechanical 11:4,9
  14:5 22:12,15,16,17
  33:18 34:11 40:1
  41:5,11,17 43:19
  45:4 77:19 78:17
  79:16
biomechanically 73:12
biomechanics 11:16
  16:20 22:13,14,18
  32:20,22 40:20 43:19
  44:7 60:2 61:16 62:5
  62:7 76:7 80:1
biomechanic's 39:12
biomedical 9:5 28:13
  28:14
bit 59:25
blank 18:18
board 13:1,5,9
bodies 42:9
body 9:5 23:16 26:5,7
  31:17 32:8 39:3 42:9
  61:19 64:2,3
bolted 57:2,3,5,6,11,11
  57:13,15
bone 41:14,18,21,24
bones 42:13
book 9:18 45:8
both 11:23 12:19 22:1
  24:2 27:7 37:11,12
  42:4 47:10 65:16,20
  68:8
bottom 51:22
Boulevard 4:8
brackets 71:1
brake 27:18 55:12,16
  55:18,19,21,23 56:2
  59:1
braking 3:15 6:14
  26:13,19
Brant-Zawadzki 8:1
Brault 7:2
Braun 5:17
BRC 11:15 82:2
break 49:25 56:6
Breaud 1:3,3 4:17,18
  55:13 56:18 59:10,14
  65:1,21 66:3 67:8

72:16 73:5 83:2,2
  84:3,3
Breaud's 52:11 53:7,9
  53:23 55:3,8,11,19
  56:12 66:1 67:12
  70:19 71:22 72:22
  75:18
Brief 41:23 68:24
briefly 10:25
bring 4:22 9:15
broad 9:20
brought 62:11
build 31:16,17
bulge 43:9,12
bumper 53:7
bunch 39:9 67:7
business 4:9,10
butt 41:19 46:2
B.ENG 1:11,15 3:5 4:1
  83:12,15,19 84:10,18

_____ C _____

C 1:3 2:1 83:2 84:3
cadaver 42:8
calculate 55:3 56:9
calculated 58:10 75:11
  81:9
calculation 55:5 71:21
  71:25 72:1
calculations 8:20 33:4
  53:14 57:25 59:8,12
  70:2,16 71:6,8,14,20
  75:21
called 45:9
Callihan 2:7 5:3,13,16
  8:14,17 9:17 17:23
  18:3,7,12 20:3,8 25:9
  25:13,19 32:25 33:5
  33:7,11,14 34:19
  36:15 45:3 50:17
  61:20,25 66:7,12
  68:10 73:23 74:4,10
  74:17 82:10,23 86:2
Callihan's 50:10
Calridge 21:12
came 30:17 66:5
camera 55:22
Canada 12:6,9,19 13:4
  13:7 23:4 78:24 82:9
Canadian 11:19
capacity 16:19
card 83:20
care 67:12
career 23:6
carried 44:3
cars 72:9
case 4:17 9:11 10:2,8

16:15,23 17:3,9,9,11
  17:21 18:11,15,17,20
  18:22 19:6,9,16 20:9
  20:13,18,20 21:1,2
  21:15 22:4,9 33:1,1,7
  46:25 50:24 54:21
  55:24 66:20 73:19
  79:25 80:4
cases 15:12,13 16:21,25
  17:8,18,22 18:6,6
  22:21 78:21 79:1,10
  79:13 82:5
CASTEEL 2:7
Castro 6:21
casualty 82:5,18,19,20
caught 17:13
causal 40:16
causation 29:8 82:4
cause 1:18 9:1,1 41:10
  41:21 43:21 44:9
  45:24 46:3 48:18
  51:14 63:14
caused 61:14
causes 42:20,20,23
causing 46:23 52:13
cautioned 84:21
Center 67:19
certain 21:3 22:5,7
  64:4 81:8,20
certainly 32:20 33:25
  53:11 54:16 61:3
  72:10 78:7 82:14
certificate 3:8 13:3,14
  13:16 84:9
certification 13:5,9
certified 12:19,21,24
  84:13 85:2 86:9
certify 84:14 86:4
cervical 28:5 31:25
  32:17 33:20 35:12,13
  36:10,18,19
chance 61:13
change 32:22 33:17
  34:14 59:25 69:24
  72:21 73:3 83:3
Changes 3:7 83:1 85:8
chapter 39:12 45:2,8
charge 84:23
Charles 1:11,15 3:5 4:1
  4:7 83:12,15,19
  84:10,17
charts 14:23
check 16:3 81:24
Chemical 10:23
chronic 21:21
circle 28:18
cited 25:16 33:10

cites 39:17
Civil 1:4,22 84:3,25
claim 18:16 24:23
claimants 40:14
clarify 48:7
classic 42:8
Clifford 21:24
clinical 3:17 7:6 14:17
  14:18 23:19 26:11
clinicians 46:10
closing 66:25
coefficient 72:8,9,11,12
collated 24:8
collating 39:6
colleagues 28:18
collecting 36:23
College 10:20 11:18
  13:3
collinear 80:25,25
collision 3:18 7:14
  17:22 18:13 19:22,23
  23:13,21 24:17 26:20
  27:8 30:11 37:21
  46:1 56:6 60:3,20
  61:6,17 62:6,9 63:1
  64:10 73:6 78:5
collisions 3:16,18 6:16
  7:7 23:18,20 24:1
  26:3,15,18 27:11
  28:20 31:12 33:18
  35:3 44:9 60:8,15
  61:2,10 76:20 78:1
  80:16,25 81:1
come 27:19 31:5 42:14
  52:10 55:11,18,23
  59:1 69:20 72:5,15
  75:25
coming 47:22 48:1,12
  48:13,20 49:1,1 56:5
comment 32:19
comments 30:4,5
commissioned 50:9
common 11:12 46:8,16
  46:18,19 55:14
commonly 43:5
communications 73:21
community 28:12,13
  28:16 29:19 44:12
  46:24
companies 76:9,12
company 76:8 77:14,16
Compare 51:8
compartment 69:15
complain 62:8
complaining 61:18
complaint 48:8,9
complaints 35:24,25

36:2 67:8,25
completed 13:17 84:24
complex 42:9
Complies 16:7
components 56:24
compressing 59:21
compute 69:5
concerning 41:8
conclude 54:12 58:22
concluded 82:24
conclusion 30:24 40:4
  40:5,6 72:3
conclusions 8:20 9:12
  35:22 45:11 53:15
  80:13
condensed 85:7
condition 21:22 45:19
conditions 25:18,22
conduction 48:23
confused 45:21 71:17
conjunction 47:4 79:15
  79:17
connected 75:3
connection 76:24
consequence 56:5
consequently 56:12
conservation 55:3
consider 77:18,18
  80:20
considerably 75:19
consideration 64:8
  83:21
considerations 70:1,4
considered 66:16
consist 54:23
consistent 54:24
consisting 48:22
consultants 77:14
consulted 8:24
contact 50:10 52:15,17
  52:22,24 53:4
contacted 58:21
contain 67:8 77:20
contained 43:23
contend 60:2
content 43:5
context 60:19
continue 11:17 57:21
continuing 20:4,10
contracting 63:18,19
contradicted 40:13
  41:3
controlled 48:10
controversial 49:17
convince 60:20 61:11
copies 5:10 73:20
copy 10:11,13 50:7

85:7
**Corporation** 14:10,12
  37:23
**correct** 4:15 8:13 10:7
  12:7 18:9 22:13,20
  24:22 27:1,2,9 32:18
  39:24 42:1,22 44:16
  45:7 46:5 47:8,9 55:9
  56:20 58:20 77:2
  83:13 84:15
**corrections** 85:5,10,20
**correlate** 31:19
**correlates** 49:10,11
**correspondence** 73:24
**counsel** 85:6,12 86:4
**count** 57:20 70:21
**County** 16:17 83:17
**couple** 24:2 52:11
  53:19
**coupler** 52:7
**course** 4:15 18:7 52:1
  73:23
**courses** 13:17,20
**court** 1:1 15:12 22:11
  78:12 84:1
**courts** 15:8 77:10
  78:17
**cover** 57:24
**Covington** 2:5
**crashes** 75:3
**Cronan's** 67:15
**crush** 68:25,25 69:1,2,5
  69:6,11,11,13,17,20
  69:22 70:1,4,7 71:4
  71:14,18 72:4,13
**crush-based** 72:14
**crush-related** 71:8
**CSR** 1:19 86:12
**culture** 61:8
**Curriculum** 3:22
**CV** 10:11 13:22 14:3
  15:5,10
**C.C.F.P** 1:11,16 3:5
  4:1 83:12,15,19
  84:10,18

**D**

**D** 1:6 2:7 3:1 84:5 86:2
**damage** 8:25 41:14,15
  43:21 52:4,5,9 53:6
  54:19 63:14 70:8
  71:4,18 72:4
**damaged** 43:20 66:22
  67:3 69:7 70:16,18
  71:10,13
**dancing** 64:16
**dangling** 42:13

**data** 28:4 30:18,25
  32:10,12 33:18 64:21
  75:2
**database** 75:2
**date** 41:12 67:20 68:9
  68:18 74:5 86:13
**dated** 38:5
**day** 1:18 29:9 37:1,2
  45:23,23 46:1 62:24
  83:18,23 86:9
**days** 38:5 62:24 63:22
  68:20,23 85:1,10,18
  85:22
**de** 21:24
**deal** 51:23
**dealing** 32:1,2
**deals** 41:6
**Deborah** 21:12
**declined** 24:2
**defendant** 19:1,2,18,19
  21:8,9
**Defendant(s)** 1:8 2:6
  84:8
**defer** 29:2,4
**definitive** 24:10
**deform** 55:4 70:21
**deformation** 69:3
  71:23
**degenerates** 43:3,15,16
**degenerating** 45:22
**degeneration** 3:19 7:20
  41:6 43:13
**degenerative** 25:22
  40:11 45:12 46:17,19
  46:22,22 47:16,19,20
  47:22
**degree** 10:22 11:18
  13:14 22:17 53:4
**degrees** 52:15 81:1
**Delcine** 1:19 84:13
  86:12
**Delta** 27:13 51:24
  52:10 55:4,6,17 56:8
  56:12 58:18 59:3,5
  59:13,14,18 60:4
  69:21,22 72:5,15,20
  72:23,24 73:1 75:17
  81:10,12
**demonstrate** 40:1
**demonstrated** 41:12
  60:22
**denied** 23:2
**denies** 66:4
**Department** 10:23
**depends** 33:23
**deposition** 1:10,15 5:6
  5:8 58:3 65:15 66:1,9

66:10,14,17,19 73:7
  73:9,14 74:8 82:24
  83:12 84:10,15,17,24
  85:3,3,7,12,13,15
  86:1
**depositions** 65:25
**describe** 35:2
**describing** 27:17 32:3
  39:7
**description** 3:13 83:20
**descriptive** 24:9 27:16
  31:8 35:10 37:19
  38:11
**design** 11:1
**detail** 30:21 36:4
**detailed** 24:15
**details** 31:9
**determine** 47:25 48:20
  48:25 60:9 69:10,18
  69:22
**determined** 75:22
**determining** 60:9
**develop** 63:5,21,21
**developed** 62:4
**development** 21:21
**device** 34:5
**diagnose** 48:3
**diagnosed** 46:11,11,15
**diagnoses** 29:7
**diagnosis** 79:19
**diagnostic** 48:22
**Dicamillo** 16:14,22
  17:3,11,13
**difference** 22:14 27:10
  27:12,13 33:16 55:12
  55:13 57:4,7,10,17
  57:25 64:3,9,12
  70:13 73:12
**different** 31:1 34:1
  43:10 50:19 52:11
  78:16 80:12,19,22
  81:2,7,7
**differential** 63:3
**differently** 42:19
**difficult** 31:19 72:8,14
**direction** 84:23
**directions** 43:11
**directly** 56:23 79:23,23
  80:14
**disagree** 40:24
**disagrees** 44:8
**disappears** 46:13
**Disc** 3:19 7:20
**discipline** 44:7 77:18
**disciplines** 11:13
**discomfort** 62:20
**discounted** 53:24

**discuss** 40:17,19
**discussed** 5:4 34:22
  58:17 70:25
**discusses** 40:15
**discussing** 5:12 45:12
**discussion** 40:9 41:23
  61:8 68:24
**disease** 3:20 7:21 45:12
  45:17 46:17,19,22,22
  47:17,19,21,22 76:2
  76:5,7
**diseased** 42:2 43:20
  45:22
**disk** 18:15,17 19:11,13
  19:24 21:18 22:4,6
  39:7 40:10,12,23
  41:2,7,10,12,15,18
  41:22,25 42:2,2,3,4,9
  42:9,11,12,13,16,20
  43:2,4,5,7,8,9,11,15
  43:18,20 44:9 45:12
  45:22 46:4,17,19,22
  46:22 47:17,19,20,22
  48:10 49:3,4,5,10,18
  61:21,22 76:1,5,7
**diskography** 49:14,15
  49:16,16
**disposal** 30:2
**distance** 54:10,13 56:7
  56:11 58:10,17 59:13
  81:15,18,19
**distances** 81:2,7
**distancing** 65:18
**DISTRICT** 1:1,1 84:1
  84:1
**DOCKET** 1:5 84:4
**doctor** 10:17 14:4
  22:24 47:1 74:18
  76:4 79:24 82:9
**doctors** 48:19
**document** 5:19,24 9:25
  10:7 15:11 74:2
  83:20
**documentation** 74:6
**documented** 24:5 26:21
**documents** 4:22 8:11
  8:14,20,23 9:3 20:8
  47:7 50:4
**Dodge** 52:6,10,20 53:2
  53:7 55:8 58:7 65:17
**doing** 15:2 39:6 59:20
  71:21
**done** 29:24 31:10 38:12
  50:12 60:24 62:19
  71:24 76:16 80:9,11
  80:12,17,20 81:1
  82:23

**door** 17:14
**double** 54:16
**doubt** 45:1 59:5
**down** 15:17 30:20 31:4
  46:12 48:21 51:20
  62:23 63:22 65:3
  77:9 81:2
**downwards** 52:22
**dozen** 16:10
**dozens** 44:2
**Dr** 4:13 20:5 38:25
  42:7 43:24 44:22
  45:8 67:15 73:25
  77:5 81:22,23 82:1
**drawing** 18:18
**Drive** 2:8 20:12
**driver** 57:19 65:2,8
  66:20
**driving** 64:6
**drove** 52:13
**drying** 43:5
**Duces** 4:15,21 8:12
  10:10
**due** 47:19 84:24
**duly** 1:17 4:2 84:20
**dummy** 37:9,9,16
**dump** 21:16
**duration** 24:13,14
**during** 26:20,23 57:22
**dye** 49:15
**dynamic** 41:19 42:1
**dynamics** 50:25
**D.H** 7:13

**E**

**E** 1:11,15 2:1,1 3:1,5
  3:11 4:1 83:12,15,19
  84:10,17
**each** 5:4 13:16 15:13
  34:9 35:20 43:10
  85:25
**earlier** 4:14 17:16,17
  23:9 46:2 48:2 63:23
  67:24 78:23
**easily** 68:21
**education** 13:22,24
  14:2
**educational** 10:18
  11:17 13:19
**Edward** 4:7
**effect** 3:15 6:14 26:13
  34:6 65:21
**effort** 31:12
**efforts** 24:9
**eight** 15:12 17:16 24:3
  45:5 47:3,4
**either** 11:9 28:24 45:18

(210) 331-2280
9901 IH 10 West, Suite 630

ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 558-3670
(800) 969-3027

66:20
ejected 41:20
Electrical 48:22
electromyography
  48:23
elements 69:14 77:20
elevator 16:14,21 17:1
  17:14
Elizabeth 19:21 80:6
emergency 11:24 12:5
  12:14,20 28:18 67:18
  68:17 79:18
employed 14:4 37:22
  77:7 86:5
employment 14:11,12
empty 54:5
end 5:18 51:11 53:16
  53:17,18 54:19 58:14
  58:15,16 72:24,25
  81:19 82:15
energy 53:22,24 55:4,8
  70:20,21 71:22,23
energy-based 71:2
  72:14
engineer 14:5
engineering 9:5 10:22
  10:22,23,24 11:3,4,8
  11:9,11,12,14 22:12
  22:15,16,17
engineers 43:19 44:20
enough 59:3
entail 76:19
Enterprises 1:6 4:18
  83:2 84:6
entire 32:8 69:14 80:21
entities 76:10
episodes 46:10,13
  47:18 48:5 68:4
error 23:20 25:2,5
  27:15,20 31:6 35:9
  38:10
estimate 52:6 56:17
  67:5
estimates 52:2 54:21
et 5:18 6:5,14,22 7:3,13
etiology 46:12
even 22:7 49:3
event 26:24 32:4 37:3
  41:13 42:1 45:20
  58:16 61:14 68:18,23
  71:8 73:11,13
events 28:7 63:4 78:3,7
  78:9
eventually 52:19
ever 9:18,19 23:2 50:12
  74:18 76:1,4 78:11
  79:24

every 9:17,18,18 29:9
Everything 8:17
evidence 40:11 43:22
  43:23 47:20 56:13
  60:6
evident 70:7
exact 56:24
examination 3:6 4:3
  56:18 85:23
examinations 13:2
  26:11,12 27:24,25
  36:3
examine 56:15
exceed 51:15
except 54:19 83:13
exceptions 46:6
excess 81:13,14
exclusively 76:9
Excuse 47:1 49:9
executed 83:21
exhibit 6:2,3,11,12,19
  6:20 7:1,11,12,18,24
  8:5,10 15:6,23 16:2
  17:24 18:4 23:19
  34:17,23 37:6 45:6
  47:1,5 49:21 79:7
exist 49:2
existing 75:2
expediency 5:12
experience 36:5 54:20
  57:18 60:6,7,17,18
  60:22 61:3,6 62:15
  62:16
experienced 24:6,12
  26:21 31:21 32:6
  36:25 38:3 51:6 62:5
experiencing 26:2
Experiments 23:24
expert 15:8,13 16:15
  16:19 22:12,13,18,23
  23:2,4 78:12,19 79:8
expertise 30:2 78:17
Expiration 86:13
exposed 9:6 62:3
expressed 83:22
extended 37:2
extensively 40:10
extremely 46:8

          F
facet 48:10
facility 68:18
fact 46:24 58:6 66:8,21
  67:2
factors 60:9 63:25
facts 33:9 53:6
fairly 40:8

fall 41:19 46:2
family 11:24 12:5,8,13
  12:19 13:4,7 79:18
far 20:9 31:21,23,24
  36:7 47:19,19 59:2
  68:2 74:5
Farm 18:11 20:17
fast 54:4
faulty 40:16
Favre 2:3 3:6 4:4,13
  5:9,14,17 6:4,13,21
  7:2,6,13,19,25 8:6,11
  8:16,19 9:21 15:7,15
  15:24 17:25 18:2,5,9
  18:10,13 20:6,11
  25:11,15,23 33:2,6,8
  33:13,16 34:2,21
  36:17 37:5 41:24
  45:5 50:6,18,22
  61:23 62:1,2 66:10
  66:13 68:11,25 74:1
  74:7,11,16,18 82:16
  86:2
Federal 1:22 84:25
feel 40:18 44:10 49:17
  49:19 78:4,8
feet 53:3 54:7,10,13,15
  54:17,25 55:15,18
  56:4,8 57:23,24
  58:11,25 59:13
felt 63:11
female 24:19
fibers 43:10,12
fibrous 42:11
field 9:8 11:8 12:24
  44:6
fighter 41:20
final 81:17
financially 86:7
find 29:14 36:7 40:7
  70:12 72:10,11 75:14
findings 24:10 55:15
fine 5:13,16
finger 17:13 48:12,17
firm 50:10,12 86:13
firmly 34:9
first 4:2 11:12,13 16:10
  29:11 41:21 42:24
  43:3 46:15 50:9,24
  51:12,21,25 66:17
  70:7 73:7,18 74:2,3,5
  84:20
firsthand 25:10,12
five 11:19 15:12 24:3,4
  27:13 50:2 59:15,18
  60:4,15,25 75:12
Flores 21:24

Florida 77:12
flow 42:18,19,21,21,23
  42:24,24
focus 28:8
follow 25:13 50:22
followed 36:8 37:25
following 11:18,21,23
  36:6 64:18
follows 4:2 43:18 86:1
follow-up 36:3 37:2
foot 55:11,19,21,22,23
  56:5
force 11:19,20 69:5,8
  70:9 75:6
forces 33:25 51:1,14
  57:13 59:12 63:3
foregoing 83:12,21
  84:15,17
forget 60:1
formal 13:22,23 14:2
formed 9:13
forming 9:22 10:1
  23:10 26:16 47:8
formula 9:18
formulas 69:8,19 72:14
formulating 14:23 39:5
forth 5:15
forward 33:19 52:13
  53:23 54:3 55:21
  56:4 59:18,20,21
  64:13,16 65:17 70:20
four 15:12 34:16,17,18
  34:19 37:14 59:19,23
  62:24
fourth 80:4,5
fracture 41:22,24
frame 54:9 56:23,25
  57:22 70:23 71:5,19
Frances 19:3
freight 17:14 53:21
frequency 47:15,16
frequently 40:13 41:3
from 1:18 5:10 10:3
  11:16 13:14 23:15
  24:5 26:15 37:4,21
  39:17,17 40:16 43:14
  46:18 47:19,22,24
  48:1,13,16,20 49:1,2
  50:5 51:3 52:5 54:20
  55:2,5,20,21 56:4
  57:20 59:15 64:21,23
  64:24 66:4 67:4
  68:17 69:3,11 79:25
  80:5,5,18 81:3 84:9
  84:24 85:22
front 22:3
full 84:15

Florida 77:12
full-sized 85:8
full-time 82:18
further 5:3 43:21 85:16
  86:4,6
F-350 19:7

          G
G 59:19,23
gamut 80:17
Garfin 7:19
gather 49:24
gathered 39:9,21
gave 24:13 32:9 79:11
general 9:9,24 10:17
  11:22 28:19
generalization 46:5
generally 23:9 28:6,10
generate 69:9
generated 33:25
George 20:17
Gerald 21:12
gets 56:4 59:1
getting 28:4 36:17
  71:17
give 10:17 15:15 29:8
  30:12,21 31:13,13,20
  38:6 73:18 77:19
given 13:16 27:20
  60:16 75:13 76:4,6
  79:19,24 83:23
giving 74:2
go 5:3 9:14 15:17 16:12
  36:6 47:12 51:10,21
  51:22 53:18 59:2
  79:5
goes 40:15 61:15
going 17:23 18:4 20:3
  20:10 33:23,25 41:20
  43:4 44:5,5 45:23
  52:21,22 54:7,16,18
  56:1,3 58:14 61:21
  63:17,23 64:15 70:12
  72:22 81:11 82:10
good 25:12 29:16 44:1
  48:2 49:11
Gough 7:13
government 74:19
Grady 21:12
grants 74:19
greater 56:8,9 58:18,18
  59:6
green 65:17
Gregory 2:7 86:2
ground 52:15,17,20,21
  52:23,24 53:4
group 29:18 30:1 49:17
  49:19,22

**guess** 71:12 74:4 77:22

---

**H**

**H** 3:11
**half** 16:10 56:2
**hand** 17:21 48:11,15
83:23
**handed** 47:1
**happen** 43:2
**happens** 43:3,7
**harness** 52:8
**having** 4:2 68:22 84:20
**head** 27:12 30:22 31:10
31:11,18,22,24 32:11
32:14 33:19,24 34:6
34:10,12,14 35:14
37:21 50:22 58:21,21
58:24,25 59:3,4,5
73:16
**heads** 59:2
**healthy** 42:2
**heavy** 33:24 63:20
**height** 43:8 53:1
**Heights** 4:7
**helmet** 32:23,24 33:22
34:3,8,9
**helmets** 33:5,12,17
**her** 18:16 21:22 85:4
**hereinbefore** 84:18
**hereto** 1:23 85:5,11,20
**Herkowitz** 7:20
**herniated** 18:17 19:13
22:6 42:20 61:21,22
**herniation** 41:22
**herniations** 39:8 44:9
**high** 47:15,16 59:15
**higher** 54:16,17 56:12
56:13 58:19
**highly** 59:5
**Highway** 2:5
**high-speed** 78:2,5,5,9
**him** 18:3 20:5 22:3
25:9,14 33:14 50:17
54:24,25 55:7,20
56:1,3 59:11,21 66:5
74:1,7.
**himself** 56:19
**HINGLE** 2:4
**history** 3:22 15:16
**hit** 22:2 53:21 54:18
55:7 58:24 59:3,4
**hitch** 52:16 53:2,5
56:21 70:17,18,18,25
71:5,19 74:21,25
75:22
**hitches** 56:25
**hold** 77:21,23

**holding** 78:1
**hole** 42:14
**Holland** 1:7 4:19 65:20
83:2 84:7
**Hollycrest** 2:4
**home** 4:9
**Hospital** 11:23 68:19
**hospitals** 82:17
**hour** 24:4,5 27:13
54:11,19,23 55:6,7,9
55:17 56:1 58:8 59:2
59:4,15,18 60:16,25
62:15 66:21,25 72:22
72:23,24 73:1 75:12
80:18,18 81:13
**Howard** 6:5
**human** 3:14,14,15,17
3:18 5:18 6:6,14 7:6
7:14 23:15,17,19
26:14,17 30:12 34:23
37:6 62:18 80:24
**humans** 11:16
**hurt** 61:2,3
**hurts** 46:4
**H.N** 7:19

---

**I**

**idea** 31:20 69:8 75:10
**identified** 9:23 23:8
**identify** 5:10 17:21
**identity** 83:20
**IH-10** 1:21 86:14
**images** 52:5 56:16 67:4
**imaging** 3:20 81:1 47:6
**immediate** 31:5
**immediately** 36:6
**impact** 3:14 5:18 24:3
40:13,23 41:2,9
43:21 51:2,21 52:3
55:16 56:11 57:9
58:6 59:11 62:4
66:21 67:1 69:4,21
72:17 73:15 77:25
78:8 81:8,8,14,17,21
**impacted** 24:3
**impacts** 3:15,17 6:7,23
24:12 26:22 32:1
37:7
**impairment** 43:4
**impending** 73:6
**implies** 52:8
**imply** 22:16 53:7 81:13
**important** 75:16 81:16
**inability** 40:12 41:2
**Inc** 1:6 4:18 83:2 84:6
**incident** 26:1
**include** 32:4

**including** 9:2
**indicate** 18:6 54:21
73:8
**indicated** 67:25
**Indicating** 17:25
**individual** 27:25 51:3
63:17
**individuals** 24:1,11
27:17 30:1,13 31:11
31:15,16,20,21 35:15
35:25 44:3,10,15
45:9 46:20 60:5
65:20
**individual's** 26:19,23
37:20 51:15 62:23
**information** 11:2 30:20
50:20 61:10 65:8,19
**initial** 50:10 64:17
**injection** 49:15
**injure** 62:25 63:2
**injured** 61:9,16
**injuries** 3:16 6:22
20:25 36:18,20 39:2
40:3 60:7 82:4
**injury** 3:21 8:6 9:1,2
17:14 18:15,16 19:11
19:24 20:2,22,24
21:6,18,20 22:4 28:8
32:21 38:23 41:21,21
49:1 51:6,7,7,13,14
51:14,15 60:3,24
61:19,20,23 62:12,13
62:16 63:4 64:3 76:1
**inside** 18:6 43:14 48:12
48:15
**inspected** 70:23,24
**installed** 56:21
**instance** 1:16 24:25
**Institute** 13:12,15
**instructed** 85:13
**instrument** 83:21
**instrumental** 35:16
**instrumented** 32:13
**insurance** 76:9,12
**interchangeable** 69:12
**interest** 32:20
**interested** 86:7
**internship** 11:22
**interpreted** 68:21
**introduced** 4:13
**intrusion** 69:11,14
**invariably** 46:12
**investigated** 36:2
**investigator** 30:4
**involve** 19:11,13,15,23
20:1 21:18,20,22
27:21 35:12,17

**involved** 14:21,23 21:5
21:21 23:12 24:11,19
59:10 63:5 69:21
**involvement** 14:25
79:25
**involves** 23:17
**involving** 11:15 78:21
**inwards** 69:15
**in-house** 82:21
**iron** 74:21
**issue** 33:11
**issues** 79:9
**item** 5:4 6:8,16

---

**J**

**James** 16:14
**Jefferson** 82:5
**jelly** 42:16,18
**Jensen** 7:25
**Jhoun** 5:18
**John** 1:7 4:18 83:2 84:7
**Johnny** 20:12
**journal** 30:1,6,19
**journals** 8:23 39:17
**June** 1:12,18 67:17,17
67:22 82:14 84:11,19
**just** 5:11 9:2 10:16,17
11:7 13:25 16:3 20:3
20:9 23:9 28:3 29:19
31:2 34:9 36:13 39:9
40:4,21 41:5 45:15
47:1 48:7 50:14
51:17,25 54:14,20
57:18,19 58:15 61:25
63:18 68:4,17 71:14
78:9
**J.B** 6:14 7:2
**J.H** 5:17
**J.P** 7:13
**J.R** 7:2

---

**K**

**keeps** 45:22
**Kern** 16:22,22,25 17:3
17:4,4,6,7
**Kernel** 82:4
**kilometers** 24:4
**Kinematic** 3:14 6:6
37:6
**kinematics** 3:16 6:15
26:14 34:14
**King** 8:6 38:25 42:7
43:24 44:22 45:8
**Kingston** 10:21 11:21
**knew** 25:2 71:9
**know** 16:2 18:21 23:20
25:7,16 29:14,16,22

**29:24,25 30:7,9 31:6
33:9 35:9 38:15,22
42:21 44:15,16,25
48:11 49:7,21 52:24
56:21,24 57:3 66:8
67:20 70:9,11 71:1,4
71:18,24 72:16 73:2
73:3,5,5,18 74:21,23
74:24 75:2,6,13 76:8
76:11 77:3,5,13
81:22 82:1,7,13
**knowledge** 9:14,24
10:3 26:6 28:17 40:1
40:1 41:6 62:7
**known** 83:19
**knows** 25:9,11,14
48:10

---

**L**

**LA** 2:5,8
**Lady** 67:19
**Lake** 67:19
**Lane** 68:19
**large** 29:19 31:17
49:19
**last** 40:8 60:12 82:9,13
**later** 66:18
**lawsuit** 76:24 77:1
**layer** 43:10,14,16
**layered** 43:9
**lead** 63:6
**leaning** 64:13,14
**least** 37:2 43:24 57:17
64:17
**led** 44:3
**left** 11:20
**length** 24:6 53:3
**lengthy** 40:8
**less** 27:7 27:14 54:23
59:6 60:18 62:14,21
66:23 73:15
**let** 40:7 47:12 59:25
81:24
**let's** 4:21 5:1 6:2,11
13:23 15:5,17 16:11
17:20 23:8 26:13
49:24 50:2,6,14
51:17 53:18 59:14
69:17 78:23
**levels** 51:7
**license** 12:22 15:1
**licensed** 15:2
**lift** 63:20
**light** 34:5 65:16,17
72:10
**like** 14:21 32:17 42:15
42:17,17,18,24 43:9

46:2,9 48:8 50:24
**likely** 51:24 57:16
**limit** 67:1
**limited** 9:2 77:14
**Linda** 18:10 21:4
**Line** 37:5 83:3
**liner** 53:21
**list** 5:5 15:11,14,15,17
16:1,4,10,21,22 17:6
17:21 18:8 65:3 79:1
**listed** 13:22 14:3 25:19
36:16 65:7
**lists** 44:2
**literature** 8:22 9:6
23:17 36:22 39:7,11
39:13,15,16,21 41:11
41:17 44:11 46:25
60:23 62:10 80:21,24
**little** 16:3 27:2 59:25
**living** 46:1
**Lloyd** 81:22,23 82:1
**load** 40:13,23 41:2,9
**loaded** 19:8,8 21:16
**loading** 41:20 42:1,12
**localize** 49:18
**long** 14:4 43:1 57:11
81:18
**longer** 56:11
**long-standing** 45:13,18
**look** 9:11 10:5,13 15:24
23:8 26:13 30:14
36:21 45:18 46:8
48:3 50:6,14,25 51:3
51:6 52:1,25 53:1
60:13,14,23 62:14,18
**looked** 9:25 26:19
36:22
**looking** 26:4,6 54:3
**loses** 43:8
**losing** 43:5
**lot** 27:14 41:16 50:20
55:15,17 64:12
**lots** 47:22
**Louisiana** 1:1 77:10
82:5 84:1
**low** 3:16,16,18 6:15
7:14 18:11,15,20
19:11,17,22,23,23
20:22 21:18 22:4
30:11 40:2 47:15
53:16,17 62:20,25
64:11,15 67:9,16
68:1,4 73:14 76:22
**lower** 58:5 75:19
**low-impact** 44:8 60:3
61:2,17
**low-speed** 6:22 26:14

27:11 32:1 35:3
37:21 59:10 62:6,9
62:14 64:10 77:25
78:7
**low-velocity** 3:15 6:7
23:12,17 24:17 26:2
26:18 28:19 31:12
37:7 55:14 58:23
59:15 60:7,14 61:10
62:18 63:1 80:16,17
80:24
**lumbar** 3:19,20 7:20
8:1 28:2,5,7 32:1,12
32:18,21 33:21 35:17
35:18,20,22,25 36:20
36:21,22 45:10 59:22
76:1,5,7
**lying** 57:8
**L.L.C** 2:4

─────── M ───────

**M** 1:19 6:21 84:13
86:12
**machine** 1:20
**made** 22:11 39:22 54:6
55:13 70:15 72:18
74:21 75:24 85:5
**Maghee** 2:8
**MAGISTRATE** 1:7
84:6
**Magnetic** 3:20 8:1
**magnitude** 31:21 62:4
**mail** 85:2
**major** 46:23
**majority** 23:13 28:8
48:5 57:21 62:3
**make** 20:3,10 24:9
27:10,11 29:7 31:12
34:7 51:11 53:19
55:12 57:4,7,10,17
57:25 64:2,9,11
70:13 71:5,19 73:7
73:10,12
**makes** 33:16
**making** 30:24
**male** 24:19
**manner** 48:24
**many** 30:15 35:4
**Maria** 21:24
**mark** 6:2,11,19,25 7:11
7:17,23 15:5,22 16:1
18:3
**marked** 5:24 6:3,12,20
7:1,12,18,24 8:5,9,10
15:6,23
**Marvin** 1:3 4:17 83:2
84:3

**mass** 33:23 34:2 53:21
53:25
**material** 42:12,13,16
43:15
**math** 11:13
**Matson** 19:20,21 80:7
**matter** 38:5 43:20
**may** 8:25 9:19 18:8
30:19,25,25 32:5,5,6
55:11 57:8 58:21
62:1 67:16,18,21
68:18 82:15,15
**maybe** 15:15 48:8 56:4
59:23 63:13
**McConnell** 6:5
**McGill** 18:10
**McNish** 77:5
**McVey** 21:24
**McVey's** 22:1
**mean** 24:13 31:18 33:1
35:13 39:16 47:21
52:17 53:8 54:14
64:12 81:17
**meaning** 64:6
**means** 40:23
**meant** 60:12 68:21
73:16
**measure** 34:4 35:13
**measurements** 35:15
**mechanical** 61:18
**mechanics** 64:3
**mechanism** 33:19
34:12 40:10 51:13,14
56:24 66:6
**mechanisms** 51:6
**medical** 9:5 11:20
13:20 14:15,17,20,23
15:1 22:24,25 28:12
28:16 45:9 46:24
51:8,16 67:7,19
78:18,19 79:8,9,11
79:15,24
**medicine** 7:3 11:9,23
11:24,24 12:2,5,8,13
12:14,20,20,22 14:22
14:22,25 48:9 79:18
**Memorial** 68:19
**memory** 20:5
**men** 24:13 26:1
**mention** 66:17
**mentioned** 48:2 63:23
64:1
**method** 48:24 71:15
72:2,5 75:22
**MICHAEL** 2:4
**mid** 40:2 59:22
**MIDDLE** 1:1 84:1

**Mid-Continental** 82:5
**might** 39:19 53:4 54:8
**mild** 63:17
**mile** 66:25 80:18
**miles** 24:4 27:13 54:11
54:19,23 55:6,7,9,17
56:1 58:8 59:2,4,15
59:18 60:15,25 62:15
66:21 72:22,23,24
73:1 75:12 80:18
81:13
**Military** 10:20·11:18
**mind** 10:8 48:7 50:20
**mine** 10:17
**minimal** 59:12 61:1
**minimize** 34:6
**minor** 36:25
**Minority** 62:4
**minus** 24:17 31:19
**minute** 4:22
**minutes** 50:2
**misconception** 42:15
47:14
**missed** 47:12
**missing** 16:9
**mistaken** 45:7
**misunderstood** 39:19
41:16 63:24
**modified** 30:5
**momentum** 55:3
**month** 82:14
**more** 16:9 30:18,19
32:18,20 33:20 40:22
68:16
**morning** 46:4
**most** 24:1 36:5 63:17
77:13 80:23
**motion** 26:23 27:12,17
35:2 37:20 73:15,16
73:16
**mounted** 56:23 71:1
**mouthful** 6:7
**move** 43:15 53:9,18,19
53:23 55:20,21
**moved** 51:1,4 54:2
55:14 63:11 65:17
**movement** 26:20 27:18
32:3 42:25 44:16
**movements** 32:9
**moves** 23:12 43:17
**moving** 52:20,20 59:20
69:15 70:20 72:16
**MRI** 25:22 27:25 46:18
47:5,21
**much** 31:15,19 32:2,20
33:23 70:19 73:4
**multiple** 20:25

**muscle** 63:6,8,12,14,18
**muscles** 63:18
**muscular** 62:15
**must** 67:24
**myself** 28:18 77:23
**M.C** 7:25
**M.D** 1:11,15 3:5 4:1
83:12,15,19 84:10,18
**M.N** 7:25

─────── N ───────

**N** 2:1,5 3:1
**name** 4:5,13 9:4 83:20
**named** 84:18,19
**nature** 21:6
**near** 80:4
**Nebraska** 1:7 4:18 83:2
84:7
**necessarily** 49:7
**necessary** 49:9 51:12
73:2
**neck** 20:25 21:22 25:7
25:17,21 27:12,25
28:3,9 31:10 32:2,4,7
32:19 34:1 35:14
36:1,25 37:20 48:16
61:13 62:16 73:17
**need** 5:8 16:2 71:4,18
71:24
**needed** 69:8
**needle** 49:13
**neither** 86:4
**nerve** 48:17,20,23 49:1
**neurologic** 27:23
**Neurologists** 28:25
**neurosurgeon** 60:11
**Neurosurgeons** 28:23
**never** 22:23,25 76:16
**next** 6:4,13,21 7:2 19:3
26:13 30:11 43:7
**nicely** 39:1
**nine** 9:2,23 15:12 16:11
17:7
**noise** 63:5
**nonclinical** 14:22
**normal** 3:19 7:20 45:15
56:2 64:6
**normally** 54:10,25
56:10
**Northwestern** 13:11,15
13:20
**Notary** 83:25
**note** 67:18
**noted** 23:14 83:13
**notes** 73:24
**nothing** 36:20 45:24
46:2 84:22,

(210) 331-2280
9901 IH 10 West, Suite 630

ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 558-3670
(800) 969-3027

**noticed** 15:10 36:24
**notified** 85:2
**nuclear** 10:22,24 11:1
11:8,11
**number** 4:11 5:1,17,23
6:8,17,25 7:4,19,25
8:4,6,9 17:7,17,23 19:19
27:2,19 30:12,21
31:3,5,17 34:16,17
34:18,20 36:15 37:5
45:5,5 46:7,17 49:21
54:14 58:13
**numbered** 1:18
**numbness** 48:11,14
**numerical** 32:10
**numerous** 39:17,15
**nutrients** 43:4

**O**

**O** 72:25
**oath** 83:19
**object** 9:19 33:24 34:1
62:1 74:1 82:10
**objection** 20:4,10
32:25 73:24
**observations** 64:18
**obvious** 60:10
**obviously** 37:2 56:18
**occasions** 76:18,19
**occupant** 3:15 6:15
23:12 26:14 69:16
**occupants** 35:2,20
**occupant's** 32:3
**occupied** 28:1
**occur** 3:16 6:22 41:21
44:11 53:4 60:3
**occurred** 53:6 73:15
**off** 5:1 16:10 30:21
41:23 50:9 52:16
53:5 55:11,18,23
56:6 59:1 62:2 63:25
65:11,14 68:24 75:25
**offered** 10:22 76:17
**offering** 78:9
**office** 5:4 73:21,22
83:23 85:4
**officer** 82:18,19,20
85:3,13,15
**offsets** 81:1
**Oh** 36:14 65:3,7,11
74:15
**okay** 4:21 5:21 6:11,19
6:25 7:11 10:10,16
13:23 15:5,17 16:5,8
16:12 17:9 18:10
20:11,20 22:19 23:9
34:25 35:6 36:9

43:23 48:7 50:1 61:5
65:1,5,13,16 67:7,11
68:11 74:7,16 79:7
80:9
**once** 27:12 30:18 43:11
54:9 55:15,16 57:17
**one** 6:4 12:11,13 15:11
15:16,24,25 17:23
18:1,2,3,18 19:3,17
20:25 26:13 30:11
34:15 35:2 37:1,2,16
40:23,23 42:7 44:22
45:15,20,23,23 46:3
46:7,8 47:7 48:16
52:12 53:16,20,21,25
54:5 55:14 57:10
61:12,12 62:24 65:10
67:16 72:20 77:15
80:4,4,18 82:18,18
82:19
**ones** 9:11 15:25 16:3,12
17:20,22 65:7 67:11
79:7 80:3
**one-time** 41:13
**ongoing** 68:23
**only** 8:11 26:25 32:13
46:14 48:4 70:8
75:14
**Ontario** 10:21 11:21
**onto** 58:6 67:1
**open** 10:5 61:8
**opinion** 8:24 9:22 10:1
23:10 26:16 40:15
41:7 45:25 47:8
51:12 73:19 77:19
78:10 79:15,24
**opinions** 14:24 29:8
39:5 64:19,22 76:17
79:11,19
**opposed** 28:5 32:23
**ORAL** 1:10,15 84:10
**order** 4:25 57:21
**organizations** 76:6
**original** 30:23 61:15,21
85:3,8,13,17,19
**originally** 75:25
**originate** 47:23 48:16
**originating** 11:16
**orthopedic** 27:24 28:22
**orthopedics** 28:21
**orthopedist** 60:11,13
**other** 8:19 9:3,9,10,11
9:13,23 10:3,4 12:11
12:13,17 13:19,19
14:1,11,12 30:18,20
31:3,20 40:17,24
41:4 42:10 45:16,25

46:3 47:23 50:25
51:15 53:18 55:22
57:10 61:18 62:12
67:17 75:11 76:10
83:20
**others** 18:8
**otherwise** 40:18 76:12
86:7
**Otis** 16:14,21,25
**ourselves** 4:14
**out** 9:15 24:10 29:14
30:3,17 36:7 39:4
41:20 42:14 43:5,11
43:14 44:3,10 61:10
64:5,5,6,13,14 75:4
75:15 77:21,23 78:1
81:24
**outcome** 86:7
**outline** 67:5
**outlined** 38:3
**outlining** 31:10
**outside** 43:18
**over** 9:6 15:16 16:5
43:17 50:22 54:7,10
54:15,24,25 56:11
62:10,10 80:17 81:6
81:15,18,19
**overly** 9:19
**own** 50:15 54:20 57:18

**P**

**P** 2:1,1
**page** 3:13 10:5 36:15
51:22 83:3
**pain** 3:21 21:21 46:8,10
46:11,11,13,15,20,21
46:23 47:15,18,21,23
47:25 48:4,5 49:3,4,5
49:18 61:13 62:3
67:9,16,22 68:1,4,20
68:22,23
**paper** 26:19 30:5,14,17
31:4,8,9 76:1
**papers** 28:9 29:16
38:22 39:17 44:2
60:23 62:25
**paragraph** 40:7,8
50:15,16 62:2 64:17
64:19
**paraphrasing** 66:11,13
**Pardon** 39:14 65:23
**Parish** 82:5
**part** 9:14 15:10 26:20
33:13 35:18 36:23
58:22 66:8
**participants** 26:25 27:3
36:25 62:22

**participated** 35:21
**particular** 9:15,25
23:10 25:23 26:18
28:4
**particularly** 9:22 26:4
40:14,22
**particulars** 20:9
**parties** 85:24 86:5
**party** 85:25
**part-time** 82:19,20
**passenger** 64:15 69:15
72:9
**past** 9:6 15:16 55:17
**path** 43:18
**pathology** 49:2
**pathophysiology** 39:7
41:7
**patient** 36:24
**patients** 14:24 29:7
79:20
**pattern** 43:12
**peak** 31:22,24
**pedal** 55:12
**peer** 29:12,13,14,17,20
30:8,9 38:13,18,22
44:25 45:1
**peers** 29:18
**pelvic** 40:2
**pelvis** 3:21 8:7 37:20
38:24 59:22
**Pennsylvania** 16:17
**people** 3:21 24:1,6,16
24:19 25:17,20 26:9
33:17 37:14 41:17
46:13 60:6,17,17,21
61:1,6,9 62:8,15,20
63:4
**people's** 48:5 55:15,18
58:24 59:2
**per** 24:4 27:13 55:6
56:1 60:15 62:15
72:23,24
**percent** 24:16,18 31:19
46:10 48:4 60:21
61:13 62:21,22
**percentage** 46:14 62:20
62:21
**Percival** 19:20 80:4,6,6
**performed** 24:15 35:11
**period** 63:7
**periods** 62:17
**permanent** 69:3
**permitted** 82:3
**person** 32:22,23 60:10
64:5,12 83:20
**personally** 83:19
**perspective** 40:16

45:13
**Peterbilt** 54:2,18 57:16
58:7 66:19,20,23
67:1 72:11 73:10
**phenomenon** 45:14
**Philadelphia** 16:17
**phone** 4:11
**physical** 7:3 8:25 62:12
62:12
**physician** 22:23 23:1
27:24 67:12 68:19
76:7 79:18 82:21
**physicians** 13:4,7 28:19
29:6 40:13,14,17,19
40:21,22,24 41:3,4,8
42:15 48:24,25 49:17
49:19,22
**physics** 11:13
**pick** 58:8
**picked** 58:13
**pickup** 53:23 75:23
**pickups** 22:1
**pictures** 52:1
**pilot** 11:19
**place** 63:4 66:6 73:24
**placebo** 60:14
**places** 48:15
**plaintiff** 18:25 19:18
21:7,10
**plaintiffs** 1:17 19:16
76:13,14,17 84:24
**Plaintiff(s)** 1:4 2:3 84:4
**play** 11:8 53:14
**Plaza** 2:4
**please** 4:6 11:7,17
**plus** 24:17 31:18
**point** 9:4 31:2 39:2
42:4 45:17 52:14,22
77:15
**points** 40:11
**police** 65:12,14
**pop** 52:16 53:5
**population** 24:24 27:5
35:7 38:8 47:16,17
**portion** 32:13
**position** 44:12 45:15,16
64:2,4,5,6,7,13
**possible** 34:6 53:12,13
53:17
**possibly** 65:14,14
**post-radiographic**
27:21
**post-test** 26:8,11,12
27:23,25 36:7
**potential** 32:21
**poundage** 75:6
**pounds** 70:10,11,14,14

(210) 331-2280
9901 IH 10 West, Suite 630

ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 558-3670
(800) 969-3027

75:14
**practice** 11:4,9,25 12:5
12:22 14:15,17,20
**practiced** 12:17
**practicing** 11:23 14:22
**pre** 27:23
**preceded** 68:22,23
**preliminary** 64:19
**present** 26:1 51:13,14
72:13
**presented** 9:11,24
24:14
**presently** 11:14
**pretty** 38:16,16
**previous** 36:10,19 47:5
**pre-existing** 25:17,21
25:21
**primarily** 82:18
**primary** 26:22 67:12
**principal** 30:4
**principle** 55:2
**prior** 25:7 67:9 68:1,2
68:7,8 81:20
**probable** 53:12
**probably** 40:7 42:7
43:3 44:15 46:25
52:14 53:2 56:3
64:11
**problem** 49:4
**problems** 25:8 46:7
49:4,5
**Procedure** 1:22 85:1
**proceeding** 86:6
**process** 3:20 7:21
36:23 40:12 43:3,13
45:16,17 51:9,10
**produce** 4:25
**produced** 1:16 8:12
**product** 73:23
**Prognosis** 79:22
**program** 22:17
**prominent** 39:12
**properly** 57:13
**properties** 74:24
**proposed** 51:7
**protocol** 36:7
**proved** 83:19
**provided** 5:5 8:18 9:7
15:25 17:6,16,17
56:17,17 65:4 79:3
**provisions** 1:22
**psychosomatically**
61:17
**Public** 83:25
**publication** 6:5 30:23
38:17,19 47:7
**publications** 31:1

**published** 30:18,19
38:25 45:2
**pull** 63:12
**pulling** 19:8 57:20
65:13
**purpose** 25:24
**purposes** 83:21
**pursuant** 1:21 84:25
**put** 16:3 18:5 33:24,24
58:5 67:1
**putting** 34:5
**p.m** 1:19,19 37:4,4 50:5
50:5 82:24

_____

**Q**

**qualifications** 78:16
**qualified** 15:7 78:4,8
78:11,19 79:8
**Queen's** 11:21
**question** 11:6 25:14
29:16 34:11 39:20
44:13 46:21 48:19
51:4 61:15,21 62:5
63:13 64:1 71:3,16
72:2 78:23 80:14
**questions** 10:19 20:4
**quickly** 62:23

_____

**R**

**R** 2:1
**radiographic** 26:8,12
**radiographically** 36:2
**raised** 71:2
**range** 24:14 31:13 53:4
58:25 59:19 60:16
62:14 80:17 81:10
**rapidly** 81:19
**rate** 23:21 25:2,5 26:1
27:15,20 35:9 54:6
**rates** 81:8
**rather** 5:14
**rating** 31:6 38:10
**RE** 83:2
**reach** 35:22 40:4 54:12
64:21 71:14
**reached** 40:5
**reaching** 8:20 9:12
64:14 72:3 80:13
**reaction** 56:2
**reactor** 10:25 11:1
**read** 8:23 9:18 25:15
36:4 40:21 50:17
66:14 83:12
**reading** 31:4 85:6
**real** 70:8
**really** 5:9 46:14
**rear** 3:16 5:18 6:23

21:17 22:2 52:9 53:6
56:14 66:4,22 67:2,5
**rear-end** 3:14,15,16,17
3:18 6:7,15 7:7,14
17:17,22 18:6,13
19:9,22,23 20:20
21:18 23:13,20,21
24:1 26:2,14 28:20
30:11 31:12 33:18
34:22 35:3 37:7,21
44:8 46:1 59:11 60:7
60:15,20 61:1,10
62:9 63:1 64:10
76:19 80:16
**reason** 26:22 31:14
54:17 83:3
**reasonable** 54:22
**reasons** 61:18
**recall** 17:10 20:1,13,15
20:17,24 21:4,5,13
21:20,22,25 22:6,9
22:10
**receipt** 85:2
**receive** 52:6
**received** 5:7 10:21
64:23 85:22
**recent** 68:16
**recently** 10:14
**Recess** 37:4 50:5
**recipient** 74:19
**reconstruct** 78:2
**reconstruction** 11:15
54:4 69:7 70:12
77:20,21,25 78:6,10
78:12
**reconstructionist** 77:22
77:24 78:2,13
**record** 1:23 4:6 41:23
51:8,16 68:17,24
**recorded** 68:20
**records** 65:4,5 67:7,8
67:15,25 68:3 74:12
**red** 65:16
**reduced** 84:22
**refer** 5:22 8:19 26:10
38:5 44:2 67:13
**reference** 67:18
**references** 67:16,22
**referred** 5:24 6:16 7:9
7:15 43:6
**referring** 17:2 38:21
49:14 55:24
**refers** 69:14
**reflexive** 63:6,8,9,14
**regard** 85:17
**regarding** 20:5 70:4
76:5 82:4

**regards** 27:17 39:2
40:2 52:9 80:19
**Regional** 67:19
**Registration** 86:13
**regroup** 50:4
**Rehabilitation** 7:3
**relate** 47:18
**related** 21:22 36:1 86:5
**relating** 32:5
**relatively** 28:20
**release** 85:13
**released** 85:16
**relevance** 32:25 33:1,2
**reliable** 49:20
**relied** 9:13
**remember** 18:16,18
20:6,7 21:1 64:1
**remembers** 18:8
**repair** 52:2,6 54:21
56:17 67:4,5
**repeat** 71:16
**rephrase** 11:7
**replace** 52:7
**report** 5:22 32:12
39:22 40:4 50:6,9,15
50:21 51:22 65:12,14
**reported** 1:20 32:9
36:24 52:4
**reportedly** 54:2
**Reporter** 7:5 84:14
**Reporter's** 3:8
**representative** 9:7
23:16 24:24 26:17
27:4,5 35:7 38:7
**request** 9:19,21,21
**requested** 5:1 6:8 8:17
8:22 20:9 85:2
**requesting** 9:17
**required** 70:10
**research** 8:23 14:9,11
37:23 39:2 44:3
**Resonance** 3:20 8:1
**responds** 29:20
**response** 3:17 4:14 7:6
8:12 23:19 63:19
**Responses** 3:14 6:6
37:7
**responsibility** 85:16
**rest** 58:21,25 59:3,5
**restate** 11:7
**restrained** 65:2,8
**resubmitted** 30:6
**result** 24:16 25:4,5
26:22 32:3 37:1
41:13 43:9 51:2
55:16 56:6 58:15
81:20

**resulted** 38:4 59:11
**resulting** 17:14 37:21
**results** 24:8 37:18 38:2
43:4 69:3
**retained** 73:18 74:2,3,5
**return** 85:2
**returned** 30:4 85:10,20
**review** 5:6 9:9 29:12
30:2 36:9 38:13,22
44:25 65:6 66:1
67:25 85:4,9,15,19
**reviewed** 8:23 29:13,15
29:17,20 30:8,9,23
38:18 39:11,15 45:1
47:7 67:7 68:3
**reviewers** 30:3
**reviewing** 14:23 30:20
**rheumatoid** 48:9
**right** 17:14 23:22,23
28:6 34:17 37:24
39:25 42:21 44:1,5,6
48:11 58:5 61:24
62:1 71:3
**ring** 42:11 48:12
**risk** 28:8
**rolled** 55:25
**roll-over** 78:5
**roll-overs** 78:3
**Ron** 4:13
**Ronald** 2:3 86:2
**Ronetta** 19:20 80:6
**room** 67:18 68:17
**Rouge** 2:8
**roughly** 24:4,11 58:25
66:25
**Royal** 10:20 11:18
**rubbery** 42:17
**Rules** 1:22 84:25
**run** 43:10 75:15,18
80:16
**rundown** 10:18
**rupture** 40:10,12,23
41:2,7,10,12,25
**R.D** 6:13
**R.P** 6:5

_____

**S**

**S** 2:1 3:11
**SAE** 29:16 38:17,22
44:19,21
**same** 10:14,16 16:23
17:3,8,9 31:17,17
45:8 47:10 54:25
72:3,6,25 83:13,21
84:22
**San** 1:21 4:8 14:9 86:14
**satisfy** 10:10

(210) 331-2280
9901 IH 10 West, Suite 630

ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 558-3670
(800) 969-3027

saw 67:4
saying 41:4 46:24
  47:13 57:12 68:11
  50:15 74:2
scale 58:15
Scarborough 11:22
scenario 53:10,14,17
  55:1
Schilgen 6:22
school 11:20 44:7,8,13
science 41:11 48:9
scientific 40:11
seal 83:23
seat 59:20 64:15,16
second 24:3 56:1,1
  59:24 66:18 73:9,14
seconds 54:7 57:24
section 1:6 40:9 84:5
securely 57:5,6,11
see 10:13 16:21 17:4
  33:25 40:7 46:9,21
  54:19 64:19
seeing 14:24
seem 36:18 52:5 60:15
seems 10:10 16:9 32:17
  36:5 60:16
seen 46:18
self-employed 82:17
seminar 76:4
sensitivity 80:12,19,22
  81:2
sent 30:3 85:9
serious 9:2
served 11:19
Service 20:13
set 30:17
setting 41:19
settle 63:22
settled 62:23
settles 46:12
seven 15:12 35:5,6
several 35:1 48:15
  68:20,23 78:16
severe 63:14
severity 9:1
sex 31:16
shape 75:7
Sheet 85:8
Sherry 50:11
shift 54:9 57:22 58:1,4
  58:6
shifted 57:17 58:1
shifts 82:13
short 13:20 63:7 81:19
shorthand 1:20 84:13
shoulder 17:15 20:2

show 23:11 74:12
shown 42:6 58:23 62:9
shows 65:4
sick 42:2
side 64:14
sign 57:20
signature 3:7 83:1,12
  85:4,8,10,15,19,23
signed 85:21
significant 41:14,15
simply 24:8,10 27:17
  32:3
since 5:7 20:8 33:10
single 40:12 41:2,9,9
sir 7:21 14:14,17 15:9
  20:16 21:11 22:22
  23:3 28:3,11 29:1,3
  29:10 50:1,8 55:10
  56:16,20 57:3 58:2
  58:13 59:9 64:20
  66:2,15 67:10 68:15
  69:23 70:5,24 71:3,7
  71:16 73:16,20 74:20
  75:1,9,13,24 76:3,15
  76:21,23,25 77:2,4
  77:17,23 78:3,9,15
  78:20,22,25 79:4,6
  79:12,14,21 80:2,8
  80:10 82:6,8
sitting 30:20 31:4
situation 27:18
six 7:13 15:12 56:4
size 31:15
sizing 42:11
slow 40:11 42:25
slowly 43:16 81:18
slowly-progressive
  45:14,19
small 21:16 46:14
  62:19
society 44:20 60:19
  61:9
soft 42:16
solely 22:25 78:13
some 16:9 23:11,14
  25:21 31:21 36:21,21
  52:14,22 54:19 60:23
  63:25 81:1,11
somebody 22:3 60:20
  61:11
someone 59:3 78:1
something 40:21 47:13
  48:9,13 62:12 63:24
  64:14 65:21
somewhat 43:18
somewhere 30:15
somewhere's 48:21

some-odd 66:18
sorry 11:4 12:12 14:1,2
  17:2,2 18:13,19
  29:23 31:11 36:14,14
  39:19 47:13 62:22
  65:3 68:8,13 70:18
  71:16 80:10 81:5
space 43:15,17
speak 28:22,24 29:4
  31:1
specialize 12:2
specialty 12:8,15,18,24
specific 10:19 36:19
specifically 9:4,10 10:1
  11:3,11 30:10
specifics 21:1 29:25
  77:13,15
specify 34:8
specimen 42:8
speed 3:16,16,18 6:15
  7:14 19:22,23 30:11
  54:15 56:11 58:6,6
  58:16,18 59:1 66:21
  66:23,25 72:23,25
  73:2,14 75:10 76:22
  81:8,9,14,17
speeds 80:13,20
spend 73:1
spinal 32:12 59:22
spine 3:20,21 8:2,7
  28:2,5,5,7 31:25 32:1
  32:18,18,21 33:20,21
  35:17,18,21,23,25
  36:10,23 38:24 41:6
  45:10 59:22 60:3
spoken 79:9
squirting 42:14
stand 44:12
standard 69:7
standing 79:25
start 5:1 14:8 43:14
  50:14 51:23 60:17
started 14:6 55:20
starting 51:24 59:12
  72:25 73:2
startled 63:11,19
starts 43:11,14
state 1:20 4:5 18:10
  20:7,17 30:15 38:21
  40:1 46:10 47:18
  53:12 60:5 62:25
  83:17,25 84:14
stated 1:22 24:10 34:9
  41:1,1 46:2 54:2
  65:21,24 66:3,19,20
  68:4 73:9,13 75:19
statement 41:4 42:5

43:22 60:13 65:15
states 1:1 12:25 13:2
  14:5,13,16,24 15:1,8
  24:24 25:16 40:9
  46:25 78:24,25 84:1
stating 13:17 24:16
  41:5,5 52:7 71:10
statistical 24:15 27:19
  31:9 35:11 38:12
  39:8
statistically 24:23 27:5
  35:7 38:7
statistics 39:9
steel 74:22,23
stenograph 84:19
step-by-step 51:10
stiffness 37:1 72:8,9,11
  72:12
still 14:21 66:24 77:7
  77:16 81:24
Stipulations 3:4
stop 56:3 57:20 66:5,19
  73:10 81:3
stopped 54:2 55:16
  56:5 65:16,18 66:3
  66:20,24 72:16,18,20
strain 43:12 63:6,8,18
strength 74:24
stress 43:12
strictly 78:10
strike 53:8
striking 19:7 52:12
  54:1 81:5,6
stronger 41:18
struck 21:16 22:2 58:7
  66:4
structure 41:18
structures 42:10 47:23
studied 40:10
studies 9:23 25:22 26:8
  33:3 36:22 39:8,10
  39:21,25 42:6,8
  46:18 48:3,23 55:14
  60:14 80:15,17
study 13:9 23:21,21,25
  24:9,10,19 25:3,4,23
  25:24,24 26:1,11,20
  26:23,25 27:3,15,16
  27:21,21 31:7,25
  32:8 33:6,8,9,10,11
  33:13,15 34:3,25
  35:1,4,9,10,12,17,18
  35:21 37:15,19,19,22
  38:4,6,10,11,19,21
  39:4,20,21 47:6
  61:12
stuff 49:24

subject 3:14 6:6 18:7
  23:17 26:18 29:12
  34:9 36:4 37:6 38:13
  38:22 44:25 59:25
  62:19 80:24
subjected 23:25 29:19
  59:11,14,17,22
subjects 3:14,17,19
  5:19 7:7,14 23:15,20
  25:7 27:22 30:12,15
  31:3 32:13 34:23
  35:4 36:5,8 37:10,22
  62:3
submitted 24:2
subpoena 4:15,15,21
  5:5,25 8:12 10:10
subscribed 83:20
substance 42:18
successful 48:4
successfully 13:17
suddenly 63:11,18
sufficient 9:1 74:9
Suite 2:5 86:14
sum 31:13
summarize 10:25 40:9
summarized 42:7
summarizes 39:1 40:8
summary 36:13 44:1
supplying 48:17
support 43:22 56:13
  60:6,24
supporting 8:24,24
supports 66:23
sure 5:2,23 11:6 15:11
  15:14,19 18:24 25:13
  26:12 38:16,16 44:10
  47:11 50:3 60:12
  67:14 68:21 74:15
surgeons 28:22
surgery 18:20 19:15,17
  22:9
surmising 31:2
surprise 63:5
surrounding 42:12
  43:8
susceptible 33:20
sworn 1:17 4:2 84:21
symptom 24:13,14
  48:14,18 49:1
symptomatic 45:23,24
  45:25 46:3 62:8
symptoms 23:14 24:5,7
  24:12,17 26:2,21
  32:5 36:6,10,23 38:3
  38:4 60:7,17,18,22
  61:4,6 62:4,5,6,8,11
  62:16 63:7,21

(210) 331-2280
9901 IH 10 West, Suite 630

ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230

FAX (210) 558-3670
(800) 969-3027

**S.R** 7:19

**T**

**T** 3:11
**tailgate** 53:7
**take** 35:15 49:24 50:2
  50:19 54:7 56:1 63:4
  75:7
**taken** 1:17 60:19 64:7
  71:23 84:19 86:6
**takes** 40:22 42:25
  57:24
**taking** 42:8,10 45:14
  63:25
**talk** 4:21 5:11 13:23
  16:11 34:2 47:10
  51:17 69:17
**talked** 29:11
**talking** 5:11 43:24 47:5
  61:20 64:11 70:17
**talks** 76:6
**target** 28:1 81:3,4,11
  81:12,15
**targets** 25:8
**Tecum** 4:15,21 8:13
  10:11
**tell** 15:25 17:20 34:25
  35:4 38:18 48:13
  50:14 59:6 72:2 74:4
  74:7,11,14 84:21
**telling** 74:1
**tells** 38:19,19 61:11
**ten** 56:4 57:23,24 58:11
  59:4,6,13 62:15
  80:18 81:13
**tend** 58:24,25 59:2,6
**tended** 55:18
**tendency** 46:23 47:17
  55:20 60:1
**tends** 58:5
**tenth** 59:23
**term** 68:25 80:15,19
**terms** 73:1
**test** 3:14,14 5:18 6:6
  23:17 28:4 30:13
  32:7,13 36:6 37:6,9
  45:6 49:20 62:3
  75:15,19 81:2
**tested** 27:7 31:17
**testified** 4:2 15:13
  16:15,23,25 19:18
  22:19,23,25
**testify** 16:19 18:25 77:1
  82:3
**testifying** 3:22 15:16
  21:7,10 23:4 33:20
**testimony** 23:2 58:3

66:9,11 77:9,14
**testing** 3:14,18 5:18
  7:14 26:18 30:11
  31:3 32:17 34:22
  35:12,13 36:18 48:22
  49:6,10,11,13 59:16
  62:19 80:24
**tests** 23:24 36:18,19
  48:19 58:23 80:12,22
**Texas** 1:20,21 4:8
  12:22 15:1,2 23:6
  84:14 86:12,14
**textbook** 9:15 10:5,7
  39:12 45:2,3,4,9
  70:12
**textbooks** 10:4 46:9
  54:4
**Thank** 43:23 67:15
  80:9
**their** 24:5,7,11 26:21
  27:12 28:17 30:1,2
  31:22,24 32:4,8,9,11
  32:14 33:24 35:14
  36:7,8 38:3 40:15
  45:11 58:25 59:4
  62:16 64:15 77:14
**themselves** 78:1
**they'd** 64:13
**thick** 42:17
**thing** 41:16 43:7 46:15
  50:24 51:21,25
**things** 35:1 51:17 72:20
**think** 14:21 15:10
  18:23 19:17 20:25
  28:19 31:14 34:4,19
  37:5 38:4,4 41:1
  42:18 45:17 47:4
  52:8 53:3,11,13 54:9
  54:22 55:19 58:5
  61:22,23,24 62:21
  66:10,22,24 72:10
  73:10 75:4,14,14,17
  75:17 76:17 82:12,22
**thinking** 48:8
**third** 24:11 51:23 80:5
  82:19
**thirty** 85:18
**Thomas** 20:12
**Thoracolumbar** 3:21
  8:7 38:24
**though** 26:23 49:3 53:1
**thought** 17:2 44:7,13
  58:14 68:11 78:23
**thousands** 9:16
**three** 15:12 16:21 24:4
  30:3 34:15 36:25

57:24 59:2,19,23
  60:2 62:23 67:16
  76:18,19,21 82:17
**threshold** 60:24
**through** 10:23 13:25
  30:14 31:4 49:6,10
  51:11 53:22,22 55:8
  57:14 83:19
**thrust** 33:19
**time** 24:6 40:2 43:1
  44:6 47:10 48:4 54:9
  56:2 57:22 62:17
  63:7 84:19 85:25
**times** 38:6 60:2
**today** 4:14 11:10 14:25
  15:3
**together** 42:13
**told** 51:17 65:1
**tolerance** 51:7,16
**tongue** 52:3,7,13,16,18
  52:21 53:3,8,23,24
  55:5 70:9,21 74:25
  75:7
**toothpaste** 42:16
**top** 7:8 13:3 30:22 80:4
  80:5,5
**Toronto** 11:22
**torturous** 43:18
**total** 36:24
**towards** 49:8 51:22
  69:15
**traced** 49:5,10
**tractor** 54:5 75:10
**Traffic** 13:12,15
**trailer** 19:8,8 52:3,7,9
  52:13,19,19 53:2,20
  53:22,24 54:5,18,20
  55:5 56:14,15,21,25
  65:13 66:22 67:3,6
  70:4,9,15,22,25 71:5
  71:19 74:21 75:7,22
**trailers** 72:12 75:3
**trained** 29:7
**training** 77:24
**transcript** 84:16 85:3,7
  85:14,19,21
**transferred** 55:8
**translated** 53:22
**transmitted** 57:14
  71:22
**Transportation** 19:4
**trauma** 46:1
**travel** 56:3
**traveling** 55:25
**treat** 29:7
**treating** 40:14,22
**treatment** 37:1 60:10

60:13
**Trisha** 20:17
**truck** 21:16 52:5,12
  53:18,19,20 55:7
  56:10,22 57:19 70:23
  71:5,5,19,22 73:10
  75:23
**trucks** 57:19,21 72:10
**truck's** 75:13
**true** 33:21 49:6 83:13
  84:15
**truth** 47:20 84:21,21
  84:22
**try** 44:6 48:3 51:4
  52:10
**trying** 35:1 63:20
**Tucker** 21:4
**turn** 54:3
**turned** 65:17 77:9
**twice** 16:22 82:11
**two** 11:12,13 13:3,16
  14:6 15:11,16 16:25
  17:7 19:16 26:25
  31:1 34:15 42:9,12
  45:9 46:17 47:18
  53:2 69:20
**type** 14:20 52:2 59:16
  63:6 71:24 72:1
**types** 42:4 56:25
**typewriting** 84:23
**typical** 48:24,24 78:6
**typically** 30:3 60:18
  63:22 64:13 69:14
  72:8
**T.A** 5:17

**U**

**unaware** 27:7 73:6,8
**unbrake** 57:13
**undamaged** 56:14
**under** 40:12 41:2 42:1
  83:19,23 84:23
**undergo** 81:11
**undergone** 81:12
**undergraduate** 11:12
**underneath** 57:8
**understand** 11:6 12:21
  33:18 41:17 42:25
  56:7
**understanding** 5:7
  41:10 69:20
**underwent** 72:23 73:3
**undiagnosed** 48:6
**uniformly** 64:16
**union** 43:10
**United** 1:1 12:25 14:5
  14:12,15,24 15:1,8

24:24 78:24 84:1
**universal** 40:17
**University** 4:7 11:21
  13:11,15,21
**unknown** 46:12
**unless** 31:16 41:13
  61:17
**unlikely** 54:8 63:22
**unloaded** 65:13
**unusual** 52:2
**updated** 10:14 15:14
**upper** 55:1,1 58:14,15
  58:16 67:1
**upwards** 52:4
**use** 9:23 10:17 17:20,24
  18:4 23:9 39:4 66:21
  69:5,6,7,19,22 70:1
  71:7 72:5,14 73:1
**used** 9:19 11:2 23:11
  23:15,15 26:25 30:13
  31:1,3 32:8 33:3 35:5
  37:9,9,11 39:25 47:6
  48:8 49:18,20 55:1,2
  56:16 69:17 70:21
  80:15 81:3,24 82:1
  85:25
**useful** 72:21
**using** 3:18 7:14 11:14
  30:12 33:8 71:14
  80:19,24
**usually** 56:25
**utility** 19:8 52:9 53:20
  54:18,20 55:5 66:22
  72:12
**utilize** 9:3 15:1 26:15
  48:25
**utilized** 10:1 30:16
  38:23

**V**

**V** 27:13 51:24 52:10
  55:4,6,17 56:8,12
  58:18 59:3,5,13,15
  59:18 60:4 69:21,22
  72:5,15,20,23,24
  73:1 75:17 81:10,12
**Vaguely** 21:5
**validated** 51:16 54:4
**validation** 51:8
**validity** 33:3,9,15
**values** 72:9
**van** 75:23
**variability** 31:15
**variety** 39:17 76:11
  81:7,7
**various** 46:9 51:6
  60:23 62:24

(210) 331-2280
9901 IH 10 West, Suite 630

ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 558-3670
(800) 969-3027

varying 62:17
vast 28:8 48:5 57:21
vehicle 3:15 6:15 19:7
  21:17 22:2 26:14
  28:1 50:25 51:1,4
  52:11,25 53:9 55:3
  55:20,22,25 56:5
  57:1,8,14 64:4 69:6
  69:14 70:19,20 71:23
  72:22 73:2,3 75:18
  81:3,5,11
vehicles 21:5 22:1
  35:16 65:16 69:20
  70:8,24 71:10,13
  72:7 75:3,3 81:4,6,12
  81:16
velocity 48:23 54:1,22
  58:24 69:24 72:21
  81:20
versus 4:18 16:14,25
  18:10 19:3,20 20:12
  20:17 21:4,12,24
  80:6 82:4
vertebral 42:8,9
very 10:25 27:2,11
  29:6 33:24,24 39:1
  42:16,17,25 44:1
  46:14,14,16,18,18,19
  46:19 47:15 48:2
  49:16 53:12,13,17
  62:19,23 63:7 72:7
  72:13,14 73:14 81:18
  81:19
Vicenta 21:24
Vicki 1:3 4:17 83:2
  84:3
view 39:22
violent 63:8,14
visible 70:8
Vitae 3:22
volunteer 62:3
volunteered 25:8
volunteers 36:9,19
VS 1:5 83:2 84:5

_____ W _____
waived 85:24
waking 46:3
Walt's 20:12
want 4:25 16:1 18:3
  25:16 33:9 49:24
  50:17 81:20
wanted 36:19 60:1
Warner 4:18
wasn't 24:15 27:19
  35:10 39:20 57:6
  66:16 67:3 70:7

77:11
watching 57:19
water 42:18 43:5
way 43:11,17 45:18
  57:10 75:14 79:7
ways 47:25 48:2
wearing 32:10,23,23
  33:5,12,17
weight 34:8,12,14
  75:13
Welcher 6:14
welded 57:2,3,11,15
well 5:10 9:13 14:21
  15:17 17:23 18:25
  25:4,15 29:6 30:25
  32:8 33:23 35:20,24
  36:17 37:19 39:6
  42:6,24 45:12 48:14
  49:14,15 50:18 53:16
  54:24 57:18 59:14
  60:12 61:15,25 62:14
  63:10,10 64:10,18
  66:13,17 69:13 70:7
  70:15 72:7 76:11
  78:7 80:14 81:14
well-protected 28:7
well-trained 29:6
went 9:24 13:25 54:3
  68:18 70:20
were 8:12 9:10 17:2
  19:16 20:8,25 21:7
  21:10 22:1 23:2,11
  23:15 24:3 26:4,6
  27:2,7,16,23,24
  29:13 30:15 31:3
  32:3,10,17 33:17
  35:1,16,24 36:1,2
  37:22,24,25 38:1,3,5
  51:1,12,13 55:15
  56:8,16 63:25 65:4
  65:16 67:11,15,23
  68:8,11 71:10,13
  72:13 73:18 80:12,16
  81:3,16 84:22
weren't 24:9 32:2 39:8
  77:1
WERNER 1:6 83:2
  84:6
West 1:21 7:13 86:14
we'll 5:11 6:19,25 7:11
  7:17 16:12
we're 37:5 43:24 48:7
  64:11 82:23
we've 5:3 58:17 63:11
  63:11
Wheeler 7:2
while 4:22 54:3 55:16

Whiplash 3:16 6:22
whole 9:5 17:21 44:11
  44:12 46:7 80:17
  84:21
William 81:23
wiring 52:8
witness 1:16 18:1 25:20
  45:4 50:19 82:13
  83:15 84:18,20 85:1
  85:5,18,22,24,24
women 24:14 26:2
words 50:15,25 51:15
  55:22
wore 34:9
work 11:14 14:6 43:11
  50:12 67:5 73:23
  76:9,10,11,12,14
  81:24 82:2,9,16
worked 82:14,15,17
working 14:8 49:8
works 77:16 81:25
world 23:16 39:22
worldwide 62:19
world's 36:22 39:2,16
  80:21
worms 43:17
wouldn't 5:7 11:2 15:4
  29:3,4 54:16 55:13
  64:11 72:10 75:21
  78:9
write 39:11 51:20
written 13:1 36:12 45:9
  76:1
wrote 39:10
W.E 6:5
W.H.M 6:21

_____ X _____
X 3:1,11 18:5 25:5 85:6

_____ Y _____
Yeah 17:12 18:5 34:21
  49:16 50:2 74:10
  78:14
year 66:18
years 9:6 11:12,14,19
  14:7 15:16 39:18
  79:17
Young 50:11 64:23,25
Young's 73:21
you-all 76:9

_____ 0 _____
00:00 86:2
02:28 86:2
03 68:12,16
03-CV 1:5 84:4

04-15 16:23

_____ 1 _____
1 1:7 3:4,14 5:1,17 6:2
  6:3 34:20,23 62:21
  62:22 84:6
1,000 70:10,13
1:04 1:19
1:58 37:4
10 3:22 15:5,6 54:7,10
  54:13,17,25 56:8
1001 57:20
1002 57:20
1003 57:21
11 3:22 15:22,23
12 67:17
12/31/05 86:13
138 2:8
14 1:12 84:11,19
14th 1:18
15 3:22,22
18-wheeler 18:22,23
  19:6 21:2,15 66:5
190 2:5
1970 10:20
1979 11:20
1983 12:1,2
1994 67:19 68:5
1995 68:5

_____ 2 _____
2 3:3,14 6:9,11,12 37:6
  67:21 68:18
2nd 8:25
2:03 37:4
2:23 50:5
2:25 50:5
20 24:21 54:15 60:21
  61:13 79:17
2002 39:1 45:2
2003 8:25 13:11 14:6
  67:21 68:10,19 82:14
  82:15
2005 1:12,18 84:11,20
  86:10
202C 2:5
21 24:19,19
210 4:12 86:15
22 67:17
25th 67:16
28,000 75:14

_____ 3 _____
3 3:15 6:17,19,20 24:18
  54:7 55:17
3.8 55:6,6,9,25 72:23
  73:1 75:20

3:22 1:19 82:24
30 9:6 52:15 53:3 67:18
  81:1 85:1,10,18,22
331-2280 86:15

_____ 4 _____
4 3:6,16 5:23 6:25 7:1
  34:17
4.7 54:11 58:7,8 66:25
42 23:25 24:19
45 52:15 53:4
4721 86:12

_____ 5 _____
5 3:17 7:4,11,12 23:19
  24:16 48:4 51:22
  54:11,18,23 55:7
  66:21,25 72:22
5,000 70:11,14
5711 4:7

_____ 6 _____
6 3:14,15,16,18 7:17,18
  37:5
600 2:5
630 86:14
691-0281 4:12

_____ 7 _____
7 3:17,18,19,19,20 7:19
  7:23,24 45:6
70433 2:5
70815 2:8
77 86:13
78230 86:14
78249 4:8

_____ 8 _____
8 3:20,21,21 7:25 8:4,5
8.8 72:24
83 3:7
84-86 3:8
860 1:5 84:4

_____ 9 _____
9 3:21 8:6,9,10 49:21
94 67:17,23 68:14
95 46:10 67:17,23
  68:14,16
9901 1:21 86:14

(210) 331-2280
9901 IH 10 West, Suite 630

ESQUIRE DEPOSITION SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 558-3670
(800) 969-3027